1  A. KRISTINA LITTMAN (NJ Bar No. 04350-2005)
   STEVEN D. BUCHHOLZ (Cal. Bar No. 202638)
2    buchholzs@sec.gov
   MARC D. KATZ (Cal. Bar No. 189534)
3    katzma@sec.gov
   ALICE L. JENSEN (Cal. Bar No. 203327)
4    jensena@sec.gov

5

6  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
7  San Francisco, CA 94104
   (415) 705-2500

8

9

10

11

12                        UNITED STATES DISTRICT COURT

13                       NORTHERN DISTRICT OF CALIFORNIA

                            SAN FRANCISCO DIVISION
14

15  SECURITIES AND EXCHANGE COMMISSION,          Case No.

16             Plaintiff,

17      v.                                        **COMPLAINT**

18  NAC Foundation, LLC and ROWLAND MARCUS
    ANDRADE,
19
               Defendants.
20

21

22

23      Plaintiff Securities and Exchange Commission (the "Commission") alleges:

24                           **SUMMARY OF THE ACTION**

25      1.      This case involves the fraudulent and unregistered offer and sale of digital asset

26  securities by Defendant NAC Foundation, LLC ("NAC"), a company that was in early-stage

27  development of a blockchain-based digital token called AML BitCoin, which NAC claimed was

28  superior to the original bitcoin because it had purported anti-money laundering, know-your-

---

COMPLAINT                                    SECURITIES AND EXCHANGE COMMISSION
*SEC V. NAC FOUNDATION, LLC, ET AL.*               44 MONTGOMERY STREET, SUITE 2800
                                             SAN FRANCISCO, CA 94104 ǁ (415) 705-2500

1  customer, and other security features encoded in the smart contracts for the token and was

2  purportedly compliant with regulatory requirements relating to cryptocurrencies, including in the

3  United States.  NAC's founder and Chief Executive Officer, Defendant Rowland Marcus

4  Andrade ("Andrade"), was the primary architect and beneficiary of the fraudulent offering, and

5  with lobbyist and consultant Jack Alan Abramoff ("Abramoff"), NAC and Andrade promoted

6  the offering and raised at least $5.6 million from approximately 2,400 retail investors, primarily

7  in the United States, from at least August 2017 through December 2018.  The Commission has

8  filed a separate action against Abramoff.

9         2.      The tokens NAC offered and sold during the offering, including through an initial

10  coin offering ("ICO") phase to the general public between October 2017 and February 2018,

11  constituted a "security" under the federal securities laws.  The definition of "security" includes a

12  range of investment vehicles, including "investment contracts."  Investment contracts are

13  instruments involving the investment of money in a common enterprise with the reasonable

14  expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

15  Investors in Defendants' offering reasonably viewed the offering as an opportunity to profit if

16  NAC and Andrade were successful in further developing the advertised features of the token and

17  blockchain.

18         3.      NAC's offering materials falsely stated that while the proprietary anti-money

19  laundering, know-your-customer, and other security features of AML BitCoin had already been

20  developed, certain additional features of the token and NAC's "privately regulated public

21  blockchain" were still being completed.  As a result, NAC stated that it would initially issue

22  tokens with the symbol ABTC ("ABTC tokens") that could eventually be exchanged one-for-one

23  for functional AML BitCoin tokens.  NAC issued the ABTC tokens in May 2018, and NAC took

24  steps to make the tokens available for trading on third-party digital asset trading platforms.  The

25  ABTC tokens became available for trading on at least one such platform beginning in May 2018.

26         4.      At no time did the ABTC tokens have any use.  NAC did not have a platform

27  where the ABTC tokens could be used to purchase goods or services or transact any business,

28

1  they could only be exchanged for other digital assets or fiat currencies on certain third-party

2  digital asset trading platforms.  NAC marketed the ABTC tokens to investors who reasonably

3  viewed them as a speculative, tradeable investment vehicle that might appreciate in value based

4  on NAC's and Andrade's managerial and entrepreneurial efforts.  The AML BitCoin White

5  Paper, which Andrade wrote and posted on the AML BitCoin website, stated that AML BitCoin

6  could "appreciate in value through speculative trading … ."

