KATHERINE D. COOPER (*appearance pro hac vice*)
Murphy & McGonigle, P.C.
1185 Avenue of the Americas, 21st Floor
New York, NY 10036
Tel.: 212.880.3630
Fax: 212.880.3998
kcooper@mmlawus.com

MAURICIO S. BEUGELMANS (Bar No. 201131)
Murphy & McGonigle, RLLP
44 Montgomery Street, Suite 3750
San Francisco, CA 94104
Tel.: 415.651.5707
Fax: 415.651.5708
mbeugelmans@mmlawus.com

LIONEL ANDRÉ (*appearance pro hac vice*)
Murphy & McGonigle, P.C.
1001 G Street NW, 7th Floor
Washington, DC 20001
Tel.: 202.661.7039
Fax: 202.661.7059
landre@mmlawus.com

Attorneys for Defendants NAC Foundation, LLC and
Rowland Marcus Andrade

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | CASE NO.: 20-cv-4188-RS |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| NAC FOUNDATION, LLC and ROWLAND MARCUS ANDRADE, | **Filed Concurrently with Request for Judicial Notice and Proposed Order** |
| Defendants. | Date:        December 3, 2020<br>Time:        1:30 pm PT<br>Courtroom: 3, 17th Floor |
| | Honorable Richard Seeborg, District Judge |
| | Filed: October 19, 2020 |

1
2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

3
4
5
6
7
8
9
10

**PLEASE TAKE NOTICE** that on Thursday, December 3, 2020 at 1:30 pm PT, or as soon thereafter as the matter may be heard, in Courtroom 3, 17th Floor, Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants NAC Foundation, LLC and Rowland Marcus Andrade (collectively "Defendants") will, and hereby do, move this Court, the Honorable Judge Richard Seeborg presiding, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing the Complaint of Plaintiff, Securities and Exchange Commission, in its entirety for failure to state a claim upon which relief can be granted.

11
12
13
14
15
16

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, attached Exhibits 1, 2 and 3 consisting of documents previously produced to Plaintiff by the Defendants, the Declaration of Sachin Agrawal dated October 18, 2020 and Darren Winczura dated October 19, 2020, Request for Judicial Notice, the attached Form of Proposed Order, all pleadings and papers on file in this action, and such other and further matters as the Court may consider.

17
18

Date:   October 19, 2020

Respectfully submitted,

19
20
21
22
23

*/s/ Katherine D. Cooper*
KATHERINE D. COOPER
LIONEL ANDRÉ
Murphy & McGonigle, P.C.
MAURICIO S. BEUGELMANS
Murphy & McGonigle, RLLP
Attorneys for Defendants NAC Foundation,
LLC and Rowland Marcus Andrade

24
25
26
27
28

1

2

### Table of Contents

POINTS AND AUTHORITIES SUPPORTING DEFENDANTS' MOTION TO DISMISS ....... 2

Preliminary Statement .................................................................................................... 2

Allegations in the Complaint and Admissible Extrinsic Facts ...................................... 3

Legal Analysis and Discussion ...................................................................................... 6

    I.   Legal Standard of Review ............................................................................................. 6

    II.   Substantive Securities Law Analysis ......................................................................... 8

      A.   Howey and its Progeny ............................................................................................ 8

      B.   Howey and Digital Tokens: The SEC's ICO Enforcement Actions ........................... 9

      C.   The Offering and Sale of ABTC Tokens – Analysis under *Howey* and *Joiner* .......... 11

        i.   Howey: Common Enterprise Prong .......................................................................... 11

        ii.   Howey: Reasonable Expectation of Profits Prong ................................................... 13

        iii.  Joiner: The Terms of the Offer .............................................................................. 14

        iv.  Joiner: The Plan of Distribution .............................................................................. 16

        v.   Joiner: The Economic Inducements Held Out to Prospective Buyers ....................... 17

    III.   The ABTC Token was a Forward Contract Outside SEC's Jurisdiction .................. 18

    IV.   The Integrity of the SEC's Investigation and Allegations Are Suspect ..................... 21

      A.   The Misconduct ....................................................................................................... 21

      B.   Notwithstanding the SEC's Misconduct the Patents Belie the Bald and the

         Conclusory Claims by the SEC that there was No Technology ................................. 22

CONCLUSION ............................................................................................................. 23

1

## **Table of Authorities**

2

**Cases**

3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 6, 12

4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................ 6, 12, 13, 18

5

*CFTC v. Am. Metal Exch. Corp.*, 693 F. Supp. 168 (D.N.J. 1988) ........................... 19

6

*CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573 (9th Cir. 1982) ........................... 19

7

*CFTC v. Int'l Fin. Serv. (N.Y.)*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004) .................... 19

8

*CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995) ............................... 19

9

*Cohen v. Facebook Inc.*, 798 F. Supp.2d 1090 (N.D. Cal. 2011) ............................... 7

10

*Epstein v. Wash. Energy Co.*, 83 F.3d 1136 (9th Cir.1996) ........................... 6, 11, 13

11

*Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir.) ........................... 22

12

*Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1022 (2d Cir. 1974) ............. 17

13

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) .................................................. 8

14

*Hsu v, Puma Biotechnology, Inc.*, 213 F. Supp.3d 1275 (C.D. Cal. 2016) .................... 7

15

*In re Competitive Strategies for Agric., Ltd.*, ¶ 29 (CFTC Nov. 25, 2003) ................. 19

16

*In re Grain Land Coop.*, ¶ 29 (CFTC Nov. 25, 2003) ............................................. 19

17

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) ..................... 7, 22

18

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ............................................... 6, 7

19

*Los Angeles Trust Deed & Mort. Exchange v. SEC*, 285 F.2d 162 (9th Cir. 1960) ..... 18

20

*Marine Bank v. Weaver*, 455 U.S. 551 (1982) ...................................................... 9

21

*Parks Sch. of Bus. v. Symington*, 51 F.3d 1480 (9th Cir.1995) .................................. 6

22

*Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir.1998) ................................. 6, 7, 11, 20

23

*Reves v. Ernst & Young,* 494 U.S. 56 (1990) ........................................................ 9

24

*Rice v. Branigar Org.*, 922 F.2d 788 (11th Cir.1991) ........................................... 15

25

*Salomon Forex, Inc. v. Tauber*, 8 F.3d 966 (4th Cir. 1993) ................................... 19

26

*San Francisco Residence Club, Inc. v. Amado*, 2010 WL 2300987 (N.D. Cal. June 4, 2010) ....... 8

27

*SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577 (2d Cir. 1982) ....................... 16, 17