7          5.      NAC and Andrade deceived investors in the offering by making it appear as if

8  NAC had successfully developed the anti-money laundering, know-your-customer, and other

9  security features of the AML BitCoin token.  In reality NAC had not developed any of these

10  features and the company needed to raise significant funds for such development.  They deceived

11  investors by, among other things, making false and misleading statements in press releases,

12  social media posts, and other promotional materials regarding the status of the technology and

13  governmental agencies' interest in using AML BitCoin in their payment systems.  Many of these

14  false and misleading statements were also disseminated through paid articles that Abramoff

15  arranged and helped write, which purported to be written by independent authors rather than

16  disclosing that they were paid promotions of NAC.

17          6.      NAC, Andrade, and Abramoff also deceived investors by making false and

18  misleading statements in press releases and other promotional materials suggesting they were on

19  the verge of airing a Super Bowl commercial for AML BitCoin that they falsely claimed was

20  rejected by the National Football League and NBC because of its political content.

21          7.      Andrade also directly made false and misleading statements to investors and

22  potential investors about many aspects of NAC's business, including the development status of

23  the AML BitCoin token, NAC's financial condition, and purported interest by and negotiations

24  with governmental agencies for use of AML BitCoin in their payment systems.  These

25  statements were made with the intent to deceive or with reckless disregard for the truth.

26

27

28

1      8.      NAC and Andrade also misrepresented to investors that NAC's technology was

2  superior to the original bitcoin, compliant with regulatory requirements, and nearly ready for use

3  in payment systems.

4      9.      At all times, however, NAC and Andrade were aware, and during the ICO

5  Abramoff became aware, that NAC had not developed any of the claimed features of the AML

6  BitCoin tokens and that NAC only had introductory meetings with governmental agencies, none

7  of which had led to follow-up meetings or negotiations about potential use of the tokens in the

8  agencies' systems.  NAC, Andrade, and Abramoff also were aware at least by January 2018 that

9  NAC could not pay for a Super Bowl advertisement, and that the commercial they produced for

10  AML BitCoin had not been rejected by the National Football League or NBC.

11      10.     Andrade also took steps to manipulate the market for ABTC tokens and

12  artificially increase the trading volume and value of the ABTC tokens on digital asset trading

13  platforms.

14      11.     During the offering, Andrade misappropriated approximately $1.1 million of the

15  offering proceeds for his personal use, including approximately $747,000 to purchase a personal

16  residence, $69,000 to buy a Cadillac Escalade, $60,000 to buy a Ford F250 truck, and $226,150

17  to buy a property for his father.

18      12.     In this action, the Commission seeks injunctions; disgorgement of ill-gotten

19  gains, with prejudgment interest; civil monetary penalties; and other appropriate relief.  Unless

20  NAC and Andrade are permanently restrained and enjoined, they will continue to engage in the

21  acts, practices, and courses of business set forth in this complaint and in acts, practices, and

22  courses of business of similar type and object.

23                          **JURISDICTION AND VENUE**

24      13.     The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a)

25  of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and

26  Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act")

27  [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

28

1    14.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1)

2    and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d),

3    21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

4    15.    Defendants, directly or indirectly, made use of the means and instrumentalities of

5    interstate commerce or of the mails in connection with the acts, transactions, practices, and

6    courses of business alleged in this complaint.

7    16.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act

8    [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts,

9    transactions, practices, and courses of business that form the basis for the violations alleged in

10   this complaint occurred in this District.  Defendants met with and solicited prospective investors

11   in this District, and offers and sales of securities took place in this District.

12   17.    Under Civil Local Rule 3-2(d), this civil action should be assigned to the San

13   Francisco Division, because a substantial part of the events or omissions which give rise to the

14   claims alleged herein occurred in San Francisco County.

15                                **DEFENDANTS**

16   18.    **NAC Foundation, LLC** is a Nevada limited liability company formed in 2014

17   with its principal place of business in Las Vegas, Nevada.  NAC is wholly owned and controlled

18   by Andrade.