28

*SEC v. Blockvest, LLC*, 1019 WL 625163 (S.D. Cal Feb. 14, 2019) ........................ 10

*SEC v. Blockvest, LLC*, 2018 WL 6181408 (S.D. Cal. Nov. 27, 2018) ............... 10, 13, 15

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943)...................................................... passim

*SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973).................................... 15

*SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459 (9th Cir.1985) .................................... 15

*SEC v. Kik Interactive Inc.*, 2020 WL 5819770 (S.D.N.Y. Sept. 30, 2020)................ 9, 10, 13, 15

*SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125 (9th Cir. 1991) .................................................. 11

*SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003)........................................................................ 8

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001)........................................................................... 17

*SEC v. Telegram Group, Inc.*, 448 F. Supp.3d 352 (S.D.N.Y. 2020).................................... 9, 13

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) .................................................................. passim

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) ............................................................................ 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)........................................ 6, 20

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975)................................. 9, 15, 17

*United States v. Richie*, 342 F.3d 903 (9th Cir. 2003) ............................................................. 7

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) ........................................................ 8, 10, 14

**Statutes**

7 U.S.C. § 1a(27) ............................................................................................................... 18

7 U.S.C. § 1a(47)(B)(ii) ...................................................................................................... 20

7 U.S.C. §§ 1 *et seq*............................................................................................................. 18

15 U.S.C. § 77b(17) ............................................................................................................ 20

Section 10(b) of the Exchange Act ........................................................................................ 2

Securities Act of 1933.......................................................................................................... 2

**Other Authorities**

*How Many People Use Bitcoin in 2020?* (Bitcoin Market Journal Feb. 5, 2020) ....................... 16

*Report of the Attorney General's Cyber Digital Task Force* 5-20 (DOJ Oct. 1, 2020)................ 16

*Systems and methods for providing block chain or distributed ledger-based entity identity and relationship verification*, U.S. Patent 10,749,865 (USPTO) ..................................................... 22

*Systems and methods for providing block chain-based multifactor personal identity verification*, U.S. Patent 10,389,713 (USPTO) ...................................................................................... 22

*Systems and methods for providing block chain-based multifactor personal identity verification*,

  U.S. Patent No. 9,985,964 (USPTO) .................................................................. 21, 22

**Rules**

Fed. R. Civ. P. 12(b)(6) ………………………………………………………………..6

Fed. R. Evid. 201 ...................................................................................................... 22

**Regulations**

17 C.F.R. §§ 230.500 *et seq.* ..................................................................................... 10

*Further Definition of ''Swap,'' ''Security-Based Swap,'' and ''Security-Based Swap*

  *Agreement''; Mixed Swaps; Security-Based Swap Agreement Recordkeeping; Final Rule*, 77

  Fed. Reg. 48208 (SEC & CFTC Aug. 13, 2012) .................................................... 20

*Statutory Interpretation Concerning Forward Transactions*, 55 Fed. Reg. 39188, 39190 (Sept.

  25, 1990) ................................................................................................................. 19

## POINTS AND AUTHORITIES SUPPORTING
## DEFENDANTS' MOTION TO DISMISS

### *Preliminary Statement*

The Securities and Exchange Commission ("SEC") alleges that the digital tokens that the Defendants sold were as a matter of law "securities," which were not registered under Section 5 of the Securities Act of 1933 and did not qualify for an exemption from registration.  (ECF Docket No.1, "Complaint" or "Cmplt.").  The Complaint alleges that Defendants' offer and sale of the digital tokens violated Section 5, alleged misrepresentations regarding the digital tokens violated Section 10(b) of the Exchange Act, Rule 10b-5 thereunder and Section 17(a) of the Securities Act, all of which require that the referenced transactions be securities transactions.

The SEC's allegations that the digital tokens at issue here are "investment contracts," and therefore "securities," are based on underlying factual pleadings that are at best broad, vague and conclusory.  The few more detailed allegations are cherry-picked and taken out of context.  But more importantly, the SEC failed to attach to the Complaint the controlling written terms of the offer and contract of sale of these digital tokens and related White Paper on which their entire case rests.  Those detailed, written terms – which Defendant NAC Foundation ("NAC") produced to the SEC in April 2018 – are diametrically at odds with the SEC's general and conclusory allegations supporting its theory that the digital tokens here are "securities."  Among the many inconvenient facts that the SEC neglected to disclose in the Complaint are that purchasers of the digital tokens agreed in writing that:

- They were not purchasing the digital tokens as investments;

- They expected no return on investment;

- They understood the digital tokens were a medium of exchange and not a pooled interest in any business entity or common enterprise;

- The digital tokens did not represent a debt instrument – that defendant NAC had no obligation to pay purchasers a return or had an obligation to repay the purchaser or otherwise redeem the digital tokens; and

- NAC'S refund policy clearly states that if anyone was led to believe they would generate a return or make any type of profit and could prove someone working for NAC led them to believe that, they were intitled to an immediate refund.

Even more disturbing, the SEC's Complaint alleges multiple times that the technology to support NAC's and Andrade's AML Bitcoin did not exist when the SEC had known for over two years prior to its filing of the Complaint that ***Andrade had been awarded a patent for just such technology***. Since then, Andrade has been awarded several more which the SEC could have found out about if it had only followed up on the first patent. As discussed below, it is proper for the Court on this motion to dismiss to consider the White Paper and the terms and conditions of sale under the "incorporated by reference doctrine" and the patents as a matter of judicial notice.

At the end of the day here, the digital tokens at issue are not "securities." The SEC has no case. This action should be dismissed in its entirety and with prejudice.

### *Allegations in the Complaint and Admissible Extrinsic Facts*

*Relevant Period and the Sale of ABTC Tokens*

As set forth in the White Paper (Ex. 1 or "WP"), NAC and its President and CEO, Rowland Marcus Andrade, issued a digital token, the ABTC token, which would be exchangeable on a one-to-one basis in the future for a digital token, AML Bitcoin. The SEC's Complaint, filed on June 25, 2020, alleges that the ABTC tokens offered through an initial coin offering between October 2017 and February 2018 constituted a "security" under the federal securities laws. (Cmplt. ¶ 2). Elsewhere, the SEC claims that "NAC, Andrade and Abramoff offered and sold securities [apparently ABTC tokens] from at least August 2017 through December 2018." (*Id.* ¶ 28). The Complaint also describes, as disclosed to purchasers, that NAC's initial tokens, the ABTC tokens, did not incorporate the AML, KYC and other security features that AML Bitcoins would have. The Complaint states that NAC issued the ABTC tokens in May 2018. (*Id.* ¶ 3). The SEC alleges that the sale of the ABTC tokens "raised at least $5.6 million from approximately 2,400 retail investors." (*Id.* ¶ 1).