19   19.    **Rowland Marcus Andrade**, age 42, of Missouri City, Texas, is the Chief

20   Executive Officer ("CEO"), President, founder, and sole owner of NAC.

21                          **OTHER RELEVANT INDIVIDUAL**

22   20.    **Jack Alan Abramoff**, age 61, of Silver Spring, Maryland, is a lobbyist and

23   consultant who provided services to NAC during the offering.

24                            **FACTUAL ALLEGATIONS**

25   **A.    The Securities Registration Requirements and NAC's Offering**

26   21.    Congress enacted the Securities Act of 1933 to regulate the offer and sale of

27   securities.  In contrast to ordinary commerce, which often operates under the principle of caveat

28

1    emptor, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell

2    securities to the investing public to provide sufficient, accurate information to allow investors to

3    make informed decisions before they invest. Such disclosure is ordinarily provided in a

4    "registration statement," which provides public investors with, among other things, financial and

5    managerial information about the issuer of the securities, details about the terms of the securities

6    offering, the proposed use of investor proceeds, and an analysis of the risks and material trends

7    that would affect the enterprise.

8        22.    Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a

9    registration statement is in effect as to a security or an exemption from registration applies, it is

10   unlawful for any person, directly or indirectly, to sell securities in interstate commerce. Section

11   5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell

12   or offers to buy, unless a registration statement has been filed. If a violation of Sections 5(a) or

13   5(c) is established, a defendant may avoid liability by proving that the securities offering

14   qualified for a registration exemption. Thus, Sections 5(a) and 5(c) of the Securities Act prohibit

15   the unregistered offer or sale of securities in interstate commerce absent an applicable

16   exemption.

17       23.    In a variety of circumstances, courts have found that investment vehicles other

18   than traditional stocks and bonds constitute investment contracts and therefore securities. As the

19   Supreme Court of the United States has noted, Congress defined "security" broadly to embody a

20   "flexible rather than a static principle, one that is capable of adaptation to meet the countless and

21   variable schemes devised by those who seek the use of the money of others on the promise of

22   profits."

23       24.    On July 25, 2017, the SEC issued what is often called the "DAO Report." The

24   DAO Report "advise[d] those who would use . . . distributed ledger or blockchain-enabled means

25   for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities

26   laws," and found that digital assets at issue in that matter were investment contracts and therefore

27   securities.

28

COMPLAINT
*SEC v. NAC Foundation, LLC, et al.*                    -6-

1        25.      Beginning in at least August 2017 and continuing through at least December

2   2018, NAC, Andrade, and Abramoff offered and sold digital asset securities.  NAC initially

3   issued ABTC tokens, which had no use during the offering and purportedly could eventually be

4   exchanged one-for-one for functional AML BitCoin tokens.  The offering materials touted the

5   prospect that NAC's efforts to further develop the AML BitCoin token and blockchain, and to

6   establish relationships with third parties for use of AML BitCoin in their payment systems,

7   would increase demand for AML BitCoin and yield profits for buyers.  They also emphasized

8   that only a finite number of ABTC and AML BitCoin tokens would be created, such that rising

9   demand for the tokens would cause their value to appreciate.

10        26.      NAC assured prospective buyers that, following distribution of the initial ABTC

11   tokens, buyers would be able to trade the tokens on various digital asset trading platforms,

12   enabling conversion of the tokens to other digital assets, such as bitcoin or ether, or to fiat

13   currency, such as U.S. dollars.

14        27.      NAC raised at least $5.6 million during the offering from approximately 2,400

15   retail investors, primarily in the United States.  Investors' funds were pooled in NAC's accounts

16   and digital asset wallets and used to fund NAC's business, including for the further development

17   of AML BitCoin and NAC's own blockchain.

18        28.      Under the federal securities laws, NAC, Andrade, and Abramoff offered and sold

19   securities from at least August 2017 through December 2018.  But NAC has never filed a

20   registration statement with the SEC for its offer and sale of securities, and no exemptions from

21   registration were available.  By failing to prepare and file a registration statement, NAC did not

22   provide important information to investors regarding the investment opportunity promoted by

23   NAC, such as information about NAC's poor financial condition, future plans of operation and

24   budget, the proposed use of investor proceeds, and detailed disclosure of material trends and the

25   most significant factors that made the offering speculative and risky.  NAC thus failed to disclose

26   information relevant for investors to evaluate NAC's promises and representations about the

27   investment potential of the ABTC tokens and the AML BitCoin project.