*Reasonable Expectation of Profit*

The Complaint alleges that the ABTC tokens were "investment contracts." (*Id.* ¶ 2). The SEC claims purchasers "reasonably viewed the offering [of ABTC tokens] as an opportunity to profit" (*id.*) and "reasonably viewed [the ABTC tokens] as a speculative, tradeable investment vehicle that might appreciate in value based on NAC's and Andrade's managerial and entrepreneurial efforts." (*Id.* ¶ 4; *see also id.* ¶ 39).

These overly general allegations are flatly contradicted by the terms of the offer and sale of the ABTC tokens. They stated:

- "You have not purchased and have no intention of purchasing AML BitCoins and/or AML BitCoin Tokens for investment purposes and You expect no return on investment" (Exhibit 2 Terms and Conditions ("T&C") ¶ 15);

- "Neither AML BitCoins and/or AML BitCoin Tokens nor any agreement related to Your purchase of AML BitCoins and/or AML BitCoin Tokens creates or constitutes a debt of NAC to You. Neither BGCI nor NAC is obligated to pay You any returns or repayment regarding Your purchase of AML BitCoins and/or AML BitCoin Tokens" (T&C ¶13); and

- "AML BitCoins and/or AML BitCoin Tokens are intended to be and are solely an Internet-based exchange medium" (T&C ¶ 17).

Also, the White Paper nowhere makes an assertion that purchasers of the ABTC token could profit from their purchase of the ABTC tokens.

*Use of Proceeds – "Pooling"*

The SEC asserts that "[i]nvestors' funds were pooled in NAC's accounts and digital asset wallets and used to fund NAC's business, including the further development of AML BitCoin and NAC's own blockchain." (Cmplt. ¶ 27). It also claims that "NAC sold the ABTC tokens to raise capital for the enterprise." (*Id.* ¶ 35).

Again, these broad, conclusory allegations are completely at odds with the terms of the offer and sale of ABTC tokens:

- "AML BitCoin is a medium of exchange and not a pooled interest in any business entity or common enterprise or a business venture involving You and BGCI, NAC or its affiliates or subsidiaries" (T&C ¶ 14);

- "You are not participating in and not becoming a member or investor in any pooled interest, business entity, common enterprise, or business venture with NAC or any of its or their affiliates. By purchasing [ABTC tokens], You have no right to vote on any activity of BGCI, NAC, or any other affiliate or subsidiary of BGCI or NAC.

Also, the White Paper identifies specific pending patent applications,  WO 2016156954 A1, EP3073670A1, US20160283941. (WP at 2 & 6-7)). They demonstrate that a significant amount of the AML technology already existed and was the subject of those pending patent applications and source code which was copyrighted in 2015.

*Secondary Market Trading*

The Complaint alleges that the Defendant took steps to make the ABTC tokens available for trading on digital asset trading platforms.  (Cmplt. ¶ 3), and that "NAC assured prospective buyers . . . would be able to trade the tokens on various digital asset trading platforms."  (Cmplt. ¶ 26).  The SEC asserts that "NAC tied the value of the ABTC token to purchasers' ability to quickly resell it to other investors, not any immediate utility" and the White Paper stated "that the tokens could 'appreciate in value through speculative trading . . . .'" (*Id.* ¶ 43).

These allegations simply are not consistent with the White Paper and terms of the offer and sale of the ABTC tokens which stated:

- there will be no functional business based on the AML BitCoin and no payout of business revenue from any business to AML BitCoin holders. Any possible payout would derive from speculation by and under the control of the AML BitCoin holder (WP at i);

- no warranties and/or guarantees that AML BitCoin Token [ABTC token] and AML BitCoin will be listed or made available for exchange with other digital coins and cryptographic coins and/or fiat money in the future, and no warranties

or guarantees are given whatsoever with respect to the capacity (volume) of such potential exchanges or the demand for AML BitCoins or AML BitCoin Tokens in the future. (Ex. 2 at NAC-000218).

### *Legal Analysis and Discussion*

### I.    <u>Legal Standard of Review</u>

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995).  Generally, when evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996); *see also  Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555) ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true).

Although a motion to dismiss under Rule 12(b)(6) usually must be evaluated solely on the face of the complaint, courts can, and should, consider documents incorporated into the complaint by reference, and any relevant matters of which judicial notice may be properly taken. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Ninth Circuit has

> extended the "incorporation by reference" doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.

*Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) *citing Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998). The theory behind this rule is the policy concern of "[p]reventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon

which their claims are based." *Parrino,* 146 F.3d at 706; *see also Cohen v. Facebook Inc.*, 798 F. Supp.2d 1090, 1094 (N.D. Cal. 2011) (Seeborg, J.).[1]

Here the Complaint references the White Paper twelve times in its sixteen pages of what is apparently intended to pass for factual allegations.[2]  The Complaint refers to the "offer" or "offering" of securities ***sixty times*** and the sale of securities eleven times.  It will not come to the Court's surprise that those offers of sale came with terms and conditions.  The resulting sales were made pursuant to contracts of sale. Unsurprisingly, the contracts of sale also included terms and conditions.  The Complaint's allegations of offers and sales, therefore, necessarily incorporate by reference the terms and conditions of such offers and sales and yet not only ignore – but entirely contradict – those terms and conditions and White Paper which NAC voluntarily produced to the SEC in 2018.

Here the authenticity of the terms and conditions is clear.   Both Mr. Winczura, an ABTC token purchaser, and Mr. Argawal, a technical support who worked for NAC and Andrade from 2015 through 2017, declared under the penalty of perjury that ABTC token purchasers had to agree to the terms and conditions prior to purchasing and using their wallets.  (*See* attached declarations of Darren Winczura dated Oct. 19, 2020 and Sachin Argawal dated Oct. 18, 2020; *see also* Exhibit 1 containing the White Paper and Exhibit 2 containing the terms and conditions).  Accordingly, it is not only permissible for the Court consider such extrinsic

---

[1] In a private securities class-action, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018), the court found that the district court had abused its discretion by applying the "incorporation by reference" doctrine to six securities analysts' reports and blog posts, three SEC filings and two FDA reports on the defendant's motion to dismiss.  It noted that use of extensive extrinsic evidence by defendants in private securities actions on motions to dismiss was concerning in light of the asymmetry in information held by the parties in such actions "where a defendant starts off with sole possession of the information about the alleged wrongdoing." *Id.* at 999 *quoting Hsu v, Puma Biotechnology, Inc.*, 213 F. Supp.3d 1275, 1281-82 (C.D. Cal. 2016).  Here, there is no such concern.  The SEC could have exhaustively investigated this matter prior to bringing its case, and, indeed, had the White Paper and terms and conditions for over two years prior to filing the Complaint.  *See also United States v. Richie*, 342 F.3d 903 (9th Cir. 2003) (rejecting use of extrinsic documents on motion to dismiss that were created after the complaint was filed).