28

1         **B.**       **Background of NAC and Its Development of AML BitCoin**

2         29.       NAC began posting materials promoting AML BitCoin and the upcoming ICO

3 on its website, through social media outlets, and by paying authors to write positive articles about

4 AML BitCoin in or about August 2017.  Andrade wrote the White Paper describing the offering

5 and the development of AML BitCoin and posted it on NAC's website, which was accessible to

6 the investing public worldwide, on October 4, 2017.  The White Paper and NAC's website

7 represented that NAC had developed and launched a predecessor to AML BitCoin, called Aten

8 Coin, in September 2015, which NAC claimed was the first "cryptocurrency" designed to be

9 anti-money laundering and anti-terrorist compliant and theft-resistant.  NAC falsely claimed that

10 this functionality was encoded in the token and built based on patent-pending technology that

11 Andrade licensed to NAC.

12         30.       The White Paper misrepresented that "AML BitCoin was created with anti-

13 money laundering, anti-terrorism and theft-resistant properties built into the code of the coin, and

14 as a result, it is compliant with a host of laws, including but not limited to: Anti-Money

15 Laundering (AML), Counter Financing of Terrorism (CFT), Anti-Fraud and Financial Crimes

16 (AFF), Office of Foreign Assets Control (OFAC), Bank Secrecy Act (BSA), USA PATRIOT

17 Act and the FACT Act."

18         31.       The White Paper further misstated that "[u]sing proprietary technology, this

19 identity-based digital currency is compliant with laws, statutes, rules, and regulations that

20 govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial

21 crimes, and know-your-customer laws."

22         32.       NAC also claimed that it was developing its own blockchain that would include

23 additional features, such as certified digital identity verification, through a "white label

24 AML/KYC Platform."  NAC referred to this blockchain as a "privately regulated public

25 blockchain," which it claimed would be faster and more efficient than the original bitcoin

26 blockchain.

27

28

1    33.    The White Paper stated that the process of integrating the AML BitCoin token

2    features into the new blockchain was ongoing, and that purchasers in the offering would first

3    receive ABTC tokens that could be traded on various platforms but would not have any of the

4    features of AML BitCoin.  NAC represented to purchasers that they could exchange the ABTC

5    tokens for functional AML BitCoin tokens on a one-for-one basis as soon as the new blockchain

6    and tokens were ready.

7    34.    A November 22, 2017 press release stated "NAC Foundation's just launched a

8    dynamic digital currency, the AML BitCoin, which is the only cryptocurrency running on a

9    privately regulated blockchain and using biometric identification protocols, including voice

10   recognition, to verify the owners of AML BitCoin cryptowallets."

11          **C.    NAC Offered and Sold Digital Asset Securities in an Unregistered Offering**

12   35.    Between at least August 2017 and December 2018, including during the ICO

13   phase from October 2017 through February 2018, NAC sold the ABTC tokens to raise capital for

14   the enterprise.  ABTC tokens could be purchased with fiat currency, bitcoin, ether, litecoin, and

15   other digital assets at prices ranging from $0.35 to $0.45 per token in the pre-sale phase of the

16   offering prior to the ICO phase, then at prices ranging from $1.00 to $1.50 per token in the ICO

17   and after.

18   36.    NAC advertised the ABTC tokens as being available for purchase by individuals

19   in the United States and worldwide through the AML BitCoin website, Facebook, Telegram, and

20   other internet forums and social media pages.

21   37.    According to the White Paper, NAC generated a total of 200 million ABTC

22   tokens, of which 76 million were available for purchase in the offering, which aimed to raise

23   $100 million.  The remainder of the ABTC tokens were retained by NAC and its administration

24   team, including Andrade.  NAC ultimately raised at least $5.6 million from approximately 2,400

25   primarily domestic, retail investors during the offering.