[2] (Cmplt. ¶¶ 4, 29, 30, 31, 33, 37, 39, 41, 43, 45 & 46).

1    evidence on this motion to dismiss, but it is in the interests of justice. *Knievel* and *Parrino* direct

2    that the Court take the terms and conditions and White Paper into account in deciding how to

3    rule on this motion.

4          As explained below, here the Complaint's copious reliance on conclusory allegations

5    utterly belied by the terms and conditions of the offer of the ABTC tokens, the terms of the

6    contracts of sale of the ABTC tokens, and the verbiage of the White Paper are fatal to the SEC's

7    case.

8    ## II.     Substantive Securities Law Analysis

9

10         A.     Howey and its Progeny

11         The SEC alleges that the ABTC tokens were "investment contracts" and hence securities.

12   (Cmplt. ¶¶ 2-3). Under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946), an investment

13   contract is "a contract, transaction or scheme whereby a person invests his money in a common

14   enterprise and is led to expect profits solely from the efforts of the promoter or a third party."

15   Howey's three-part test requires "(1) an investment of money (2) in a common enterprise (3)

16   with an expectation of profits produced by the efforts of others." *SEC v. Rubera*, 350 F.3d 1084,

17   1090 (9th Cir. 2003) (internal quotation marks omitted). "[T]he third prong of this test involves

18   two distinct concepts: whether a transaction involves any expectation of profit and whether such

19   expected profits are the product of the efforts of a person other than the investor." *San Francisco*

20   *Residence Club, Inc. v. Amado*, 2010 WL 2300987 *4 (N.D. Cal. June 4, 2010) (Seeborg, J.)

21   *citing Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009)

22         Although the Ninth Circuit has noted that "the subjective intent of the purchasers may

23   have some bearing on the issue of whether they entered into investment contracts, [the] focus of

24   our inquiry is on what the purchasers were offered or promised." *Warfield*, 569 F.3d at 1021

25   *citing SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943) ("The test ... is what

26   character the instrument is given in commerce by the terms of the offer, the plan of distribution,

27   and the economic inducements held out to the prospect"). In addition, the Ninth Circuit has

28   stated that the term "offer" is broader than what was contained "in the contract or other written

instrument" to include promotional materials, merchandising approaches, oral assurances" as well as contractual agreements.  *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) *citing Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("in searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality").

Although the Supreme Court has stated that Congress defined "security" to be sufficiently broad to "so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security," the term security is not without its limits.  *Reves v. Ernst & Young,* 494 U.S. 56, 61 (1990).  "Congress did not . . . 'intend to provide a broad federal remedy for all fraud'."  *Id. quoting Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982).  Indeed, of utmost relevance here, the Supreme Court has held that the securities laws do not apply to purchases of "a commodity for personal consumption."  *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 858 (1975).

       B.      <u>Howey and Digital Tokens: The SEC's ICO Enforcement Actions</u>

Although the SEC has brought numerous enforcement actions alleging that a digital token constituted a security, only a few have resulted in litigated court decisions.  In *SEC v. Telegram Group, Inc.*, 448 F. Supp.3d 352 (S.D.N.Y. 2020), the court ruled on a motion for a preliminary injunction that the SEC had made a substantial showing of likelihood of success in establishing that Telegram's digital token, "Gram," which operated on the "TON Blockchain," was a security.  The court noted that the TON White Paper described a pricing mechanism that Telegram would use tending to increase the price of Grams, and promotional materials that claimed when "[i]ntergrated into Telegram applications, the TON [w]allet is expected to become the world's most adopted  cryptocurrency wallet."  *Id.* at 361-62.  The offering materials also "highlighted" that the TON Foundation "would have discretion to buy and sell Grams as needed to support the market price of Grams."  *Id.* at 363.  In light of the fact that Telegram had raised $1.7 billion from only 175 initial purchasers of Grams (averaging $971,000 per purchaser), the court concluded that the size and concentration of Grams among the initial purchasers "support[ed] the finding that [they] did not intend to use their allotments of Grams as a substitute

currency to store or transfer value." *Id*. at 372. In other words, the buyers were not buying the Grams for personal consumption, but rather to profit from Telegram's future development of the TON Blockchain.

In *SEC v. Kik Interactive Inc.*, 2020 WL 5819770 (S.D.N.Y. Sept. 30, 2020), the court granted the SEC's motion for summary judgment concluding that Kik's digital token, "Kin," was a security. Kik raised approximately $50 million in a private pre-sale for which it claimed an exemption from registration under Regulation D,[3] and $49.2 million from approximately 10,000 buyers in a public sale of Kin. Five days before the beginning of the public sale of Kin, Kik's CEO explained how buyers of Kin could profit: "'if you set some aside for yourself at the beginning, you could make a lot of money'." *Id*. at *2. "In public statements and at public events promoting Kin, Kik extolled Kin's profit-making potential. Kik's CEO explained the role of supply and demand in driving the value of Kin: Kik was offering only a limited supply of Kin, so as demand increased, the value of Kin would increase, and early purchasers would have the opportunity to earn a profit." *Id*. at *7.

In *SEC v. Blockvest, LLC*, 2018 WL 6181408 (S.D. Cal. Nov. 27, 2018), the court initially denied the SEC's motion for a preliminary injunction against Blockvest. The SEC had alleged that Blockvest's digital token, "BLV," was a security. Blockvest had sold $10,000 worth of BLVs to 32 "test investors." The court noted that the SEC had not shown that the 32 test investors "reviewed the Blockvest website, the white paper and media posts when they clicked the "buy now" button on Blockvest's website." *Id*. at *6. Accordingly, the court reasoned that the SEC had not established a likelihood of success on the merits because the SEC had not demonstrated that the investors had an "expectation of profits," citing the Ninth Circuit's decision in *Warfield*. *Id*. *6-7. On a motion for reconsideration, however, the court reversed itself. 1019 WL 625163 (S.D. Cal Feb. 14, 2019). It noted that the Blockvest website and White Paper hawked BLVs saying "[a]s a Blockvest token holder, your Blockvest will generate a pro-rated share of 50% of the profit generated quarterly as well as fees for processing transactions."