26

27

28

*SEC v. NAC FOUNDATION, LLC, ET AL.*          -9-          SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2800
SAN FRANCISCO, CA 94104 | (415) 705-2500

1    38.    After the ICO, NAC took steps to make the ABTC tokens available for trading on

2  various digital asset trading platforms.  ABTC tokens began trading on one such platform in May

3  2018 and later became traded on at least two additional platforms.

4    **D.    NAC Marketed the Tokens as an Investment**

5    39.    NAC marketed the ABTC tokens and the offering in a manner consistent with an

6  investment.  Purchasers would have reasonably viewed the offering as an opportunity to profit if

7  Andrade and NAC were successful in their entrepreneurial and managerial efforts to further

8  develop the advertised features of the token and blockchain.  Based on NAC's statements in the

9  White Paper and on its website and in other online forums, purchasers would have reasonably

10  believed they could pursue such profits by holding or trading the ABTC tokens they received in

11  the offering.

12    40.    ABTC tokens had no use.  NAC did not have a platform where ABTC tokens

13  could be used to purchase goods or services or transact any business.  Instead, its value derived

14  entirely from trading on digital asset trading platforms.  NAC marketed the offering to investors

15  who would have reasonably viewed the ABTC tokens as a tradeable investment vehicle that

16  might appreciate based on NAC's and Andrade's managerial and entrepreneurial efforts to

17  develop the AML BitCoin and blockchain.

18    41.    In one of NAC's social media channels, company representatives highlighted the

19  availability of secondary market trading to attract investors.  The White Paper also stated that

20  "users may trade, sell and purchase [tokens] as they desire, including on participating exchanges

21  and trading websites," and "to speculate."

22    42.    The NAC marketing plan was designed by Andrade and Abramoff to create

23  demand and market price appreciation for the ABTC tokens independent of any use for the

24  tokens.  Defendants promoted the value of the ABTC tokens to investors based on the success of

25  the token sale and the eventual demand for tokens if NAC and Andrade were successful in

26  launching the blockchain and AML BitCoin, not on any utility of the ABTC tokens issued in the

27  offering.

28

43.     NAC tied the value of the ABTC token to purchasers' ability to quickly resell it to other investors, not to any immediate utility.  The White Paper explicitly stated that the tokens could "appreciate in value through speculative trading … ."

**E.     NAC, Andrade, and Abramoff Made Materially False and Misleading Statements During the Offering**

44.     NAC's offering materials, press releases, social media posts, and marketing efforts directed by Andrade and Abramoff made materially false and misleading statements about the status of the technology and the status of purported negotiations with governmental agencies for use of AML BitCoin in their payment systems.  They also designed a deceptive marketing scheme through which they filmed an advertisement for AML BitCoin, indicated that they were on the verge of purchasing an expensive spot to air the ad during the Super Bowl, and then falsely claimed that the ad was rejected by the NFL and NBC because of its political content.  In reality, they lacked the funds for, and never intended to air, the Super Bowl ad.

**1.     False or Misleading Statements About the Technology Development**

45.     NAC's marketing strategy for AML BitCoin, as reflected in its name, was to take advantage of the rising price of bitcoin in 2017 and tout the anti-money laundering, know-your-customer, anti-terrorism, and other security features that NAC falsely claimed had already been built into the code of the token.  According to the White Paper authored by Andrade, "using proprietary technology, this identity-based digital currency is compliant with laws, statutes, rules, and regulations that govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial crimes, and know-your-customer laws."

46.     The White Paper also falsely claimed that NAC's technology included a "personal legal identity-linked credential authentication protocol" that was built into the source code for the token.  This protocol purportedly included "an integration of three major processes, including (i) personal identity verification, (ii) credential authentication, and (iii) a two-party signature scheme."

47.     In reality, NAC's technology for the AML BitCoin token did not have the anti-money laundering, know-your-customer, and other capabilities as claimed during the offering. Andrade retained a project manager and a series of software and blockchain developers during and after the offering to design a development plan and start developing the features that the offering materials claimed NAC's technology already contained, but Andrade quickly stopped paying each of these individuals and they made no progress in developing the features.