---

[3] 17 C.F.R. §§ 230.500 *et seq.*

1    *Id.* at \*7.  Reasoning that the analysis of whether a product is a security, includes what was part

2    of the promotion – and therefore the "offer," the court concluded that the website's claims of

3    profitability was all that was needed to show that Blockvest had "offered" to sell a security

4    whether or not the 32 "test investors" had reviewed the website.

5

6            C.       The Offering and Sale of ABTC Tokens – Analysis under *Howey* and *Joiner*

7            The Complaint fails to adequately plead anything other than general and conclusory facts

8    to support its claims that either the (i) common enterprise and (ii) reasonable expectation of

9    profits prongs of the *Howey* test are satisfied here.  Such "conclusory allegations of law and

10   unwarranted inferences" "are insufficient to defeat a motion to dismiss for failure to state a

11   claim." *Epstein*, 83 F.3d at 1140.  The Court should replace those conclusory allegations with the

12   cold hard facts of an accurate reading of the White Paper or the terms and conditions. *Parrino*,

13   146 F.3d at 706 (proper for court on motion to dismiss to consider the relevant contractual terms

14   on which plaintiff's claim is based which are offered by defendant on motion to dismiss).

15                   i.       Howey: Common Enterprise Prong

16           The Complaint must allege sufficiently detailed facts to show that the common enterprise

17   prong of the *Howey* test is satisfied. After conceding that the investment contract test requires a

18   showing of the investment of money in "a common enterprise" in paragraph 2 (Cmplt. ¶ 2), the

19   Complaint nowhere alleges – even in a conclusory fashion – that purchasers of ABTC tokens

20   invested in a "common enterprise."  At best, it alleges that "NAC sold the ABTC tokens to raise

21   capital for the enterprise."  (Cmplt. ¶ 35).

22           The second prong of *Howey* requires either an enterprise common to an investor
             and the seller, promoter, or some third party (vertical commonality) or an
23           enterprise common to a group of investors (horizontal commonality) . . . Vertical
             commonality may be established by showing that the fortunes of the investors are
24           linked with those of the promoters. . . .   One indicator of vertical commonality. . .
             is an arrangement to share profits on a percentage basis between the investor and
25           the seller or promoter.

26   *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130-31 (9th Cir. 1991) (citations

27   omitted).  In *Reynolds*, the Ninth Circuit held that vertical commonality had been

28   established because the promoter's management fee was based on a percentage of the

profits of the program.  *Id.*  The court, however, refused to accept the SEC's argument

that horizontal commonality was present merely because the program participants' funds

had been pooled in a common bank account reasoning: "it is not clear that investors knew

that their funds would be pooled with those of other investors." *Id*. n.5.

The terms and conditions and White Paper negate both horizontal and vertical

commonality. Indeed, the terms and conditions expressly prohibit pooling as purchasers do not

obtain any interest in any enterprise.  These terms include:

- Purchasers were not purchasing the digital tokens as investments (T&C ¶ 15);

- Purchasers expected no return on investment (T&C ¶ 15);

- Purchasers understood the digital tokens were a medium of exchange and not a pooled interest in any business entity or common enterprise (T&C ¶ 14); and

- The digital tokens did not represent a debt instrument – that defendant NAC Foundation LLC ("NAC") had no obligation to pay purchasers a return or had an obligation to repay the purchaser or otherwise redeem the digital tokens (T&C ¶ 13).

Here the terms and conditions show that not only is it "not clear" that purchasers' funds

would be pooled in a common bank account, they were told that they would not be participants

in any kind of pool and they acknowledged, and agreed to, that.  Accordingly, based on

indisputable Ninth Circuit controlling precedent there was no horizontal commonality – the SEC

makes nothing but conclusory allegations about an investment in an "enterprise" – mind you, not

a common enterprise.  Black letter law instructs us that, on a motion to dismiss, the Court should

not accept as true "threadbare recitals of the elements of the cause of action, supported by mere

conclusory statements."  *Twombly*, 550 U.S. at 555.  Moreover, there was also no vertical

commonality as the Complaint makes no allegations that there was an arrangement to share

profits between the promoter and the purchaser under the terms and conditions or the White

Paper.  A Complaint that otherwise only offers "'labels and conclusions' or a 'formulaic

recitation of the elements of a cause of action will not do'."  *Iqbal*, 556 at 678 *quoting Twombly*,

550 at 555.  Here the Complaint only offers "labels and conclusions" of vertical commonality.

That is insufficient.  The Complaint fails to adequately allege that ABTC token purchasers were

participants in a common enterprise.

*ii.*      Howey: Reasonable Expectation of Profits Prong

The offering and sale of the ABTC tokens was completely unlike the offerings and sales in *Telegram*, *Kik* and *Blockvest*.  Absent from the White Paper and other promotional materials is the type of hype and claims of possibility of profit featured so prominently in those cases.

Not surprisingly, the Complaint nowhere quotes the White Paper where the White Paper expressly states the value of the ABTC token would, or could, increase as a result of the finalization of the AML Bitcoin technology.  That's because the White Paper makes no such claim.  In fact, the only express mention of possible profit in the White Paper that the SEC could manage to include in the Complaint is in Paragraph 43. There the Complaint quotes a phrase from page 19 of the White Paper stating that "the tokens could 'appreciate in value through speculative trading . . . .'"  (Cmplt. ¶ 43; WP at 19).

The Complaint fails to disclose, however, that the quoted phrase appears in a section of the White Paper discussing whether Bitcoin ***and*** AML Bitcoin were "securities" under federal and state law.  Also, the cherry-picked quote leaves out the first part of the sentence which is "Bitcoin and AML Bitcoin are negotiable and can appreciate in value through speculative trading."  The Complaint also neglects to mention that immediately following the quoted phrase, the White Paper continues on to say, "and such trading will rely entirely on the expertise of the AML BitCoin's holder."  (WP at 19).  Needless to say, the Complaint's quotation of the phrase takes the language completely out of context. The White Paper makes no express claim that buyers of the ABTC token could reasonably expect to profit from the development of the AML Bitcoin based on the purchase of ABTC tokens.

The Complaint only makes conclusory assumptions that the White Paper's discussion of both existing technology and further development of technology would make the reader think that she could reasonably expect to profit from the purchase of the ABTC token.  The White Paper nowhere expressly makes such an assertion. It is black letter law that "conclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein*, 83 F.3d at 1140; *see also Twombly*, 550 U.S. at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory

statements," are not taken as true).  The Complaint does not adequately allege that the reasonable

expectation of profits prong of the *Howey* test is satisfied.