48.     NAC never developed the technology for the tokens to integrate biometric or other capabilities associated with personal identity verification or a multi-party signature protocol.

49.     Andrade was aware at all times during the offering that NAC's claimed technology did not yet exist, and that the offering and marketing materials claiming that NAC had already developed these features for AML BitCoin were false.  Abramoff also became aware during the offering that NAC's offering and marketing materials contained false or misleading statements about the technology for the AML BitCoin tokens and the status of the development.

50.     Communications between Andrade and Abramoff during the ICO acknowledged that "our whole system is non-existent so far" and that "our product has to be started from scratch."  They also acknowledged that AML BitCoin's predecessor Aten Coin was a failure and that they had been unable to develop the identity verification features as of that time.

51.     Defendants' statements about the capabilities of the AML BitCoin technology and the status of development of the project would have been important to investors because these features were touted as improvements to existing technologies, which was a principal basis upon which they were led to reasonably expect profits on their investments.

**2.      False or Misleading Statements About Negotiations with the Panama Canal Authority**

52.     As part of Defendants' fraudulent scheme, Andrade and Abramoff designed a strategy to obtain introductory meetings with prospective governmental customers and then

COMPLAINT
*SEC V. NAC FOUNDATION, LLC, ET AL.*

-12-

1    NAC and Andrade misrepresented the nature of the meetings as negotiations in press releases to

2    generate interest in the offering.

3         53.    In a September 13, 2017 press release, NAC claimed that its Vice President of

4    Latin America Affairs "has already commenced negotiations with a number of Latin American

5    Governments, including Panama, to incorporate AML BitCoin in their payment and finance

6    structures."  Andrade told Abramoff that negotiations with the Panama Canal Authority were

7    underway, and Abramoff arranged for NAC to compensate an author, who did not disclose that

8    he was being paid by NAC, to publish an article on September 20, 2017 stating that NAC had

9    "commenced groundbreaking discussions with the Panama Maritime Authority to use AML

10   BitCoin in their payment structures … ."

11        54.    In a November 8, 2017 press release drafted by Abramoff and published by

12   Andrade, NAC stated that it "has been engaged in talks with Panamanian government and

13   private sector representatives to introduce AML BitCoin into the national financial and payment

14   infrastructures," that NAC "has been working with … the President of the Board of Directors

15   and Minister of the Panama Canal, to introduce the new currency as one of the Canal transit fee

16   e-payment options," and that "NAC Foundation executives have been talking with key Panama

17   Canal officials about the possibility of integrating the digital identity verification solutions built

18   into AML BitCoin into the payment systems which will be used by thousands of crews working

19   on ships sailing under Panama's flag."

20        55.    Andrade and Abramoff also each stated to prospective investors that NAC had

21   deals "in place" or "locked up" with the Panama Canal Authority whereby AML BitCoin would

22   be the only digital asset accepted for passage fees through the Canal.

23        56.    However, as Andrade knew, no negotiations had commenced.  On November 9,

24   2017, the day after NAC's press release, a representative of the Panama Canal Authority wrote to

25   NAC stating that they had seen NAC's press release, reminding NAC that "the meeting

26   mentioned in the release still has not yet taken place," and concluding that "this press release is

27   misleading as no talks have taken place with Canal executives."

28

1

        **3.**       **False or Misleading Statements About Negotiations with the Port of**

2

                **San Francisco**

3

       57.      Andrade also arranged to have an introductory meeting with officials from the

4

Port of San Francisco and paid authors recruited by Abramoff to publish articles misrepresenting

5

the nature and outcome of the meeting.  In a September 20, 2017 article, the same author who

6

wrote the misleading article about the Panama Canal Authority reported that officials at the Port

7

of San Francisco "are considering using [AML BitCoin] in the seaport's passage and docking

8

fees and other payment structures."  The same author wrote in an October 3, 2017 article that

9

"AML BitCoin has already made inroads in so many places where old Bitcoin would never be

10

welcome.  Such as the Port of San Francisco…"  He repeated the same statements in a February

11

2, 2018 article.