*        *        *

As the Supreme Court explained in *Joiner Leasing*, the "test [of whether a particular

product is a security] is what character the instrument is given in commerce by the terms of the

offer, the plan of distribution, and the economic inducements held out to the prospect."  320 U.S.

at 352-53.  Accordingly, we analyze below (i) the terms of the offer, (ii) the plan of distribution

and (iii) the economic inducements held out to the prospective buyer.

*iii.*        Joiner: The Terms of the Offer

Here the terms and conditions of the offer make clear that the purchase of ABTC tokens

was not the purchase of an investment: "You expect no return on investment."  (T&C ¶ 15).

Moreover, "Neither [ABTC tokens] nor any agreement related to Your purchase of [ABTC

tokens] creates or constitutes a debt of NAC to You. Neither BGCI nor NAC is obligated to pay

You any returns or repayment regarding Your purchase of AML BitCoins and/or AML BitCoin

Tokens."  (T&C ¶ 13). Rather, the terms of the offer were that if a person purchased ABTC

tokens, the person would be entitled to exchange those tokens on a one-to-one basis for AML

Bitcoins in the future, and that the person would be able to use the AML Bitcoins "solely an

Internet-based exchange medium." (T&C ¶ 17).

The tone of the White Paper which made no explicit claims about profitability and the

explicit statements in the terms and conditions of no expectation of investment return here are

distinctly different from the cases where the courts have found a product to be an investment

contract given "the terms of the offer."  In *Warfield*, for example, marketing materials claimed:

- "'Attractive Returns,' that '[y]our annuity payment is determined by your age and the amount you deposit. The older you are, the more you'll receive'."

- To get this same return through the stock market, [the hypothetical investor] would have had to find investments that pay dividends of 19.3%!

569 F.3d at 1022.

In *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 479 (9th Cir. 1973) prospects were told

- The program being sold "is a sure route to great riches;"

- About "the wealth that awaits the prospects if they will purchase one of the plans;"

- The "'rags-to-riches' story of [the program] founder Glenn W. Turner."

In *SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 464–65 (9th Cir.1985), the promoters' brochure claimed the program:

- "would also provide an 'opportunity to profit in the marketing of [the investors'] Gold and Silver'."

- Was an "[e]xcellent income potential in GOLD & SILVER in kind, which can be TAX FREE, and which is expected to exceed a 2.11 to 1 return on the original cash outlay within one to six years."

The White Paper and terms and conditions are night and day different from the explicit claims of profitability made in other SEC enforcement actions involving digital tokens:

- "'if you set some aside for yourself at the beginning, you could make a lot of money'." *Kik*, 2020 WL 5819770 at *2.

- "your Blockvest will generate a pro-rated share of 50% of the profit generated quarterly as well as fees for processing transactions." *Blockvest*, 1019 WL 625163 at *7.

In *Forman*, the Supreme Court found that the investment contract test was not met where the promotional materials "[n]owhere ... seek to attract investors by the prospect of profits." 421 U.S. at 854; *see also Rice v. Branigar Org.*, 922 F.2d 788, 791 (11th Cir.1991) (holding investment contract definition was not met where promotional materials for housing development did not emphasize investment value of lots). Purchasers on average paid $2,300 each for their ABTC tokens (Cmplt. ¶ 1) – a far cry from Telegram's $971,000, and much more in line with a consumptive rather than investment purpose.

The terms of the offer of ABTC tokens do not in any way indicate that the ABTC token purchasers could reasonably expect to make a profit and are clearly distinguishable from the cases finding products to be investment contracts where there are consistently explicit claims of

profitability.  The emphasis in the terms and conditions and White Paper on the AML functionality of the AML Bitcoin which the ABTC token could eventually be exchanged for, as opposed to non-existent promises of profits, make clear under the Supreme Court's guidance in *Forman* that the ABTC token was not an "investment contract" and therefore not a "security."

<em>iv.</em>   Joiner: The Plan of Distribution

In *Joiner Leasing*, the Supreme Court found that a widely offered interest in land packaged with oil drilling services involved a general plan of distribution.  320 U.S. at 351.  In *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 583 (2d Cir. 1982), the court considered whether the dental product being sold was marketed to persons "with experience in selling dental products."  Because no attempts were made by the promoters to find buyers with such experience, the court determined that the package of rights relating to the dental product was a security as the purchasers would be entirely passive investors.

Although the White Paper and terms and conditions were available to anyone with internet access, it simply cannot be said that the Defendants had a general plan of distribution to sell ABTC tokens to members of the public at large.  First, persons interested in digital tokens are a small fraction of the population to begin with.  A. Lielacher, *How Many People Use Bitcoin in 2020?* (Bitcoin Market Journal Feb. 5, 2020) (only five percent of Americans hold Bitcoin).[4] Second, of those persons interested in digital tokens, perhaps sadly, only a subsection is interested in using digital tokens in an AML or otherwise legally compliant manner as set forth in the *Report of the Attorney General's Cyber Digital Task Force* 5-20 (DOJ Oct. 1, 2020).[5]  The report details numerous illicit uses of cryptocurrency ranging from (i) raising funds to support international terrorism by Al-Qaeda, Al Qassam Brigades and ISIS, (ii) funding child exploitation and "real blackmail, rape and forced videos of girls around the world," (iii) the movement of value cross border by drug cartels to support the distribution of dangerous and lethal drugs, (iv) the funding of cyber-attacks by rogue states such as Russia, Iran and North

---

[4] Available at: https://www.bitcoinmarketjournal.com/how-many-people-use-bitcoin/ (last viewed Oct. 18, 2020).
[5] Available at: https://www.justice.gov/ag/page/file/1326061/download

Korea, (v) being a means of payment in ransomware scams, and (vi) otherwise hiding financial wrongdoing or evading taxes.

The White Paper and the website make clear that the point of AML Bitcoins was to provide a digital token that could not be used for these blatantly nefarious purposes – to provide a digital token that could serve as a means of payment, including importantly, cross-border payments, in an AML compliant and lawful manner.  (WP at 11-12).  The overall tone of the White Paper, website and terms and conditions was not that the purchase of the ABTC token was a way for anyone to make a quick buck or obtain a longer term return on their investment like the package of dental product rights sold in the *Aqua-Sonics* case.  Rather, the White Paper, website and terms and conditions convey a singular, high-minded purpose that the ABTC tokens were a way to purchase for deferred delivery a digital token capable of being used in an AML compliant manner solely for lawful purposes.  The marketplace for such a product was necessarily discrete. The Defendants did not engage in a general plan of distribution.