12

       58.      Andrade also directly misrepresented in soliciting an investment that a deal with

13

the Port of San Francisco was "in place."

14

       59.      In reality, Andrade knew that NAC had only had an introductory meeting with

15

the Port of San Francisco and that there was no follow-up meeting suggesting that the port was

16

considering using AML BitCoin as part of its payment system.  During the introductory meeting,

17

Andrade misrepresented that the AML BitCoin technology was already in use at a European port

18

and that NAC was highly capitalized and growing at a fast rate.  At the end of the meeting,

19

representatives of the Port of San Francisco told Andrade and other NAC representatives that the

20

port was not interested in using AML BitCoin.

21

       60.      Defendants' statements about the nature of meetings and the status of

22

negotiations with governmental agencies for use of the AML BitCoin technology would have

23

been important to investors because the efforts of NAC to establish partnerships for use of AML

24

BitCoin would create demand for the token and increase the value of the token, which was a

25

basis of their investments.

26

27

28

**4.      False or Misleading Statements About a Purported Super Bowl Commercial for AML BitCoin**

61.      In January 2018, as part of NAC's deceptive marketing strategy to promote interest in the offering, Abramoff and Andrade produced an advertisement featuring the character of North Korean leader Kim Jong-Un and paid for press to falsely claim that the ad was rejected by the National Football League and NBC for airing during the Super Bowl because it was "too political."

62.      Although NAC could not afford to pay the required $5 million to run a 30-second advertisement during the Super Bowl, Abramoff and Andrade hired a production company, filmed an advertisement, issued false press releases, and arranged and paid to have authors report that the advertisement was rejected by the NFL and NBC.

63.      On February 2, 2018, NAC issued a press release titled "NFL Rejects Humorous AML BitCoin Super Bowl Ad Attacking North Korea" which stated that "The National Football League and NBC, the network broadcasting this Sunday's NFL Super Bowl game, have not accepted the controversial television ad from AML BitCoin, the world's only patent-pending digital currency with security features blocking criminals and terrorists."

64.      On the same day, the same author who was paid by NAC to write misleading articles about the Panama Canal Authority and the Port of San Francisco published an article stating that the NFL "has refused to allow an ad by a new Bitcoin organization that wants to stop North Korea from abusing Bitcoin to evade sanctions and to keep that country's nuclear program from threatening the U.S. homeland."  The same day, another author paid by NAC published an article titled "NFL Rejects Super Bowl Ad Because It Mocks Kim Jong-Un" which stated that "the league and NBC, the network broadcasting the game Sunday, have rejected a TV ad from AML BitCoin for being 'too political' according to the company."  Neither of the authors disclosed that they had been paid to tout AML BitCoin.

65.      In fact, NAC never intended, and had nowhere near enough capital, to run an advertisement during the Super Bowl.  Communications between Andrade and Abramoff

1   confirm that they knew it was false to claim the Super Bowl advertisement had been rejected,

2   and that they intended to create press attention around a fake rejection and conspired to conceal

3   this plan from others.

4        66.    Defendants' statements about the fake Super Bowl ad rejection would have been

5   important to investors because they suggested that NAC had the financial means to purchase a $5

6   million 30-second advertisement for AML BitCoin, which would signify that NAC was in good

7   financial condition and able to take steps to prominently promote AML BitCoin and increase

8   demand for the tokens, which was a basis of their investments.

9        **F.     Andrade Took Steps to Carry Out a Market Manipulation Campaign**

10        67.    As part of the scheme to defraud investors in the offering, Andrade arranged for

11   NAC employees and third parties to buy ABTC tokens on digital asset trading platforms to

12   support the price of the tokens, artificially inflate trading volume, and avoid ABTC tokens being

13   removed from the platforms due to low trading volumes.  Whenever a platform threatened to

14   remove ABTC tokens from trading due to low trading volumes, Andrade directed employees to

15   buy more to generate the appearance of legitimate market-driven demand and trading volume.