*v.*   Joiner: The Economic Inducements Held Out to Prospective Buyers

In *Joiner Leasing*, the economic inducement held out to prospective buyers was the promise that the Joiner company would conduct test oil well drilling on the acreage being leased. *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1022, 1034-35 (2d Cir. 1974) involved the sale of barrels of Scotch whiskey.  The program was deemed to be a security because the economic inducements offered included the promoters using their supposedly great expertise in selecting the right kind of oak for the barrels and warehouse conditions to properly age the whiskey so that persons buying into the program could double their money.  In *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001), the promoters

> persistent representations of substantial pecuniary gains for privileged company shareholders distinguish its StockGeneration website from the Information Bulletin circulated to prospective purchasers in *Forman*. . . .  SG made additional representations on its website that played upon greed and fueled expectations of profit. For example, SG flatly guaranteed that investments in the shares of the privileged company would be profitable, yielding monthly returns of 10% and annual returns of 215%.

The court concluded that these types of economic inducements satisfied the test under *Joiner* and the expectation of profits prong of the *Howey* test.[6]

The White Paper is devoid of these types of economic inducements.  The SEC's conclusory allegation that the White Paper implied promises of profit are based solely in the imagination of SEC staff.  The terms and conditions flatly contradict any such promises.  The economic inducement here was to purchase ABTC tokens which could be exchanged for AML compliant digital tokens – not promises of great profits.  The economic inducement prong of the *Joiner* test is not satisfied here.

The Complaint fails to allege any concrete facts that show that purchasers of the ABTC token could have had a reasonable expectation of profits.  "[T]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true *Twombly*, 550 U.S. at 555.  With their conclusory claims regarding expectations of profits jettisoned, the SEC fails to state a critical element of the *Joiner* and *Howey* tests to determine if a product is an "investment contract."  If the ABTC token is not a "security" the SEC has no case.  Accordingly, the Court should dismiss the Complaint in its entirety with prejudice.

### III.   The ABTC Token was a Forward Contract Outside SEC's Jurisdiction

The Complaint alleges that buyers of the ABTC tokens received the right to exchange them on a one-for-one basis for AML Bitcoins in the future.  (Cmplt. ¶ 3).  The allegations of the Complaint describe a "forward contract."  ABTC tokens vested their owners with the right to receive AML Bitcoins in the future.  Thus, as alleged in the Complaint, ABTC tokens were contracts for the deferred delivery of AML Bitcoins.

The Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* ("CEA"), carves out from the definition of the term "future delivery" "any sale of any cash commodity for deferred shipment or delivery."  7 U.S.C. § 1a(27).  This definition excludes "forward contracts" from regulation under the CEA.  The Commodity Futures Trading Commission ("CFTC") has explained that the

---

[6] *See also Los Angeles Trust Deed & Mort. Exchange v. SEC*, 285 F.2d 162, 172 (9th Cir. 1960) (promises of 10% returns).

1
2
3

> underlying postulate of the [forward contract] exclusion is that the [CEA's] regulatory scheme for futures trading simply should not apply to private commercial merchandising transactions which create enforceable obligations to deliver but in which delivery is deferred for reasons of commercial convenience or necessity.

4
5

*Statutory Interpretation Concerning Forward Transactions*, 55 Fed. Reg. 39188, 39190 (Sept. 25, 1990) (''Brent Interpretation'').[7]

6
7
8
9
10
11

In its Brent Interpretation, the CFTC addressed whether contracts for the future delivery of North Sea Brent crude oil qualified for the forward contract exclusion given the practice of market participants to engage in "book-outs" through which a party could negotiate the cancellation of its delivery obligation under the contract. The CFTC concluded that the market practice of "book-outs" did not bring the Brent contracts within the scope of the CFTC's regulatory jurisdiction over futures contracts:

12
13
14
15

> It is noteworthy that while such [book-out] agreements may extinguish a party's delivery obligation, they are separate, individually negotiated, new agreements, there is no obligation or arrangement to enter into such agreements, they are not provided for by the terms of the contracts as initially entered into, and any party that is in a position in a distribution chain that provides for the opportunity to book-out with another party or parties in the chain is nevertheless entitled to require delivery of the commodity to be made through it, as required under the contracts.

16

Brent Interpretation at 39192.

17
18
19
20

Here although the Complaint alleges that holders of ABTC tokens could sell them on a third-party exchange (Cmplt. ¶¶ 3, 4, 26 & 38-41), similar to how the "parties in the chain" in the Brent contracts could require delivery, holders of the ABTC token could demand that NAC

21

--------

22
23
24
25
26
27
28

[7] The CFTC has confirmed this reasoning in subsequent adjudicative orders . *See, e.g., In re Grain Land Coop.*, [2003–2004 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 29,636 (CFTC Nov. 25, 2003); *In re Competitive Strategies for Agric., Ltd.*, [2003–2004 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 29,635 (CFTC Nov. 25, 2003). Courts have endorsed this reasoning as well. *See, e.g., Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir. 1993) (''[C]ash forwards are generally individually negotiated sales * * * in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity.''); *CFTC v. Int'l Fin. Serv. (N.Y.)*, 323 F. Supp. 2d 482, 495 (S.D.N.Y. 2004). *See also CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 579–580 (9th Cir. 1982); *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772-773 (9th Cir. 1995); *CFTC v. Am. Metal Exch. Corp.*, 693 F. Supp. 168, 192 (D.N.J. 1988).

--------

Foundation to deliver AML Bitcoins.  NAC continued to owe a contractual obligation to whomever the holder of the ABTC token was to deliver an AML Bitcoin in the future.

In the Dodd-Frank Act, Congress reiterated the forward exclusion by including the exclusion in the definition of the term "swap" that the Act added to both the CEA and the 1933 Act.  (*See* 7 U.S.C. § 1a(47)(B)(ii) & 15 U.S.C. § 77b(17)).  In their joint *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping; Final Rule*, 77 Fed. Reg.  48208, 48229 (SEC & CFTC Aug. 13, 2012), both the SEC and the CFTC acknowledged that forward contracts were not subject to regulation:

> an investment vehicle taking delivery of gold as part of its investment strategy would not be engaging in a commercial activity within the meaning of the Brent Interpretation. By contrast, were the investment vehicle, for example, to own a gold mine and sell the output of the gold mine for forward delivery, or own a chain of jewelry stores that produces its own jewelry from raw materials and purchase a supply of gold from another entity's gold mine in order to provide raw materials for its jewelry stores, such contracts could qualify as forward contracts under the Brent Interpretation—provided that such contracts otherwise satisfy the terms thereof.

*Id.* at 48229.