16        68.    In May 2018, Abramoff and Andrade also discussed a plan for NAC to retain a

17   third-party "market maker" to artificially support the price of ABTC tokens through active

18   trading, flooding internet chat rooms, and a call center operated by a team of ten people, which

19   would cost NAC $2,500 plus $500 per person per month and 100,000 ABTC tokens per month

20   for six months.  Andrade sent ABTC tokens to the firm shortly thereafter.

21        **G.     Andrade Misappropriated Investor Funds for His Personal Benefit**

22        69.    During the offering, Andrade misappropriated approximately $1.1 million of the

23   offering proceeds for his own use.  He used $747,000 of the offering proceeds to buy a personal

24   residence in Missouri City, Texas.  He used $226,150 to buy a property for his father in Corpus

25   Christi, Texas.  He used $69,000 to purchase a Cadillac Escalade and $60,000 to buy a Ford

26   F250 truck for his personal use.  He later also encumbered the Missouri City property by

27   drawing $500,000 in cash through a home equity line of credit.

28

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

*By Both Defendants*

70.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 69.

71.     By engaging in the conduct described above, Defendants NAC and Andrade, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

        (a)     Employed devices, schemes, or artifices to defraud;

        (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

        (c)     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

72.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

*By Both Defendants*

73.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 69.

74.     By engaging in the conduct described above, Defendants NAC and Andrade, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

        (1)     with scienter, employed devices, schemes, or artifices to defraud;

1

(2)     obtained money or property by means of untrue statements of material

2

fact or by omitting to state a material fact necessary in order to make the

3

statements made, in light of the circumstances under which they were

4

made, not misleading; and

5

(3)     engaged in transactions, practices, or courses of business which operated

6

or would operate as a fraud or deceit upon purchasers.

7

75.     By reason of the foregoing, Defendants violated, and unless restrained and

8

enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

9

**THIRD CLAIM FOR RELIEF**

10

*Violations of Sections 5(a) and (5)(c) of the Securities Act*

11

*By Both Defendants*

12

76.     The Commission re-alleges and incorporates by reference Paragraph Nos. 1

13

through 69.

14

77.     By virtue of the foregoing, (a) without a registration statement in effect as to that

15

security, Defendants, directly and indirectly, made use of the means and instruments of

16

transportation or communications in interstate commerce and of the mails to sell securities

17

through the use of means of a prospectus, and (b) made use of the means and instruments of

18

transportation or communication in interstate commerce and of the mails to offer to sell through

19

the use of a prospectus, securities as to which no registration statement had been filed.

20

78.     By reason of the foregoing, Defendants directly or indirectly violated, and unless

21

restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act

22

[15 U.S.C. §§ 77e(a) and (c)].

23

24

25

26

27

28

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

**I.**

Permanently enjoin Defendants NAC and Andrade from directly or indirectly violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**II.**

Permanently enjoin Defendant NAC from directly or indirectly, including, but not limited to, through any entity owned or controlled by it, participating in the issuance, purchase, offer, or sale of any securities.

**III.**

Permanently enjoin Defendant Andrade from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

**IV.**

Issue an order requiring Defendants NAC and Andrade to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this complaint, together with prejudgment interest thereon.

**V.**

Issue an order requiring Defendants NAC and Andrade to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VI.**

Prohibit Defendant Andrade from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act

1  | [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

2  | Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

3  | **VII.**

4  |      Retain jurisdiction of this action in accordance with the principles of equity and the

5  | Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

6  | decrees that may be entered, or to entertain any suitable application or motion for additional

7  | relief within the jurisdiction of this Court.

8  | **VIII.**

9  |      Grant such other and further relief as this Court may determine to be just and necessary.

10 |

11 |

12 | Dated:  June 25, 2020                Respectfully submitted,

13 |

14 |                                    */s/ Marc D. Katz*
                                      MARC D. KATZ

15 |                                    Attorney for Plaintiff
                                      SECURITIES AND EXCHANGE COMMISSION

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

COMPLAINT
*SEC V. NAC FOUNDATION, LLC, ET AL.*         -20-         SECURITIES AND EXCHANGE COMMISSION
                                                    44 MONTGOMERY STREET, SUITE 2800
                                             SAN FRANCISCO, CA 94104 | (415) 705-2500