As discussed above, the Complaint's allegations distort the central thrust of the White Paper and the terms and conditions. That central thrust is that the ABTC token was a way to buy AML Bitcoin for deferred delivery.  The SEC's allegations that the Defendants promoted the ABTC token as a speculative investment is not supported by the terms and conditions and the overall tone of the White Paper.  Those documents simply do not convey that buyers should have a reasonable expectation of profit from purchasing the ABTC token.  Here the Court can, and should, consider what those materials say because they are either incorporated into the Complaint by reference, as the White Paper is, *Tellabs*, 551 U.S. at 322, or the SEC necessarily relies on them as in the case of the terms and conditions.  *Parrino*, 146 F.3d at 706. With the Complaint stripped of its conclusory allegations of investment purpose for the ABTC token, what is left is that purchasers of ABTC tokens bought them for a commercial purpose.  They were acting more akin to the owner of a chain of jewelry in the SEC's and CFTC's example of what constitutes a forward contract exempt from regulation.  Like the jewelry store owner,

purchasers of ABTC tokens bought the tokens to use them for a commercial purpose rather than like "an investment vehicle taking delivery of gold as part of its investment strategy."

The ABTC token, as a forward contract, is not subject to the SEC's jurisdiction. The Complaint should be dismissed.

## IV.   The Integrity of the SEC's Investigation and Allegations Are Suspect

### A.   The Misconduct

Disturbingly, the integrity of the SEC's investigation in this matter and good faith in making certain allegations in the Complaint are in serious doubt. As detailed below, it appears that SEC staff recommended to the full Commission, and the Commission, based on staff's recommendation, filed in federal court either false, or at best, misleading allegations against a United States citizen.

Specifically, the SEC blithely alleges that the Defendants' AML technology did not exist:

- NAC and Andrade deceived investors in the offering by making it appear as if NAC had successfully developed the anti-money laundering, know-your-customer, and other security features of the AML BitCoin token. In reality NAC had not developed any of these features . . . .  (Cmplt. ¶5).

- NAC and Andrade were aware, and during the ICO Abramoff became aware that NAC had not developed any of the claimed features of the AML Bitcoin tokens . . . ."  (Cmplt. ¶ 9).

- NAC never developed the technology for the tokens to integrate biometric or other capabilities associated with personal identity verification or a multi-party signature protocol.  (Cmplt. ¶ 48).

- Andrade was aware at all times during the offering that NAC's claimed technology did not yet exist . . . . (Cmplt. ¶ 49).

In filing the Complaint, the SEC staff knew that each and every one of these allegations was false or at best misleading. Staff had been on notice for over twenty-seven months prior to filing the Complaint that the United States Patent and Trademark Office ("USPTO") had granted Andrade patent protection for his patent *Systems and methods for providing block chain-based multifactor personal identity verification*, U.S. Patent No. 9,985,964. On March 30, 2018, Andrade's counsel emailed Alice Jensen, a member of the SEC's staff whose name is listed on

the first page of the Complaint and on the Civil Cover Sheet as an attorney for the SEC, that USPTO had granted Andrade's patent application for his block chain-based multifactor personal identity verification technology.  Ms. Jensen replied and acknowledged receipt of the information.  (Exhibit 3).  Thus, the SEC had actual notice of that patent and could have easily found the other patents awarded to Andrade which cross-referenced that patent, U.S. Patent No. 9,985,964.  *See also, e.g.*, *Systems and methods for providing block chain-based multifactor personal identity verification*, U.S. Patent 10,389,713 (USPTO); *Systems and methods for providing block chain or distributed ledger-based entity identity and relationship verification*, U.S. Patent 10,749,865 (USPTO).  The White Paper clearly states "Marcus Andrade invented and granted a license of technology to NAC (patent pending publication numbers: WO 2016156954 A1, EP3073670A1, US20160283941) that permits tracing and tracking of the identities of senders and receivers of a cryptocurrency when necessary." (WP at 2).  A simple Google search of those patents would have confirmed their existence.

All of this is very concerning.  The SEC as a U.S. federal agency is invested with immense authority giving it the power to ruin individual's lives and companies' businesses.  Defendants submit that these facts raise the question whether investigative staff at the SEC have purposefully attempted to mislead the Court, and by extension the public at large.  The investigative staff has made what are clearly unfounded and baseless allegations in the Complaint.

    B.    Notwithstanding the SEC's Misconduct the Patents Belie the Bald and the Conclusory Claims by the SEC that there was No Technology

It is proper for Courts to take judicial notice of patents.  Fed. R. Evid. 201; *Khoja*, 899 F.3d at 1002-02 (district court properly took judicial notice of date of defendant's patent application filing with the World International Property Organization);  *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir.), *cert. denied*, 371 U.S. 910 (1962) (proper to take judicial notice of U.S. patents).  Accordingly, the Defendants ask that the Court take judicial notice of the foregoing patents and patent applications.

The SEC's conclusory claims that are based on the non-existence of this technology to infer that purchasers bought the ABTC token as a speculative investment with a reasonable

DEFENDANTS' MOTION TO DISMISS                  CASE NO. 20-CV-4188-RS

expectation of profits under the *Howey* test fall apart when the substantial, pre-existing technology is recognized.  The Court can properly take into account as a matter of judicial notice the patents and patent applications.  The broad and conclusory allegations of the Complaint are belied by the existence of these patents.  Purchasers did not buy ABTC tokens as a speculative investment, but as a means to obtain AML Bitcoins in the future.

*       *       *       *

The SEC has failed to state a claim upon relief can be granted.  The ABTC tokens were not securities.  The Complaint fails to allege specific concrete facts from which one can reasonably infer that the ABTC token purchasers invested in a common enterprise with a reasonable expectation of profits.  The SEC's conclusory allegations to the contrary should be rejected by the Court as they are inconsistent with the White Paper and terms and conditions of the offer and the sale of the ABTC tokens.  As such, there can be no Section 5, Section 10(b), Rule 10b-5, or Section 17(a) violations.  As forward contracts entered into for the commercial purpose of purchasing AML Bitcoins for deferred delivery, the ABTC tokens are not subject to the SEC's jurisdiction and are otherwise exempt from regulation.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint herein in its entirety and with prejudice.

Date:   October 19, 2020                                 Respectfully submitted,

                                                         */s/ Katherine D. Cooper*
                                                         KATHERINE D. COOPER
                                                         LIONEL ANDRÉ
                                                         Murphy & McGonigle, P.C.
                                                         MAURICIO S. BEUGELMANS
                                                         Murphy & McGonigle, RLLP
                                                         Attorneys for Defendants NAC Foundation,
                                                         LLC and Rowland Marcus Andrade