*SEC v. NAC Foundation, LLC, et al.*

**CASE NO. 20-CV-4188-RS**

**Defendants' Motion to Dismiss the Complaint**

# EXHIBIT 1

## White Paper

**White Paper of**

**AML BitCoin (AMLBit) and its Business Model**

i

Confidential treatment requested by NAC Foundation, LLC

# Abstract

The worldwide frenzy driving mass involvement in cryptocurrencies has drawn attention both to the exciting positive features of digital currencies, as well as those aspects that could hamper future expansion and development. Primarily, governments across the globe expressed concern that anonymous cryptocurrency – while innovative and auguring a new wave of future technology – serves as a medium of exchange that facilitates terrorism and criminal activity. AML BitCoin solves this concern and creates a platform for integration of digital currencies and the economy.

NAC Foundation, LLC ("NAC") created AML BitCoin and its predecessor digital currency, the Aten Coin. Both coins contain the innovative safety and compliance features developed by NAC. AML BitCoin also provides a platform for approved third parties to utilize the AML BitCoin technology.   AML BitCoin rests on a privately regulated public blockchain that facilitates AML-KYC (anti-money laundering – 'know your customer') compliance and identifies criminals associated with illicit transactions, while maintaining and strengthening the privacy protections for legitimate users.

AML BitCoin was created with anti-money laundering, anti-terrorism and theft-resistant properties built into the code of the coin, and as a result, it is compliant with a host of laws, including but not limited to: Anti-Money Laundering (AML), Counter Financing of Terrorism (CFT), Anti-Fraud and Financial Crimes (AFF), Office of Foreign Assets Control (OFAC), Bank Secrecy Act (BSA), USA PATRIOT Act and the FACT Act.

In addition, NAC will utilize a biometric identification system to verify owners of wallets that hold the AML BitCoin. This will provide additional security and safety features for ownership and use of the AML BitCoin (For more information on the DTN, please visit www.digitalidentitytrustnetwork.com)

The new AML BitCoin platform will also allow pre-approved persons and entities (but tied to an individual who has a certified digital identity profile) to utilize NAC's privately regulated public blockchain.

The AML BitCoin is a virtual currency -- a payment system. It will be an open/transparent blockchain except for AML compliance, including suspicious activity reviews and reporting. Some AML BitCoin will be available for mining.

AML BitCoin will be a modified form of an "app coin" in that the underlying protocol includes AML compliance and only persons who obtain a certified digital personal identity can obtain and use a wallet to hold the AML BitCoin. But, there will be no functional business based on the AML BitCoin and no payout of business revenue from any business

i

Version 2.2, 4 October 2017

to AML BitCoin holders. Any possible payout would derive from speculation by and under the control of the AML BitCoin holder.

AML Tokens (ABTC) will be offered in a public sale on October 1, 2017. These tokens will not include monitoring or detecting of suspicious activities, or any of the other features of the AML BitCoin. Once NAC has completed and activated its features, AML BitCoin will replace the ABTC and ABTC holders will be able to exchange the ABTC for AML BitCoins on a 1:1 ratio. In exchanging the AML Tokens for AML BitCoins, all owners will be required to have a certified digital identity as stated above and described in more detail below.

ii

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

# Table of Contents

1. **NAC Foundation, LLC and Anti-Money Laundering Cryptocurrency**
   1.1. Meet the Team
   1.2. NAC Advisors
   1.3. Legal Advisors
2. **Business Model of AML BitCoin (AMLBit) Currency**
   2.1. Overview
   2.2. AML BitCoin- A Successor of Aten Coin
   2.3 Identity Verification: *The Digital Identity Trust Network*
   2.4. AML BitCoin/AML Tokens Pre-Sale
3. **Aten Coin – First Cryptocurrency Designed for Anti-Money Laundering, Theft Resistance, and Government Compliance**
   3.1. Government Compliance & The Creation of AML BitCoin – An AML and KYC Compliant Cryptocurrency
   3.2. Privately Regulated, Public Blockchain
   3.3. Legal Identity-linked Credential Authentication Protocol
   3.4. Legal Identities of AML BitCoin Senders and Receivers are Traceable While Maintaining Privacy of AML BitCoin Users and AML-KYC Compliance
   3.5. Monitoring and Detection of Financial Crime Transactions
   3.6. Transaction Time-Control Option
   3.7. Stoppage of Financial Crime Transactions
4. **White Label Blockchain Platforms for Digital Currencies and/or Tokens**
5. **Cross-Border Money Transfer (Sending Remittance) Business**
   5.1 Low Cost Borderless Online Payment System
6. **Bitcoin History**
   6.1. Bitcoin - The First Cryptocurrency
   6.2. Limitations of BitCoin and Other Cryptocurrencies
7. **Cryptocurrencies and Regulated Securities**
   7.1. Is Bitcoin or AML BitCoin a Security?
   7.2. Are all Virtual Currencies Not Securities; what about AML BitCoin?
   7.3. Is AML BitCoin a Security?
8. **Forward Contacts and Options – United States Commodity Futures Trading Commission**
9. **U.S. Treasury Department Regulation – FinCEN**
10. **Conclusion**

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

**1. NAC Foundation and Anti-Money Laundering Cryptocurrency**

NAC Foundation, LLC ("NAC") a U.S. organization registered in Las Vegas, Nevada, focuses on development and application of blockchain technology and digital currencies. NAC's primary mission is to strengthen the social sector by advancing knowledge about the use of regulated digital currencies and blockchain technology in the U.S. and globally, facilitating and contributing to economic development through positive experiences and opportunities generated through online commerce, and creating an environment that inspires trust, credibility and confidence among organizations, financial institutions, individuals, partners and stakeholders in order to be recognized as the pre-eminent company in digital financial products and digital financial business in the world. NAC's mission on AML-KYC compliance was first publicly reported in September 2014. After two years of engagement and inquiry, NAC's dedication to its mission was recognized and NAC became a service member of the American Bank Association (ABA).

    **1.1 Meet the Team**

        1.1.1   Marcus Andrade, President and Chief Executive Officer

        1.1.2   Raymond Robertson, Vice President of European Affairs

        1.1.3   Hon. Carlos De La Guardia, Vice President of Latin America Affairs

        1.1.4   Japheth Dillman, Chief Strategy Officer

        1.1.5   John Szeder, Chief Technical Officer

        1.1.6   Erwin Doornbos, Chief Marketing Strategist

        1.1.7   Hung Q. Tran, Project Manager

        1.1.8   Sergey Petkevich, Software Developer

        1.1.9   Brandon Smietana, Software Developer

        1.1.10 Jatin Babbar, Software Developer

        1.1.11 Neha Verma, Software Developer

    **1.2 NAC Advisors**

        1.2.1   Hon. Angela Knight, CBE

        1.2.2   Neil M. Sunkin, Esq.

        1.2.3   John Crawford

        1.2.4   Natko Vlahovic

    **1.3 Legal Advisors**

        1.3.1   Law Office of Neil M. Sunkin, APC

        1.3.2   Whitaker, Chalk, Swindle & Schwartz, PLLC

1

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

## 2. Business Model of AML BitCoin (AMLBit) Currency

### 2.1 Overview

Marcus Andrade invented and granted a license of technology to NAC (patent pending publication numbers: WO 2016156954 A1, EP3073670A1, US20160283941) that permits tracing and tracking of the identities of senders and receivers of a cryptocurrency when necessary. Subsequently, using this methodology, NAC developed its first digital currency, the Aten Coin. Aten Coin was the first cryptocurrency designed to be AML complaint, *i.e.*, anti-money laundering and anti-terrorist compliant, and theft-resistant. The supply of Aten Coin was limited to 26 million ATENC. Twenty-four million ATENC were created by the NAC, and Two million ATENC were set aside for PoS mining. On September 21, 2015, NAC officially publicly launched Aten Coin and about Nine million Aten Coins were acquired by the public and NAC employees.

### 2.2 AML BitCoin – A Successor of Aten Coin

AML BitCoin (unit: AMLBit) is the successor digital currency to the Aten Coin. Existing Aten Coin holders may exchange their ATENC units to AML BitCoin on a ratio of 1:1. Based on NAC's licensing agreement with BGCI for use of the personal legal identity-linked credential authentication protocol (patent pending publication numbers: WO 2016156954 A1, EP3073670A1, US20160283941), AML BitCoin will be developed with updated bitcoin protocol and PoW/PoS protocol. Therefore, AML BitCoin possesses all the unique properties of Aten Coin, including anti-money laundering, anti-terrorism and theft resistance, with an additional AML Platform that will permit others to utilize the White-labelled AML BitCoin technology. The maximum supply of AML BitCoin is 200 million AMLBits. Table 1 summarizes the basic specifications of AML BitCoin, and Table 2 summarizes its distribution plan.

2

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

| Table 1. Basic Specifications of AML BitCoin | |
|---|---|
| Name: | AML BitCoin (unit: AmlBit) |
| AKA: | AML Coin |
| Abbreviation: | AML |
| Biometric Identifications | Mobile Application that uses blockchain technology with Biometric Identification Features. |
| Features: | Anti-Money Laundering |
| Features: | Know Your Client ("KYC") |
| Features: | Anti-Theft Feature |
| Special Feature: | Anti-Criminal Features |
| Segregated Witness (SegWit): | Yes |
| Consensus Protocol: | PoW/PoS hybrid protocol, resistant to 51% attack |
| •    Miner PoW Block Reward: | 2 AML, multiplied by 0.9 every 0.5 million blocks |
| •    Miner PoS Annual Stake Reward: | 0.5% |
| Encryption Algorithm: | X15 |
| Average Block Time: | 1 minute |
| Total Coins: | 200 Million |
| Pre-mined Coins: | 145 Million |
| Total Available for PoW/PoS Mining: | 55 Million |
| Transaction Fees: | 0.0001 AML (0.1 mAML) Per Thousand Bytes |
| Number of Mined Block Confirmation: | 240 |
| Number of Transaction Confirmation: | 6 |

| Table 2. Distribution Plan for 200 Million AMLBits (AML BitCoins) | |
|---|---|
| 76 Million | 76 Million AML Tokens for Public to Purchase |
| 9 Million | For Current Aten Coin Holders to Exchange for AML BitCoins |
| 10 Million | NAC Administration Team |
| 50 Million | Intellectual property licensing and acquisition, bounties for software debugging, employees and consultants |
| 55 Million | For Decentralized PoW/PoS mining |

### 2.3   Identity Verification: *The Digital Identity Trust Network* (DTN)

#### 2.3.1   Select the DTN Option.

The user must confirm or deny if they already have a certified digital identity in association with DTN. If so, then user opens the biometric

3

Version 2.2, 4 October 2017

mobile application and completes the biometric verification process. If the user already has such a digital identity, then the user already knows that they control the transfer of their AML-KYC data.

**2.3.2**    If the user does not have a certified digital identity associated with DTN, then they select their Country of residence, and State or Province, and then the user selects from a list of the approved locations where the user can create a certified digital identity profile.

**2.3.3**    The user must possess two forms of their current government-issued identification documents, such as a passport and a driver's license.

**2.3.4**    User will provide a biometric scan of face, Iris, and fingerprint.
Upon completion, user will have a digital identification which can be used to verify their identity anytime in the future utilizing the biometric mobile application.

## 2.4  AML BitCoin / AML Tokens Pre-Sale

### 2.4.1    Public Sale

As stated in Table 2 above, there will be 76 Million AmlBits available for public purchase. Upon completion and activation of the AML BitCoin, AML Token holders will have the opportunity to exchange them for AML BitCoins on a 1:1 ratio. In making this exchange the token holder will have had to create a certified digital identity profile in association with the DTN.

### 2.4.2    Exchange of AML Token (ABTC) for AML BitCoin (AMLBit)

After all of the features and the AML BitCoin platform are completed, users can exchange their AML Tokens for AML BitCoins. The exchange will be on a ratio of 1:1. This exchange feature will be available on participating trading websites. Within six (6) months after the announcement of the availability of the AML BitCoin, all owners of the AML Token must create a certified digital identity profile as set forth above, and exchange their AML Tokens for AML BitCoins.

### 2.4.3    Trading AML Tokens (ABTC)

At the time of the Presale**,** ABTCs only will be available for purchase. After the Presale, AML Tokens will no longer be issued or sold directly

4

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

by NAC, however, users may trade, sell and purchase ATKs as they desire, including on participating exchanges and trading websites. However, within six (6) months after the announcement that the AML BitCoin is available, holders of the AML Tokens must exchange their AML Tokens for AML BitCoins. After that six-month period, the AML Token will no longer be operational. Table 3 summarizes the buying price breakdown.

| Table 3. Buying Prices of AML Tokens | | | |
|---|---|---|---|
| Phase | AML Tokens (million) | Price, USD | Status |
| Private Sale | 2.5 | 0.60 | Completed |
| Public Sale Phase 1 | 13.5 | 1.00 | October 6, 2017 |
| Public Sale Phase 2 | 20 | 1.25 | After Completion of Phase 1 |
| Public Sale Phase 3 | 40 | 1.50 | After Completion of Phase 2 |

### 3. Aten Coin – First Cryptocurrency Designed for Anti-Money Laundering, Theft Resistance and Government Compliance

#### 3.1 Government Compliance and The Creation of AML BitCoin-an AML and KYC Compliant Cryptocurrency.

In a nutshell, the dilemma presented by crypto-currencies: While, digital currencies have been gaining acceptance as a means of transacting commerce, these currencies have a reputation of facilitating criminal activity; and this has been the focus of financial regulators, legislative bodies, law enforcement, and the media. This concern has not been ill-founded, as there are notable cases of crimes facilitated by the use of bitcoin, as discussed in more detail below.

The development of the identity-based AML compliant digital currency commenced in 2012 and NAC was formed in 2014. Using proprietary technology, this identity-based digital currency is compliant with laws, statutes, rules, and regulations that govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial crimes, and know-your-customer laws, and specifically (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, aka the USA PATRIOT Act; (b) International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, aka Title III, of the USA PATRIOT Act, and subtitles that deal with International Counter Money

5

MSF-4210

Confidential treatment requested by NAC Foundation, LLC

NAC-000162

Version 2.2, 4 October 2017

Laundering and Related Measures, Bank Secrecy Act Amendments and Related Improvements, and, Currency Crimes and Protection; (c) the Money Laundering Control Act of 1986; (d) provisions of the Fair and Accurate Credit Transactions Act of 2003, also known as FACT Act or FACTA, that pertain to the prevention of identity theft; (e) requirements related to economic and trade sanctions administered and enforced by the Office of Foreign Assets and Controls (OFAC) within the United States Department of Treasury; (f) the Bank Secrecy Act, aka BSA or the Currency and Foreign Transactions Reporting Act, which requires the reporting of certain transactions to the government.

The implementation of these features of the Aten Coin and the integration into the white label AML / KYC Platform gives birth to the innovation of AML BitCoin. To prevent criminal and terrorist use of digital currency, NAC uses an invention (patent pending publication numbers: WO 2016156954 A1, EP3073670A1, US20160283941) that permits the tracing and tracking of the identities of senders and receivers of a cryptocurrency when necessary to enable NAC to discover and prevent the use of the AML BitCoin for an illegal activity, as more particularly described below.

**3.2    Privately Regulated Public Blockchain Technology.**
The Bitcoin blockchain is considered to be a "Public Blockchain". Anyone in the world can read, modify and verify it. No one can own and control the blockchain. Anyone can freely create bitcoin addresses and freely use their addresses to receive and send bitcoins. Moreover, anyone can participate in verifying bitcoin transactions (i.e., decentralization of the transaction verification process), but no one can change any transaction records on the blockchain.

Recently there has been discussion of how to modify and make use of the bitcoin's blockchain technology. For example, The Bank of England has said that central banks are looking at ways to implement "hybrid systems" involving distributed ledger technology of the type currently used to record bitcoin transactions. Besides "Public Blockchain", "Private Blockchain" and "Consortium Blockchain" have been created. The operation of a private/consortium blockchain, including transaction verification, will be controlled solely by either a private entity or a group of private entities. These approaches, however, do not allow for the decentralization of the transaction verification process; transaction records on a private/consortium blockchain can be easily manipulated or changed by the entities controlling the blockchain, resulting in a loss of public confidence of the

6

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

integrity of such blockchain.

### 3.3 Legal Identity-linked Credential Authentication Protocol – Core Proprietary Technology of AML BitCoin

On the basis of a privately-regulated public blockchain, NAC has introduced a personal legal identity-linked credential authentication protocol into the source code of AML BitCoin (patent pending publication numbers: WO 2016156954 A1, EP3073670A1, US20160283941). The protocol involves an integration of three major processes, including

(i)      personal identity verification,

(ii)     credential authentication, and

(iii)    a two-party signature scheme.

A tracing/tracking system is introduced at the blockchain level such that:

(1)    All AML BitCoin addresses are multi-signature addresses composed of a pair of public key and private key from NAC and at least one pair of public key and private key from an AML BitCoin user;

(2)    All AML BitCoin addresses can only be created by someone who has a certified digital identity that was created by a process using biometrics; and

(3)    Without NAC's authorization, no one can use any AML BitCoin address to transfer AML BitCoins that are recorded (stored) at AML BitCoin addresses.

In order to obtain authorization from NAC, each AML BitCoin user must have created a certified digital identity and must have agreed to comply with the terms and conditions on the AML BitCoin and related websites. This registration process assures that each potential AML BitCoin user will have presented valid documentation to confirm their legal identity. Once an AML BitCoin user has successfully registered in NAC's system, they will be provided with an AML BitCoin ID, and only then will they be allowed to create their private AML BitCoin credentials to create an AML BitCoin address with which to conduct AML BitCoin transactions.

The anonymity of the user and their digital address is maintained, as the passwords of AML BitCoin credentials are only known to the AML BitCoin user who created them and they are encrypted in NAC's system. No one from NAC would access or know the user's unique passwords for AML BitCoin credentials, with the limited exception discussed below.

7

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

### 3.4 Legal Identities of AML BitCoin Senders and Receivers are Traceable While Maintaining Privacy of AML BitCoin Users and AML-KYC Compliance

In the typical transaction process, NAC's authentication system will automatically provide authorization to any request for address generation or transaction creation upon the receipt of a valid AML BitCoin credential. Therefore, generally, AML BitCoin will function similarly to Bitcoin, except that AML BitCoin transactions are faster, cheaper and more secure. All transaction data is available in the AML BitCoin's blockchain, which is open to the public. As is the case with Bitcoin, the public will not know the identities of AML BitCoin senders and receivers; however, unlike Bitcoin, the actual identities of the senders and receivers are maintained in NAC's system. Using AML BitCoin Credentials and AML BitCoin IDs, NAC can trace the legal identities of any senders and receivers when necessary. This process enables AML BitCoin compliance with AML-KYC laws. NAC may reveal identities of senders and receivers associated with any transactions that rise to the legal definition of suspicious activities, such as association with money laundering, hacking or other illegal activities, while simultaneously maintaining privacy of AML BitCoin users. Senders and receivers of all transactions can be revealed; thus, any thieves or hackers who steal AML BitCoins can be easily traced and tracked by retrieving personal identity(s) of the receiver(s) from the client information database maintained by NAC. Moreover, the credential authentication mechanism behind AML BitCoin allows a user to change their credentials to prevent the transfer of AML BitCoins from a stolen wallet. As a result, NAC's innovations can thwart the theft of AML BitCoin.

### 3.5 Monitoring and Detection of Financial Crime Transactions

Furthermore, AML BitCoin's core technology allows NAC and other institutions/organizations/agencies to monitor every transaction and identify those involved in financial crimes, such as money laundering and terrorist financing, by analyzing individual AML BitCoin users' transaction records. NAC would be legally obligated to report to governmental authorities suspicious transactions and identities of the associated senders and receivers.

In addition to monitoring and preventing the completion of a suspicious transaction, such as money-laundering or facilitating terrorist financing, NAC can restrict AML BitCoin transactions to only authorized countries. In this way, NAC can prevent AML BitCoin from being used in jurisdictions sanctioned by the United States of America or the United Nations, by monitoring the location of senders. This process should greatly diminish the opportunity for use of AML

8

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

BitCoin in terrorist or criminal activities.

Thus, the systems innovated by NAC for the AML BitCoin, provide a real solution to the lack of AML-KYC compliance by Bitcoin and various alternative currencies.

**3.6 Transaction Time- Control Option**

**3.6.1** AML BitCoin Wallet holders have an option to select a transaction time control feature, which will permit a delay of variable lengths, depending on the amount of the transaction in accordance with the chart below. This option is a high level additional security feature that reduces risk of unauthorized transactions. The feature is only an option, but is recommended for all merchants/slash exchanges/trading sights, and all other commercial use.

**3.6.2** This time-lock option can be implemented at the wallet holder's discretion to control the transaction time. For transacting fewer than 1000 AMLBits, each transaction will be immediately subjected to validation and confirmation. A transaction of more than 1000 AMLBits, would be locked for a predetermined period of time, to allow time to validate and confirm the transaction. For example, if one minute is required for every additional 25 AMLBits over 1000, a transaction of 1,025 AMLBits would be locked for one minute before it is validated and confirmed. A transaction of 100,000 AMLBits would be locked for about three days, and a transaction of 0.5 million AMLBits would be locked for about two weeks. Table 4 summarizes the tentative time-lock rule and provides some examples on how the duration of the time-lock would vary depending on the transaction amount.   If there were a hacker event, the time-lock function could provide time for a victim to discover cancel the transaction. Since most transactions would be in amounts less than 1000 AMLBits, the implementation of the time control will not significantly affect the daily use of AML BitCoins for making payment.

9

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

Table 4. NAC's tentative time-lock rule and examples for duration of time-lock

| AML BitCoin (AMLBits) | Time-lock |
|---|---|
| 0 – 1000 AML | 0 minute |
| > 1000 AML | 1 minutes per every additional 25 AML |
| Example 1:      999 AML | 0 minute |
| Example 2:      1,025 AML | 1 minutes |
| Example 3:      1,100 AML | 4 minutes |
| Example 4:      10,000 AML | 6 hrs. |
| | *(10,000 − 1,000) /25 = 360 minutes* |
| Example 5:   100,000 AML | 2.75 days |
| | *(100,000 − 1,000) /25 = 3960 minutes* |
| Example 6:   500,000 AML | 13.86 days |
| | *(500,000 − 1,000) /25 = 19,960 minutes* |
| Example 7: 1,000,000 AML | 27.75 days |
| | *(1,000,000 − 1,000)/25 = 39,960 minutes* |

### 3.6.3 Alert System for Transactions Exceeding the Defined Limit

An alert system will be implemented to inform an AML BitCoin holder when the amount of AMLBits being sent from his/her wallet exceeds a predefined limit. Each AML BitCoin holder can set such a AML BitCoin limit. NAC will monitor every transaction for each AML BitCoin account. When NAC detects a transaction exceeding the predefined limit, NAC's system will identify the AML BitCoin holder and an alert will be emailed to that AML BitCoin holder allowing them time to act, such as to cancel the transaction within time-lock period, or call NAC's customer service center.

### 3.6.4 Locking the AML BitCoin Accounts of Suspected Criminals

Sometimes a victim may discover the AML BitCoin theft after the time-lock period has passed. Once NAC has confirmed that the victim has contacted the appropriate authorities, NAC will immediately identify the receiver(s). NAC may also lock the AML BitCoin account(s) of the receiver(s) if the stolen amount is substantial. Then the suspected theft cannot spend the stolen AMLBits or send to third persons. If the receiver(s) has already sent the stolen AMLBits, NAC could track and identify the third person receivers. Depending on the situation, NAC may also lock the accounts of those third persons to prevent further sending of the stolen AMLBits. Moreover, NAC will

10

Confidential treatment
requested by NAC Foundation,
LLC

Version 2.2, 4 October 2017

collaborate with professional bodies to perform real-time monitoring for any suspicious AML BitCoin transactions, e.g. those which are likely to be involved in money laundering or financing terrorist activities. Once those suspicious transactions are identified, NAC would be obligated to report those suspicious transactions to the relevant governmental bodies. Upon a legitimate request from a governmental body, NAC will identify the suspects and lock their AML BitCoin accounts.

### 3.7 Stoppage of Financial Crime Transactions.

Bitcoin transactions cannot be stopped and are irreversible once initiated, except in cases of double spending. While this leads to increased transaction speed, fee-free transactions, and secure payments, in the ordinary Bitcoin transaction, this irreversibility and speed can be devastating to a digital currency owner whose coins are stolen, such as by a hacker. NAC employs a process, however, to overcome this problem.

### 4. White Label Blockchain Platforms for Digital Currencies and/or Tokens

NAC will make its white-labelled AML/KYC compliant platform available to pre-approved users. In that regard NAC will assist businesses, institutions, and governments interested in using NAC's AML-KYC compliant blockchain technology to create their own AML-KYC complaint solutions, including, by providing technical support services through NAC's white-labeled blockchain platform. (Those pre-approved users who create a modified AML compliant product may make the transaction time-lock feature referenced above mandatory or optional.)   NAC will evaluate applications for participating in its platform to ensure compliance with NAC's legal and ethical standards.

### 5. Cross-Border Money Transfer (Sending Remittance) Business

There is an enormous global need for transferring money across countries' borders. According to estimates by the World Bank, global remittances, which include flows to high-income countries, amounted to $575 billion USD in 2016. About 75% ($429 billion USD) was remitted to developing countries. "*Remittances are an important source of income for millions of families in developing countries. As such, a weakening of remittance flows can have a serious impact on the ability of families to get health care, education or proper nutrition,*" said Rita Ramalho, Acting Director of the World Bank's Global Indicators Group. [*http://www.worldbank.org/en/news/press-release/2017/04/21/remittances-to-developing-countries-decline-for-second-consecutive-year*].

11

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017



**Figure 1. The Cost of Sending and Receiving Money [*Image source: The World Bank*]**

The global average cost of sending remittances was 7.32% as of June 2017 (Figure 1). Blockchain technology facilitates cross-border transmission of cryptocurrency at extremely low costs. By introducing AML BitCoin into the international remittance industry, NAC plans to set-up a highly competitive AML-KYC compliant business for cross-border money transfer for low fees.

### 5.1    Low Cost Borderless Online Payment System

There is also a global need for a low cost borderless payment system. PayPal, a cross-border online payment system established in 1998, charges merchant transaction fees normally of between 2% and 3%. In 2016, PayPal had a total payment volume of $354 billion USD in 26 currencies across more than 190 nations, generating a total revenue of $10.842 billion USD. The average daily payment volume was $967 million USD per day. In early 2017, Bitcoin transaction volume was $260 million USD per day, with 27% of this volume resulting from daily Bitcoin trading in the exchange markets. Bitcoin transaction volume associated with illicit activities is not available. If one estimates the legal online commerce using Bitcoin to be ten percent of the total non-trading volume, then the average daily payment volume in early 2017 using Bitcoin for legal commerce would be approximately USD$19 million, about 2% of PayPal's volume. Therefore, the potential for AML BitCoin in online commerce is immense. NAC intends to create a new automated borderless online payment processing system for utilizing AML

12

Confidential treatment
requested by NAC Foundation,
LLC

Version 2.2, 4 October 2017

BitCoin.

## 6.    Bitcoin History

Invented in 2008, Bitcoin is the first cryptographic-based electronic money. It is also referred to as the first cryptocurrency. Cryptocurrencies, such as Bitcoin, are a new type of digital currency, and are known as "decentralized digital currencies." Bitcoin is not only virtual money, but also a payment system composed of a decentralized peer-to-peer transaction network for recording and verifying money transactions. There is no central point of control over the Bitcoin supply and transaction verifications.

### 6.1   Bitcoin - The First Cryptocurrency

Bitcoins (i.e., units of Bitcoin) are stored in individual owners' client wallets, but their ownership is recorded in a public ledger of all Bitcoin transactions, i.e., blockchain, using the Bitcoin addresses of the owners. A Bitcoin address is a 160-bit hash of the public portion of a public/private Elliptic Curve Digital Signature Algorithm (ECDSA) key pair. The private key for each Bitcoin address is stored in the client wallet of the address owner. Moreover, all client wallets are connected with each other through the Internet and form nodes of a transaction network to relay and verify the transactions. Using public/private-key cryptography, one can "sign" (i.e., use his/her private key) to send an amount of Bitcoins recorded at his/her Bitcoin address to another Bitcoin address, and in the transaction network anyone who knows his/her public key can verify whether the signature is valid.

Since Bitcoin, different cryptographic-based electronic currencies have been created; collectively they are called alternative cryptocurrencies.    Some are modified forms of Bitcoin, using different cryptographic hash algorithms (e.g., Litecoin), having additional functions (e.g., Ethereum) or different signature technologies (e.g., CryptoNote).

### 6.2  Limitations of Bitcoin and Other Cryptocurrencies
#### 6.2.1    Unstable Value of Cryptocurrency

Fiat money is the term used to describe currency that is issued because of a government's order — or fiat — that the currency must be accepted as a means of payment (such as the U.S. Dollar). The value of fiat money is based solely on the faith and credit of the economy; they are not backed by a precious asset such as gold. Similarly, most cryptocurrencies, including Bitcoin, are not backed by precious assets.

13

Version 2.2, 4 October 2017

Their values are based solely on the faith and credit of individual cryptocurrencies. For example, the value of Bitcoin is based solely on the faith and credit of the Bitcoin decentralized transaction network, and the value is dictated primarily by the exchange market. The limited supply of Bitcoin (e.g. 21 million coins) has created a public perception that the value of Bitcoin will increase when demand increases. The transaction network of Bitcoin is maintained by new block generation (i.e. coin mining) by the public in a decentralized manner.    The value of Bitcoin reflects the cost of the computational power contributed by the public in new block generation and transaction verification. When Bitcoin is no longer mined, the transaction network stops and the value of the Bitcoin can become zero.

### 6.2.2    Limited Decentralization

It is believed that the decentralization of ownership and control of a cryptocurrency and its transaction network is the most appealing feature of cryptocurrencies. For example, Bitcoin and its transaction network is neither owned nor controlled by any private or governmental bodies. Unfortunately, decentralization is restricted primarily to people who know how to perform mining with their computing devices, such as personal computers. There are two major types of cryptocurrency mining. One is proof-of-work (PoW), which is used in Bitcoin mining. Generally, in the process of PoW the amount of Bitcoin mined is proportional to the relative amount of the computing power in the Bitcoin transaction network which the miner has contributed to the process of block generation. Such mining processes can be monopolized by people having ASIC miners or computers with powerful GPUs or CPUs. Once a cryptocurrency has a recognized value, the number of miners increases. Subsequently, the mining difficulty increases, while the number of coins mined per day per miner decreases. Finally, less powerful miners have a very low incentive to continue the mining. Furthermore, for those cryptocurrencies having (or expected to have) low exchange value, the incentive for mining is also very low. The decentralization process then stagnates. The other significant manner of cryptocurrency mining is proof-of-stack (PoS), considered a better method than PoW, it is used in BlackCoin mining. In the PoS process, the computation power contributed to the mining is proportional to the amount of the cryptocurrency the miner owns. The

14

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

participation of numerous participants owning a cryptocurrency in a decentralized blockchain is beneficial to the process of new block generation and transaction verification. On one hand, the use of a powerful computing device benefits the process of PoS. On the other hand, it is relatively expensive to obtain sufficient units of a cryptocurrency to achieve over 50% of computing power in the whole cryptocurrency transaction network. Compared to PoW, it is believed that PoS can enable the operation of a cryptocurrency transaction network in a more economical and secure manner.

### 6.2.3    Pseudonymous/Anonymous Property of Cryptocurrency and Illegal Activities

By design, Bitcoin is pseudonymous, while all alternative cryptocurrencies are either pseudonymous or anonymous. Anonymous cryptocurrencies are susceptible to money laundering activities because all senders and receivers in money transactions are not traceable. As to pseudonymous cryptocurrency, an academic study (Meiklejohn S, et al. University of California, San Diego, 2013) shows that evidence of interactions between institutes could be identified by analyzing the pattern of Bitcoin addresses in empirical purchasing of goods and services. While this approach may be able to identify illegal activities at institution levels, it cannot do so at the individual level.   A recent academic study (Koshy P, et al. Pennsylvania State University, 2014) has shown that it is possible to map a Bitcoin address to an IP address. However, this approach is applicable to less than 10% of the Bitcoin addresses. Therefore, Bitcoin has been used widely and successfully in illegal activities, such as money laundering (Bryans D, Indiana Law Journal, 89 (1):441, 2014), selling drugs from and online darknet market, as well as financing terrorist activities.

The pseudonymous/anonymous characteristic also makes Bitcoin and alternative cryptocurrencies attractive targets for hackers and thieves. For example, in February 2014, the Mt. Gox company, which was the world largest Bitcoin exchange company at that time, filed for bankruptcy protection because the company was hacked repeatedly, resulting in the loss of 850,000 Bitcoins (worth about US$ 480 million). In January 2015, the Slovenian Bitcoin exchange Bitstamp, which was the world's third largest Bitcoin exchange at that time, was hacked, and

15

Version 2.2, 4 October 2017

at least 19,000 BTC (worth about US$ 5 million) was stolen. In August 2016, 119,756 Bitcoins (roughly equivalent to US$ 72 million) of customer funds were stolen from the Bitfinex, the largest Bitcoin exchange by volume at that time. On May 12, 2017, there was a global wide-spread infection of a ransomware known as "WannaCry". "WannaCry" encrypted the files on computer systems, and hackers demanded a Bitcoin ransom in exchange for the decryption of files. On July 4, 2017, it was reported that millions of US dollars in Ethereum were stolen from the Bithumb, which is the largest Bitcoin and Ether exchange in South Korea by volume. On July 18, 2017, US$ 7 million of Ethereum was stolen from the CoinDash ICO. On July 19, 2017, US$ 30 million of Ethereum was stolen from many Ethereum wallets. Although the hackers/thieves must transfer the stolen Bitcoins or ethers (i.e. Ethereum tokens) to their wallet addresses, the identities of most of these hackers and thieves cannot be identified.

AML BitCoin is designed to avoid and prevent this illegal activity.

### 7.    Cryptocurrencies and Regulated Securities
#### 7.1   Is Bitcoin or AML BitCoin a Security?
##### 7.1.1 Background

AML BitCoin, like Bitcoins, is a cryptocurrency payment systems. Like other currencies, they will be subject to speculation. But, no organization controls Bitcoin or controls its returns on speculative investment. NAC Foundation will administer AML BitCoin's anti-money laundering compliance and contract with transaction settlement platforms, but will not seek to affect pricing. U.S. Securities and Exchange Commission ("SEC") regulatory actions and reviews by the SEC's Division of Corporation Finance relating to Bitcoins have focused on intermediary business entities intending to invest in or trade Bitcoins,[1] but not actual Bitcoins. Treating AML BitCoin transactions as

---

[1] See e.g. *Securities and Exchange Commission v. Trendon T. Shavers and Bitcoin Savings and Trust*, Civil Action No. Civil Action No. 4:13-CV-416, E.D. Texas Sherman Division (SEC Litigation Release No. 23090, September 22, 2014); *Bats BZX Exchange, Inc.; Order Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, to BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, to List and Trade Shares Issued by the Winklevoss Bitcoin Trust*, SEC Release No. 34-80206, March 10, 2017).

16

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

securities transactions under U.S. law would impose considerable regulatory burdens on AML BitCoin transactions.

As a matter of background, U.S. securities regulation does not regulate the investment instrument, it regulates the transaction relating to the instrument. If the transaction involves a security, all transactions relating to the instrument must either be registered with the SEC or exempt from registration. If a securities instrument is sold once pursuant to a registration statement, it does not become "free-trading." Instead all subsequent transactions in that instrument must also be either registered with the SEC or subject to an available securities exemption.[2]

Also, securities registration exemptions treat original issuances of securities differently from secondary sales by sellers who are not affiliated with the issuer. SEC Regulation D is the primary securities exemption for original issuances[3] and generally requires purchasers to be "Accredited Investors", that is individuals who have $200,000 in annual income ($300,000 in annual income with spouse") or $1 million in assets outside the home equity for the primary residence.[4] Secondary transactions by issuer non-affiliates after a purchase from an issuer will generally be subject to one-year holding periods under SEC Rule 144.[5] If a transaction involves a seller who is not the issuer or its affiliates, an underwriter (that is a securities holder who acquired the securities directly from the issuer or its affiliates) or a securities dealer, then secondary transactions will generally be exempt from U.S. securities registration requirements under Section 4(a)(1) of the Securities Act of 1933.[6] Further, states can regulate secondary transactions. Many U.S. states have securities exemptions for limited secondary transactions exemptions.[7]

---

[2] *SEC v. Cavanaugh*, 155 F.3d 129, 133 (2d Cir. 1988),

[3] 17 CFR §§500-508.

[4] 17 CFR §502.

[5] 17 CFR §144.

[6] 15 U.S.C. §77d(a).

[7] See e.g. 7 Tx. Admin. Code. 139.14.

17

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

Further, those being compensated for selling securities in U.S. transactions need to be registered to sell securities as a broker or dealer.[8] Those being compensated by U.S. clients for advising on the purchase or sale of securities are required to be registered as investment advisers under U.S. federal or state law.[9] Moreover, a business entity whose shares or units are sold to U.S. subscribers and whose business is to own securities of other issuers may be an "investment company," thus imposing a system of complex regulation under the Investment Company Act of 1940.[10] Finally, operators of facilities that provide for the purchase, sale and settlement of trades in securities sold or settled in the U.S. must register as exchanges or otherwise be exempt.[11]

Finally, all these U.S. securities transactions, whether exempt or not, are subject to the anti-fraud provisions of federal and state securities law.[12] This means that the sellers are obligated to disclose all material facts and cannot misrepresent information about the security.

### 7.1.2 Bitcoin and AML BitCoin as a Security

So, the questions are whether a Bitcoin transaction is a securities transaction under U.S. state and federal law – and whether the AML BitCoin's addition of AML compliance changes to the Bitcoin structure changes the calculus.

Bitcoin is a "decentralized peer-to-peer payment network that is powered by its users with no central authority or middlemen"[13]

The Bitcoin network is sharing a public ledger called the "block chain." This ledger contains every transaction ever

---

[8]  15 U.S.C. §78o(a).

[9]  15 U.S.C. §80b-3.

[10]  15 U.S.C. §80a-1 et seq.

[11]  *"Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The Dao,"* SEC Release No. 34-81207 (July 25, 2017), pp. 16-17 (found at https://www.sec.gov/litigation/investreport/34-81207.pdf).

[12]  See e.g. 15 U.S.C. §77q(a); 15 U.S.C. §78j; 17 CFR §240.10b-5.

[13]  What is Bitcoin? Bitcoin.org FAQs, https://bitcoin.org/en/faq#what-is-bitcoin (visited August 31, 2017).

18

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

processed, allowing a user's computer to verify the validity of each transaction. The authenticity of each transaction is protected by digital signatures corresponding to the sending addresses, allowing all users to have full control over sending Bitcoins from their own Bitcoin addresses. In addition, anyone can process transactions using the computing power of specialized hardware and earn a reward in Bitcoins for this service. This is often called "mining". [14]

AML BitCoin will function similarly. AML BitCoin will have a public ledger as an open/transparent blockchain. For the public ledger, the authenticity of each transaction will be protected by digital signatures corresponding to the sending addresses, allowing users to have control over sending AML BitCoins from their own AML BitCoin addresses (subject to AML compliance). Further, participants can process transactions using the computing power of specialized hardware and are awarded AML BitCoins for such services.

### 7.1.2.1 – Bitcoin and AML BitCoin are not stock

The definition of a "security" under federal and state law includes stock. The US Supreme Court has held that stock's characteristics include: (1) the right to receive dividends contingent upon the apportionment of profits; (2) negotiability; (3) can be pledged or hypothecated; (4) conferring voting rights in proportion to shares owned; (5) can appreciate in value.[15] Bitcoin and AML BitCoin provide no right to receive dividends or any right to participate in the profits of an enterprise. Bitcoin and AML BitCoin also do not confer voting rights. Bitcoin and AML BitCoin are negotiable and can appreciate in value through speculative trading, and such trading will rely entirely on the expertise of the AML BitCoin's holder. Under certain conditions complying with the Uniform Commercial Code, it might be possible to hypothecate Bitcoin and AML BitCoin. But, in the end, Bitcoin is not stock.

---

[14] How does Bitcoin Work? Bitcoin.org FAQs, https://bitcoin.org/en/faq#what-is-bitcoin (visited August 31, 2017).

[15] *Landreth Timber Co., v Landreth*, 471 U.S. 681, 686 (1985).

19

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

Likewise, AML BitCoin's additional features do not cause AML BitCoin to be stock. AML BitCoin's anti-money laundering compliance may enable easier transaction settlements, but should not affect pricing. AML BitCoin also is not stock.

### 7.1.2.2    Bitcoin and AML BitCoin are not a debt securities.

U.S. Courts use the *Reves* "family resemblance" test to determine whether a debt instrument is a security.[16] First, U.S. Courts will look at whether the instrument is among the items that are deemed to not be a security, such as a consumer note issued in consumer finance. Then, Courts will look at a four-factor balancing test.

First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." . . . . Second, we examine the "plan of distribution" of the instrument, . . . , to determine whether it is an instrument in which there is "common trading for speculation or investment," . . . Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. . . .    Finally, we examine whether some

---

[16]  *Reves v. Ernst & Young*, 494 US 56, 62-63 (1990).

20

Version 2.2, 4 October 2017

factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.[17]

Bitcoin and AML BitCoin sellers are not seeking to finance substantial investments in business enterprises. From FinCEN's perspective, Bitcoin and AML BitCoin that is not exchanged into legal tender will be typically used to purchase or sell goods and services. Bitcoin and AML BitCoin also do not pay a return on investment in the form of interest or otherwise. Indeed, debt securities include a promise to pay in return for the retirement of the debt security. Bitcoin and AML BitCoin have no promise to pay. Any return on investment would come from speculative trading by the Bitcoin and AML BitCoin holder. Bitcoin and AML BitCoin will have a broad distribution and common trading for speculation. Since Bitcoin is and AML BitCoin will be, a virtual currency, they are not like other instruments treated as securities. Finally, Bitcoin, and in particular, AML BitCoin, are subject to an anti-money laundering alternative regulatory regime, but such regulation is not meant to be for the protection of Bitcoin purchasers and sellers – the regulation is just intended to seek to prevent Bitcoin (and AML BitCoin) from being used for unlawful purposes. Consequently, there is no alternative regulatory regime providing protection to purchasers and sellers. Consequently, a balancing of the *Reves* factors shows that Bitcoin (and AML BitCoin) are not debt securities as two of the four balancing factors are not satisfied. In particular, any anticipated returns would come from the AML BitCoin purchaser's trading prowess, not any efforts by an issuer or other third parties. Plus, the issuer has no obligation to pay to retire the instrument as it would be obligated with a debt instrument.

### 7.1.2.3   Bitcoin and AML BitCoin are not investment contracts.

U.S. Courts use the *Howey* Test to determine whether an instrument is an "investment contract" as defined by federal and state securities laws. According to the US Supreme Court:

---

[17]   *Reves at* 62-63.

21

MSF-4210

Confidential treatment requested by NAC Foundation, LLC

NAC-000178

Version 2.2, 4 October 2017

the basic test for distinguishing the transaction from other commercial dealings is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. . . . This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, . . . or a participation in earnings resulting from the use of investors' funds, . . . . In such cases, the investor is "attracted solely by the prospects of a return" on his investment. . . . By contrast, when a purchaser is motivated by a desire to use or consume the item purchased. . . . -- the securities laws do not apply.[18]

First, Bitcoin and AML BitCoin will be purchased for money. But, it is not quite an "investment" as the issuer will have no conditional or unconditional obligation to pay. Bitcoin and AML BitCoin are instruments that can be purchased for speculation (like baseball cards,[19] tulips,[20] etc.) or as currency for payment for goods and services. Bitcoin and AML BitCoin will not pay a return on investment in the form of interest, dividends or distributions. Any return on AML BitCoin purchased in the initial coin offering or mined will not relate to the operation of any business by someone other than the purchaser or derive from the operation of any other security. In that sense, AML BitCoin is not an investment.

---

[18]  *United Housing Foundation, Inc. v. Forman*, 421 US 837, 852-853 (1975)/

[19]  See "*The Baseball-Card Bubble*" The Economist, December 17, 2014 found at
https://www.economist.com/news/christmas-specials/21636506-how-childrens-hobby-turned-classic-financi al-mania-baseball-card-bubble

[20]  See https://en.wikipedia.org/wiki/Tulip_mania

22

MSF-4210                          Confidential treatment                          NAC-000179
requested by NAC Foundation,
LLC

Version 2.2, 4 October 2017

Second, Bitcoin and AML BitCoin do not relate to common enterprises. Various courts recognize three types of common enterprise when applying the investment contract test.

Horizontal commonality (adopted in the First, Third, Sixth and Seventh Circuit Courts of Appeals) relates to a pooling of assets or funds "from multiple investors so that all share in the profits and risks of the enterprise."[21] Bitcoin and AML BitCoin do not involve the pooling of assets or funds for the sharing of profits and risks of an enterprise. They are just mediums of financial exchange.[22] While the initial coin offering does result in the pooling of purchaser funds, it does not result in the sharing of profits and risks. The AML BitCoin holder may use it to purchase goods and services or to speculate based on his or her own judgment. For secondary transactions, each owner of AML BitCoins will be buying and selling them separately and the purchase or sale of one AML BitCoin will not be contractually connected the purchase or sale of another AML BitCoin. If a seller has no ongoing obligation to act for the benefit of the participants in the pooled investment vehicle, there is no horizontal commonality.[23] Finally,

---

[21] *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972), cert. denied 409 U.S. 887, *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 99-102 (7th Cir. 1977); *Curran v. Merrill Lynch*, 622 F.2d 216, 221-225 (6th Cir. 1980, *aff'd on other grounds* 456 U.S. 353 (1982); *Salcer v. Merrill Lynch*, 682 F.2d 459 (3d Cir. 1982); *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001 (6th Cir. 1984); *Secon Service Systems v. St. Joseph Bank & Trust*, 855 F.2d 406, 411 (7th Cir. 1988); *Deckebach v. La Vida Charters, Inc. of Florida*, 867 F.2d 278, 281-284 (6th Cir. 1989); *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.3d 385, 395-397 (6th Cir. 1989) cert. denied sub nom., *Trager, Glass & Co., v. Newmyer*, 495 U.S. 930, *Wals v. Fox Hills Development Corp.*, 24 F.3d 1016 (7th Cir. 1995); SEC v. Lauer, 52 F.3d 667 (7th Cir. 1995), *SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001).

[22] This is to be distinguished from business entities that use pooled funds to purchase Bitcoins – which have drawn SEC scrutiny. See *Securities and Exchange Commission v. Trendon T. Shavers and Bitcoin Savings and Trust*, Civil Action No. Civil Action No. 4:13-CV-416, E.D. Texas Sherman Division (SEC Litigation Release No. 23090, September 22, 2014); *Bats BZX Exchange, Inc.; Order Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, to BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, to List and Trade Shares Issued by the Winklevoss Bitcoin Trust*, SEC Release No. 34-80206, March 10, 2017).

[23] "(T)o satisfy the "common enterprise" element of Howey, plaintiffs must be able to show that funds were pooled and that the fortunes of each investor in the pool were tied to the success of the overall venture." *Rolo v. City Investing Co. Liquidating Trust*, 845 F. Supp. 182, 236 (D.N.J. 1993).

23

Version 2.2, 4 October 2017

those who mine AML BitCoins do not receive returns on an as-converted basis that may correlate with other miners or initial coin offering purchasers.

AML compliance feature of the AML BitCoin does not impact the pooling of purchaser funds or the running of an enterprise that will pay a return on investment.

The Fifth and Eleventh Circuit Courts of Appeals have adopted "broad vertical commonality" which requires that the fortunes of all the investors depend on the promoter's expertise, whether or not the investment is pooled with other investments.[24] But, Bitcoin has no promoter lending expertise to generate a return on investment through a distribution of earned revenue or payment of interest. AML BitCoin has an administrator that is merely engaging in monitoring the use of the AML BitCoin to comply with AML-KYC laws not generating returns on investment to be paid to AML BitCoin holders. Mined AML BitCoin should be viewed similarly.

The Ninth Circuit has adopted "strict vertical commonality." The common enterprise may be found there the "fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or third parties."[25] Bitcoin and AML BitCoin will generate no return on investment through dividends, distributions, royalties or interest payments. There is no enterprise depending on efforts of others for its success. Any economic return will only relate to speculative trading or mining by the Bitcoin or AML BitCoin holder (thus depending on the success of the purchaser), not the operation of any enterprise.

---

[24] *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-479 (5th Cir. 1974); *SEC v. Continental Commodities Corp.*, 497 F. 2d 516, 520-523 (5th Cir. 1974); *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193 (5th Cir. 1979), *modified on other grounds*, 611 F.2d 105 (5th Cir. 1980); *Villeneuve v. Advanced Business Concepts Corp*, 698 F.2d 1121, 1124 (11th Cir. 1983), *aff'd en banc*, 730 F.2d 1403 (11th Cir. 1984).

[25] *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973), *cert. denied* 414 U.S. 821.

24

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

Third, the investment contract test requires an expectation of profits. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, . . . or a participation in earnings resulting from the use of investors' funds, . . . . In such cases, the investor is "attracted solely by the prospects of a return" on his investment."[26] Moreover, "profit may be derived from the income yield by an investment as well as from capital appreciation."[27] The profit expected may be either fixed, as with interest, or variable.[28] With Bitcoin and AML BitCoin, no return on investment from development of the initial investment, participation in earnings, or fixed payments should be expected and any return will only derive from speculative market demand for Bitcoin or AML BitCoin with the decision as to whether, when and at what price to buy and sell being within the discretion of the purchaser, not NAC or another third party. Alternatively returns could be generated with AML BitCoin mining, but those speculative actions would be in the control of the miner, not any third party.

Fourth, the investment contract test states that the anticipated return on investment comes from the efforts of others which are "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."[29] For Bitcoin and AML BitCoin, any return on investment would solely depend on mining and the purchaser's trading prowess in surfing a speculative wave. Bitcoin and AML BitCoin purchasers will not rely on others. AML BitCoin's efforts to comply with anti-money laundering laws should have no impact on returns on investment.

Accordingly, the purchase or sale of Bitcoin and AML BitCoin does not appear to involve the purchase or sale of securities under US federal and state securities laws.

---

[26] *United Housing Foundation, Inc. at* 853.

[27] *United Housing Foundation, Inc. at* 855.

[28] *SEC v. Edwards*, 540 U.S. 389 (2004).

[29] *SEC v. Glenn W. Turner Enterprises, Inc.* at 482.

25

Confidential treatment
requested by NAC Foundation,
LLC

Version 2.2, 4 October 2017

### 7.2    Are all Virtual Currencies Not Securities; what about AML BitCoin?

Whether a Virtual Currency is considered as a security depends on its nature and its associated business model. For example, on July 25, 2017, the U.S. SEC concluded that The DAO tokens, a digital asset, were securities.[30] The DAO ("Distributed Autonomous Organization") is an Ethereum-based token offered by a German blockchain startup, Slock.it. Slock.it sold The DAO tokens to investors to collect for the purpose of funding certain projects. The DAO token holders could vote on which projects were to be funded and a portion of the profits from those projects were given to The DAO token holders as a return on their investments. The SEC concluded that The DAO is a security because the fortunes of the investors (i.e., The DAO token holders) were directly tied to those of the promoter (i.e., Slock.it), and The DAO token holders' interest in business enterprise indicated a pooled investment vehicle, and the success of the pooled investment vehicle derived from the material efforts of those other than The Dao token holders.

*AML BitCoin holders will not be presented with business ventures and no votes will be taken. Thus, AML BitCoin's operations and function significantly differs from The Dao tokens. Therefore, AML BitCoin is not a security.*

### 8.    Forward Contacts and Options – United States Commodity Futures Trading Commission

The United States Commodity Futures Trading Commission ("CFTC") has determined that Bitcoins are "commodities" as defined by the Commodities Exchange Act. This means that derivative contracts such as futures contracts and options contracts on Bitcoins will be subject to the CFTC regulatory regime. On July 6, 2017, the CFTC registered LedgerX LLC as a "Swap Execution Facility" based on a business plan relating to Bitcoins.[31] On July 24, 2017 the CFTC also registered LedgerX LLC as a "Derivatives Clearing Organization."[32] LedgerX claims it is "first federally regulated bitcoin options exchange and clearing house to list and clear fully-collateralized, physically-settled bitcoin options for the institutional market."[33]

---

[30] *"Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The Dao,"* SEC Release No. 34-81207 (July 25, 2017), (found at https://www.sec.gov/litigation/investreport/34-81207.pdf).

[31] CFTC Press Release no. pr7584-17 (July 6, 2017).

[32] CFTC Press Release no. pr7592-17 (July, 24, 2017).

[33] Found at https://ledgerx.com/about-ledgerx/

26

MSF-4210                        Confidential treatment                        NAC-000183
requested by NAC Foundation,
LLC

Version 2.2, 4 October 2017

Brokers engaged in swap, option or forward contracts relating to virtual currencies will likely need to be registered with the CFTC through the National Futures Association.[34]

The CFTC has not yet granted approval for swap execution facilities or derivatives clearing organizations for the retail Bitcoin market, much less for other virtual currencies. Thus, NAC does not anticipate a market in the near future for swaps, options or forward contracts on AML BitCoins. Moreover, NAC does not anticipate facilitating such transactions, and if such transactions occur, NAC's role would be solely with respect to AML compliance as to the AML BitCoin spot transaction that may be used to settle an expiring swap, option or forward contract.

### 9.    US Treasury Department Regulation – FinCEN

AML BitCoin's creator, NAC, has been registered with The Financial Crimes Enforcement Network (FinCEN), a division of the US Treasury, as a "Money Services Business" ("MSB") since 2015. Its MSB Registration number is 31000067804981. FinCEN has a comprehensive anti-money laundering regime that governs MSBs.

U.S. money laundering penalties can be severe. Operating an unlicensed money transmitting business can lead to five years imprisonment under 18 U.S.C. § 1960. Laundering monetary instruments can lead to criminal liability under 18 USC § 1956 with up to a $500,000 fine and 20 years imprisonment. Engaging in monetary transactions in property derived from certain unlawful activities under 18 USC § 1957 can result in up to ten years in prison.

On March 18, 2013, FinCEN issued guidance on the application of FinCEN's regulations to persons "administering, exchanging or using virtual currencies."[35] This guidance described persons engaging in transactions involving virtual currency as either a "User," "Exchanger," or "Administrator."

A User "is a person who obtains virtual currency to purchase goods and services." Users can "obtain" virtual currency by several means, including earning, harvesting, mining, creating, auto-generating, manufacturing or purchasing, depending on the details of the specific virtual currency.    A User is not an MSB under federal law subject to regulation by FinCEN.

Exchangers and Administrators who (1) accept and transmit a convertible virtual currency

---

[34]  17 CFR §3.10.

[35]  Department of Treasury Financial Crimes Enforcement Network guidance regarding "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies," FIN-2013-G001 (March 18, 2013).

27

Confidential treatment requested by NAC Foundation, LLC

Version 2.2, 4 October 2017

or (2) purchase or sell virtual currency for any reason are money transmitters under FinCEN regulations as "money transmitters," unless one of six exemptions applies.[36] According to FinCEN, "(t)he definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies. Accepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under (FINcen) regulations.

For a "centralized virtual currency" the Administrator of the currency repository will be a money transmitter to the extent that it allows transfers of value between persons or from one location to another. Likewise, Exchangers will be money transmitters if they use their access to the centralized convertible virtual currency provided by the administrator to accept and transmit convertible virtual currency on behalf of others to third parties, including for payment of good and services. NAC may be seen as to exercise some of the functions of an administrator and thus it obtained its MSB registration in 2015.

"Decentralized virtual currencies" have no central repository or single administrator. Further, persons may obtain decentralized virtual currencies through their own computing or manufacturing effort. Bitcoin is a decentralized virtual currency. In connection with decentralized virtual currencies FinCEN stated:

> A person that creates units of this convertible virtual currency and uses it to purchase real or virtual goods and services is a user of the convertible virtual currency and not subject to regulation as a money transmitter. By contrast, a person that creates units of convertible virtual currency and sells those units to another person for real currency or its equivalent is

---

[36]  31 CFR §1010.100(ff)(5)(i)(A)-(F).   "The term 'money transmitter shall not include a person that only: (A) Provides the delivery, communication, or network access services used by a money transmitter to support money transmission services; (B) Acts as a payment processor to facilitate the purchase of, or payment of a bill for, a good or service through a clearance and settlement system by agreement with the creditor or seller; (C) operates a clearance and settlement system or otherwise acts as an intermediary solely between (Bank Secrecy Act) regulated institutions. . . . ; (D) Physically transports currency, other monetary instruments, other commercial paper, or other value that substitutes for currency as a person primarily engaged in such business, such as an armored car, from one person to the same person at another location or to an account belonging to the same person at a financial institution, provided that the person engaged in physical transportation has no more than a custodial interest in the currency, other monetary instruments, other commercial paper, or other value at any point during the transportation; (E) Provides prepaid access; or (F) Accepts and transmits funds only integral to the sale of goods or the provision of services, other than money transmission services, by the person who is accepting and transmitting the funds.

28

Version 2.2, 4 October 2017

> engaged in transmission to another location and is a money
> transmitter. In addition, a person is an exchanger and a
> money transmitter if the person accepts such de-centralized
> convertible virtual currency from one person and transmits it
> to another person as part of the acceptance and transfer of
> currency, funds, or other value that substitutes for currency.

FinCEN also said that convertible virtual currency administrators and exchangers will not
meet the definition of a dealer in foreign exchange because the Bank Secrecy Act requires
such dealers to be engaged in the conversion of the legal tender of two or more countries.
Virtual currencies are not legal tender.

In January 2014, FinCEN provided further guidance to a Bitcoin miner:

> From time to time, as your letter has indicated, it may be
> necessary for a user to convert Bitcoin that it has mined into a
> real currency or another convertible virtual currency, either
> because the seller of the goods or services the user wishes to
> purchase will not accept Bitcoin, or because the user wishes
> to diversify currency holdings in anticipation of future needs
> or for the user's own investment purposes. In undertaking
> such a conversion transaction, the user is not acting as an
> exchanger, notwithstanding the fact that the user is accepting
> a real currency or another convertible virtual currency and
> transmitting Bitcoin, so long as the user is undertaking the
> transaction solely for the user's own purposes and not as a
> business service performed for the benefit of another. A
> user's conversion of Bitcoin into a real currency or another
> convertible virtual currency, therefore, does not in and of
> itself make the user a money transmitter. (However, a user
> wishing to purchase goods or services with Bitcoin it has
> mined, which pays the Bitcoin to a third party at the direction
> of a seller or creditor, may be engaged in money
> transmission.)[37]

FinCEN has enforced these provisions in high profile virtual currency cases.   For example,
on July 27, 2017, the US Treasury Department's Financial Crimes Enforcement Network

---

[37] Department of Treasury Financial Crimes Enforcement Network guidance regarding "Application of
FinCEN's Regulations to Virtual Currency Mining Operations," FIN-2014-R001 (January 30, 2014).

29

MSF-4210                          Confidential treatment                          NAC-000186
                              requested by NAC Foundation,
                                         LLC

Version 2.2, 4 October 2017

("FinCEN") and the US Attorney's Office for the Northern District of California announced a $110,003,314 civil money penalty against BTC-e a/k/a Canton Business Corporation (BTC-e) and a $12 million penalty against Russian national Alexander Vinik for willful violations of US Anti-money-laundering laws. Mr. Vinik was also arrested in Greece on US money-laundering charges.[38]

According to FinCEN and DOJ:

> BTC-e is an internet-based, foreign-located money transmitter that exchanges fiat currency as well as the convertible virtual currencies Bitcoin, Litecoin, Namecoin, Novacoin, Peercoin, Ethereum, and Dash. It is one of the largest virtual currency exchanges by volume in the world. BTC-e facilitated transactions involving ransomware, computer hacking, identity theft, tax refund fraud schemes, public corruption, and drug trafficking.[39]

FinCEN's acting director stated: "We will hold accountable foreign-located money transmitters, including virtual currency exchangers that do business in the United States when they willfully violate U.S. anti-money laundering laws."[40]

On May 5, 2015, FinCEN announced a $700,000 civil money penalty against Ripple Labs, Inc. that went along with a $450,000 Department of Justice forfeiture that was partially credited to the $700,000 penalty.[41] FinCEN's director said: "Virtual currency exchangers must bring products to market that comply with our anti-money laundering laws,. . . Innovation is laudable but only as long as it does not unreasonably expose our financial system to tech-smart criminals eager to abuse the latest and most complex products."

## 10. Conclusion

AML BitCoin solves the concerns raised as to the use of cryptocurrencies to facilitate

---

[38] Fincen Press Release, July 27, 2017 found at https://www.fincen.gov/news/news-releases/fincen-fines-btc-e-virtual-currency-exchange-110-million-facilitating-ransomware

[39] id

[40] id

[41] Fincen Press Release, May 5, 2015 found at https://www.fincen.gov/news/news-releases/fincen-fines-ripple-labs-inc-first-civil-enforcement-action-against-virtual

30

MSF-4210                    Confidential treatment                    NAC-000187
                    requested by NAC Foundation,
                    LLC

Version 2.2, 4 October 2017

criminal conduct, while maintaining the beneficial features of speed of transactions and decentralization. AML BitCoin accomplishes this by the invention of a privately regulated, public blockchain that has anti-money laundering, anti-terrorist, and theft preventive features. NAC also will allow pre-approved persons to use its white-labelled technology through AML/KYC platform. These features indicate that AML BitCoin is more likely to gain wider acceptance by governments and institutions for use of the coin in the global economy as a reliable payment system.

Forward-Looking Statements: Statements, other than statements of historical facts, included in this white paper address activities, events or developments that the NAC Foundation, LLC anticipates will or may occur in the future. These forward-looking statements include such things as regulatory compliance, computer security, the anticipated use of AML BitCoin tokens or coins and other similar matters. These statements are based on certain assumptions and analyses made by NAC Foundation, LLC in light of its experience and their perception of historical trends, current conditions and expected future developments. However, the actual results of the plan for AML BitCoin Tokens and AML BitCoins might not conform with NAC Foundation, LLC's expectations due to a number of risks and uncertainties, many of which are beyond NAC Foundation, LLC's control, including, cybersecurity matters, changes in laws or regulations, secondary market conditions and other risks. Thus, all of the forward-looking statements made in this White Paper are qualified by these cautionary statements. There can be no assurance that actual results will conform to NAC Foundation, LLC's expectations.

The purchase of AML Tokens and AML BitCoins involves a high degree of speculation.

NAC makes no implied warranties of any kind concerning the AML Tokens or AML BitCoin.

31

Confidential treatment requested by NAC Foundation, LLC

*SEC v. NAC Foundation, LLC, et al.*

**CASE NO. 20-CV-4188-RS**

**Defendants' Motion to Dismiss the Complaint**

# EXHIBIT 2

## Terms and Conditions

## TERMS AND CONDITIONS

In using this website and/or registering for purchase and/or storage of AML Tokens and/or for an AML BitCoin Wallet or a wallet related to the purchase or storage of AML BitCoins and/or AML Tokens, You make the representations below and acknowledge that You have carefully read, that You understand, that You agree to the terms and conditions set forth below, and that they and Your representations below are a part of the contract and agreement between You and NAC Foundation, LLC (hereinafter "NAC"). You agree that these Terms and Conditions and the truth of Your representations are a condition to Your use of NAC Websites (including this one), all Your purchases, uses, sales, transfers, exchanges, transactions, and mining relating to the AML BitCoin, the AML Token, Your use of an AML BitCoin Wallet and Your use of an AML Token Wallet. Neither this document, nor any other document produced or signed by NAC is an offer or solicitation to buy coins or tokens.

A. Definitions. The following terms (listed alphabetically) are defined as follows:

1. "AML BitCoin" refers to the AML BitCoin digital currency.
2. "amlbitcoin.com" refers to the Website with the URL address of https://amlbitcoin.com, which is owned by NAC.
3. "AML BitCoin Wallet" refers to the digital wallet used for sending, receiving and mining AML BitCoins.
4. "amlbitcoinwallet.com" refers to the Website with the URL address of http://amlbitcoinwallet.com, which is owned by NAC.
5. "AML Compliant" refers to features or attributes of the AML BitCoin by which the AML BitCoin code and or combined with NAC's operating protocols and activities such as monitoring and reporting of activities concerning the purchase, use, sale, exchange and maintenance of the AML BitCoin, endeavor to be compliant with the AML Laws.
6. "AML Laws" means and refers to the laws, statutes, rules, regulations, and procedures of the United States, various States within the United States, and of jurisdictions of other nations in which AML BitCoin and/or AML Token is purchased, sold, exchanged, or used that govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial crimes, and pertain to know-your-customer laws, and specifically (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, aka the USA PATRIOT Act; (b) International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, aka Title III, of the USA PATRIOT Act, and subtitles that deal with International Counter Money Laundering and Related Measures, Bank Secrecy Act Amendments and Related Improvements, and, Currency Crimes and Protection; (c) the Money Laundering Control Act of 1986; (d) provisions of the Fair and Accurate Credit Transactions Act of 2003, also known as FACT Act or FACTA, that pertain to the prevention of identity theft; (e) requirements related to economic and trade sanctions administered and enforced by the Office of Foreign Assets and Controls (OFAC) within the United States Department of Treasury; (f) the Bank Secrecy Act, aka BSA or the Currency and Foreign Transactions Reporting Act,

which requires the reporting of certain transactions to the government; (g) laws pertaining to know-your-customer requirements; and (h) similar laws in other countries.

7. "AML Token" refers to a digital token which may be exchanged for an AML BitCoin.

8. "AML Token Wallet" refers to the digital wallet used for sending, receiving and mining AML Tokens.

9. "amltoken.com" refers to the Website with the URL address of https://amltoken.com, which is owned by NAC.

10. "BGCI" refers to Black Gold Coin International, Inc., a Wyoming corporation, with a principal place of business in Las Vegas, Nevada.

11. "NAC" refers to NAC Foundation, LLC, a limited liability company organized and existing under the laws of the State of Nevada, United States of America, with a principal place of business in Las Vegas, Nevada.

12. "NAC Websites" refers to AMLbitcoin.com, AMLbitcoinwallet.com, AMLtoken.com, and all other websites that may be owned by NAC from time to time. In the event a predecessor coin created by NAC (the Aten Black Gold" coin) is converted to an AML BitCoin, then NAC Websites also refers to Atencoin.com, being the Website with a former URL address of https://www.atencoin.com and Atenwallet.com, being the Website with a former URL address of https://atenwallet.com.

13. "Parties" refers to You and NAC collectively.

14. "Party" refers to NAC or You, as the case may be.

15. "You" and "Your" each refers to you, the person accessing this website and accepting these terms and conditions.

B. You acknowledge, understand, represent, warrant and agree as follows:

1. These Terms and Conditions shall be retroactive to the date of Your original purchase and/or acquisition of AML BitCoin Tokens and/or AML BitCoins and Your execution of a Purchase and Sale Agreement in connection with Your purchase of AML Tokens and/or AML BitCoins.

2. You are at least 18 years of age and are of competent mind.

3. You are not located in a country subject to sanctions imposed by laws or regulations of the United States or any governmental agency, department or office of the United States (such as the Office of Foreign Assets Control within the U.S. Department of the Treasury), or executive orders of the President of the United States, or treaties to which the United States is a party, or otherwise imposed by other organizations, such as the United Nations, European Union, any European Union country, the United Kingdom's Department of Treasury, or any other sanctions list recognized and enforced by the United States, such as, without limitation and solely by way of example, the Democratic People's Republic of North Korea and its territories, Iran, and Iraq.

4. Your purchase of AML Tokens and AML BitCoins and use of the AML Token Wallet and AML BitCoin Wallet complies with applicable law and regulation in Your jurisdiction, including, but not limited to, (a) legal capacity to enter into

Confidential treatment requested by NAC Foundation, LLC

contracts, (b) relating to purchasing, selling and using digital or cryptocurrencies such as the AML Tokens and AML BitCoins, and exchanges for such, and (d) any governmental or other consents required have been obtained.

5. Information You provided to NAC about Yourself, including, without limitation, passport, driver's license, address, social security number, email address, biometric data, bank account information in connection with verification procedures and Your use of NAC Websites, the AML Token Wallet and/or the AML BitCoin Wallet, is accurate. Should any such information be inaccurate or change, You will promptly deliver correct information to NAC.

6. In order to obtain an AML BitCoin Wallet and to purchase, sell, exchange, hold, mine, and use the AML BitCoins, You must complete, obtain, and comply with the procedures for and to obtain a certified digital identity profile. This process requires a biometric scan of one of more of Your face, iris, retina, and fingerprint.  While at this time, NAC intends to use and rely upon the Digital Identity Trust Network to administer and process the certified digital identity profile, in the future, NAC may rely upon an alternative vendor for the creation, administration and processing of certified digital identity profiles by means of biometric scans.

7. If You are using this website and/or registering for an AML Token Wallet and/or an AML BitCoin Wallet on behalf of a legal entity, You represent and warrant that (a) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (b) and You are duly authorized by such legal entity to act on its behalf.

8. As to entities, only the authorized representative of the entity shall obtain an AML Token Wallet and/or the AML BitCoin Wallet and all addresses and credentials pertaining to the AML Token Wallet and the AML BitCoin Wallet and transactions in AML Tokens and AML BitCoins, including purchases, sales, exchanges, and use in commercial or consumer transactions shall refer to an address identifying the individual representative of the entity.

9. BGCI and NAC are two separate and distinct business entities.

10. You have no right to and will not share or participate in any way with BGCI's revenue, profit, or losses earned in connection with its activities concerning the AML BitCoin and/or AML Token.

11. AML BitCoin and/or AML Token have no underlying collateral; the AML BitCoin and/or AML Token is merely an unsecured cyber currency or digital coin or in the case of the AML Token, a digital token for the exchange to an AML BitCoin.

12. AML BitCoin and/or AML Token will not be redeemed by BGCI or NAC and You are not relying upon NAC to be a source of liquidity for You or Your purchase of AML BitCoin and/or AML Token.

13. Neither AML BitCoins and/or AML Tokens nor any agreement related to Your purchase of AML BitCoins and/or AML Tokens creates or constitutes a debt of NAC to You. Neither BGCI nor NAC is obligated to pay You any returns or repayment regarding Your purchase of AML BitCoins and/or AML Tokens.

14. AML BitCoin is a medium of exchange and not a pooled interest in any business entity or common enterprise or a business venture involving You and BGCI, NAC or its affiliates or subsidiaries.

Confidential treatment requested by NAC Foundation, LLC

15. You have not purchased and have no intention of purchasing AML BitCoins and/or AML Tokens for investment purposes and You expect no return on investment.
16. AML BitCoins and/or AML Tokens are not securities and are not subject to the securities laws of any governmental entity.
17. AML BitCoins and/or AML Tokens are intended to be and are solely an Internet-based exchange medium.
18. By purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and by using the AML BitCoin Wallet, AML Token Wallet, and/or an NAC Website, or obtaining and using technical information and technical support provided by NAC, You are not participating in and not becoming a member or investor in any pooled interest, business entity, common enterprise, or business venture with NAC or any of its or their affiliates. By purchasing AML BitCoins or AML Tokens, You have no right to vote on any activity of BGCI, NAC, or any other affiliate or subsidiary of BGCI or NAC.
19. NAC and its affiliates can, without notice, purchase AML BitCoins and/or AML Tokens on the secondary market after the initial issuance, and may resell the AML BitCoins and/or AML Tokens that they purchased.
20. You shall take full responsibility for Your AML BitCoin Wallet and Your AML Token Wallet.
21. NAC will use its best efforts to create a digital currency (or cryptocurrency or cybercurrency) that is compliant with AML Laws.
22. Your purchase of AML BitCoins and/or AML Tokens is solely for the purpose of using AML BitCoins and/or AML Tokens for Your lawful commercial or personal activities, but not as an investment.
23. You have never, to Your knowledge, been involved in any terrorist or terrorist financing activity; and You shall never intentionally engage in activities that constitute terrorism or financing of terrorists.
24. You shall abide by and conform Your conduct to relevant laws in Your jurisdiction regarding the ownership, purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and use of the AML BitCoin Wallet, the AML Token Wallet and/or an NAC Website, including, but not limited to, reports to tax authorities.
25. You are not purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and/or using the AML BitCoin Wallet, the AML Token Wallet, and/or an NAC Website for the purpose of facilitating any illegal or unlawful activities, or in any way in connection with any illegal or unlawful activity.
26. In connection with the purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and/or using the AML BitCoin Wallet, the AML Token Wallet, and/or an NAC Website, You intend to and will make all reasonable efforts to comply with all laws and regulations of the United States governing currency transmission activity, all State laws governing such, and all laws governing such in Your jurisdiction.
27. The supply of AML BitCoin, AML Token and NAC services through the NAC Website are subject to United States and international export controls and economic sanctions requirements.

Confidential treatment requested by NAC Foundation, LLC

28. NAC will use its best efforts to monitor all the transactions (purchases, exchanges, sales, mining) of AML BitCoins s in an effort to detect suspicious activities that may violate AML Laws.

29. NAC intends to track AML BitCoin to identifiable persons and business entities and will file suspicious activity or similar reports with relevant governmental agencies in nations where it does business. In filing such reports NAC shall exercise reasonable care and act in good faith based on the information it has and that is provided to it. You agree that notwithstanding NAC's exercise of reasonable care and good faith, or otherwise act in conformity with the standards of applicable law, such reports may be erroneous or contain incomplete or inaccurate information. You acknowledge that generally such reports to governmental agencies that are required to be made are privileged communications, as a result of which, NAC would not be subject to a claim for damages in the event that NAC makes an incorrect or incomplete report having exercised reasonable care and good faith.

30. Your AML BitCoin transactions and their associated IP locations of senders and receivers will be recorded and securely stored in a physical server located in United States of America. Your personal information submitted to an NAC Website shall be securely stored and backed-up in a physical server located in United States of America. Your AML BitCoin transactions and their associated IP locations of senders and receivers will be monitored and analyzed in United States of America with monitoring and detecting software that allows NAC to identify any suspicious activities. Any suspicious activities associated with Your AML BitCoin transactions together with personal information and IP locations of corresponding senders and receivers may, in NAC's sole judgment, be reported to relevant government entities in Your region and/or the Financial Crimes Enforcement Network (FinCEN at http://www.fincen.gov/) in United States of America. NAC's tracking and reporting to appropriate governmental authorities of suspicious activities, includes Your activity in the United States with respect to the AML BitCoin.

31. In the event NAC receives or possesses information that would lead to a reasonable and good faith suspicion, or a basis otherwise in conformity with applicable law, that a transaction in AML Tokens and/or AML BitCoins is violating or is about to violate money laundering, anti-terrorist financing, or anti-fraud laws of the United States or of any nation or that the use of AML BitCoins is or is about to be used to facilitate a violation of such laws or a financial crime, or is in violation of a validly issued court order or other valid governmental order, NAC may refuse to process, or may rescind, cancel or reverse, any purchase, sell, exchange, transfer, use or mine of AML BitCoins, and freeze Your AML BitCoin Wallet. In the event Your AML BitCoin Wallet is frozen and You have credible evidence, or evidence otherwise satisfying the standard of applicable law, establishing that You did not knowingly engage in terrorist or criminal activity or the financing of such, and in the event NAC is not ordered otherwise by a court, governmental or law enforcement agency or department, NAC will take all reasonable actions to unfreeze and reinstate Your AML BitCoin Wallet.  (In this regard, You must contact Legal@amlbitcoin.com).

Confidential treatment requested by NAC Foundation, LLC

32. By purchasing, selling, exchanging, transferring, using or mining AML Tokens and/or AML BitCoins and by using the AML Token Wallet and/or AML BitCoin Wallet You are relinquishing rights of privacy relating to NAC's monitoring and reporting of transactions pertaining to You as provided in these Terms and Conditions. You shall have no right to a claim or cause of action or claim of damages against NAC relating to an invasion of privacy by NAC as a result of NAC's monitoring and reporting of transactions as provided in these Terms and Conditions.

33. You shall take all reasonable measures to not permit or allow access to any person or entity other than You to use Your AML Token Wallet, Your AML BitCoin Wallet and/or any NAC Website. You will implement reasonable and appropriate measures designed to secure access to (a) any device associated with the email address associated with Your AML Token Wallet, Your AML BitCoin Wallet, NAC Websites, the AML Tokens and AML BitCoins, (b) private keys required to access any relevant AML Token and AML BitCoin address, and (c) Your username, password and any other login or identifying credentials for the NAC Websites, the AML Tokens, AML BitCoins, Your AML Token Wallet or Your AML BitCoin Wallet.

34. You shall not use a web crawler or similar technique to access NAC's Websites or to extract data, reverse engineer or disassemble any aspect of NAC's Websites, the AML Tokens, AML BitCoins, AML Token Wallet or the AML BitCoin Wallet in an effort to access any source code, underlying ideas and concepts, and algorithms. You shall not take any action that imposes an unreasonable or disproportionately large load on NAC's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information. You shall not transmit or upload any material to an NAC Website that contains viruses, Trojan horses, worms, or any other harmful or deleterious program. You shall not otherwise attempt to gain unauthorized access to the NAC Websites, AML Tokens, AML Bitcoins, an AML Token Wallet and/or an AML BitCoin Wallet and/or any related computer systems or networks connected with NAC, through password mining or any other means.

35. In the event You suspect a security breach in any of the foregoing You will inform NAC immediately so it can take all required and possible measures to secure Your AML Token Wallet, Your AML BitCoin Wallet, the NAC Websites, the AML Tokens, AML BitCoins, and related systems as whole. In the event that You are no longer in possession of any device associated with Your AML Tokens and AML BitCoins or are not able to provide Your login or identifying credentials to NAC or the NAC Websites, or Your digital identity is unavailable, deleted or compromised, NAC may, in its sole discretion, grant access to Your AML BitCoin Wallet to any person providing additional credentials to NAC. NAC reserves the right to determine the additional credentials required, which may include, without limitation, a sworn, notarized statement of identity.

36. NAC will operate and maintain its computer systems and the NAC Websites in such a manner as a reasonably prudent person in the business of conducting transactions based on a sophisticated computer networking system, and NAC shall exercise due care and good faith, including employing technicians and

Confidential treatment requested by NAC Foundation, LLC

personnel highly skilled in the operation of such highly sophisticated computer and software based technologies. NAC shall endeavor to employ and utilize the most sophisticated and safest methods of internet and computer security available sufficient to assure that at all times its computer network and NAC Websites provide a safe and secure environment for the conduct of the business anticipated by these Terms and Conditions.

37. In the event of an attack on and NAC Website or computer system, a virus or malicious code in NAC's computer system, notwithstanding NAC's compliance with paragraph 36 above, or in the event NAC is required to suspend, modify, discontinue all or a portion of its services, or terminate its services by a court order or governmental order or direction, as a result of circumstances beyond NAC's control, NAC shall not be liable to You for any damage as a result of such suspension, modification, discontinuance, or termination.

38. It is possible that Your AML Token Wallet and/or Your AML BitCoin Wallet may be subject to attempted impersonation and or cyber-attack which could result in the material diminution, theft or transfer of Your AML Token Wallet and/or Your AML BitCoin Wallet. So long as NAC has complied with paragraph 36 above, and the circumstances leading to such impersonation or cyber-attack are beyond NAC's control, NAC shall not be liable for any damage caused to You as a result of the use of NAC's computer system or an NAC Website, including direct, indirect, or consequential damages, whether such damage is caused by a hack, data breach, malicious code, computer virus or criminal conduct.

39. Neither NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents will, in regard to the AML Tokens, AML BitCoins, Your AML Token Wallet, Your AML BitCoin Wallet, or NAC Websites, be liable to You or anyone else for any damages of any kind, including, but not limited to, direct, consequential, incidental, special or indirect damages, including but not limited to loss of profits, trading losses or damages, that result from use or loss of use of the AML Tokens, AML BitCoins, Your AML Token Wallet, Your AML BitCoin Wallet, or NAC Websites, even if NAC, its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents has or have been advised of the possibility of such damages or losses, except as otherwise expressly provided in these Terms and Conditions.

40. NAC shall not be liable for any delay or failure to perform any obligation under these Terms and Conditions where the delay or failure results from any cause beyond NAC's reasonable control, including acts of God, labor disputes or other industrial disturbances, electrical, telecommunications, hardware, software or other utility failures, earthquake, storms or other elements of nature, blockages, embargoes, riots, acts or orders of government, acts of terrorism, or war, changes in blockchain technology (broadly construed), or any other force or conditions not within NAC's control.

41. In making Your purchase of AML BitCoins and/or AML Tokens You are and have relied solely upon Your own judgment, belief and knowledge as to the nature of

Confidential treatment requested by NAC Foundation, LLC

the currency and the Cybercoin, cryptocurrency, or digital market and industry and You are not relying on any statements made by NAC, or any of its agents or representatives or on any of its advertising or marketing materials, or any representation or statement made on any NAC Website; and You shall not assert any claim(s) against NAC or any of its agents or representatives based on information on any NAC Website or any modification or change to any NAC Website.

42. You have a substantial and sophisticated level of understanding of the functionality, usage, and storage of cryptographic and digital coins and tokens, as well as blockchain-based software and/or technology.

43. The AML Token Wallet, AML BitCoin Wallet, AML Token and AML BitCoin are provided "as is". NAC, its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents make no warranties of any kind, whether express, implied, statutory or otherwise regarding the AML Token Wallet, AML BitCoin Wallet, AML Token and AML BitCoin, including any warranty that the AML Token Wallet, AML BitCoin Wallet, AML Token and AML BitCoin will be uninterrupted, error-free or free of harmful components, secure or not otherwise lost or damaged. Except to the extent prohibited by law, NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents disclaim all warranties, including any implied warranties of merchantability, satisfactory quality, fitness for a particular purpose, non-infringement, or quiet enjoyment, and any warranties arising out of any course of dealing or usage of trade.

44. To the fullest extent provided by applicable law, You shall indemnify, defend, and hold harmless NAC, its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents from and against any and all claims, demands, causes of action, debts or liabilities, including reasonable attorneys' fees (collectively, "Damages") to the extent that any such Damages are based upon or arise out of (a) a misrepresentation by You made in connection with Your purchase of AML BitCoins and/or AML Tokens or use of any NAC Website, or (b) Your violation of any law, statute, rule, or regulation of a nation or subdivision thereof having jurisdiction over You.

45. You shall reimburse NAC its subsidiaries, affiliates, licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, as the case may be, for all reasonable legal fees and expenses incurred in processing and responding to a subpoena, legal order or other legal process relating to You.

46. The permission or privilege to use the amlbitcoin.com website does not necessarily include a right to use any other NAC Website nor the right to an AML Token Wallet and an AML BitCoin Wallet. In order to use the amlbitcoin.com website or to acquire an AML BitCoin Wallet, You must be registered, having gone through and submitted to the required verification procedures.

47. NAC retains all right, title and interest in all of its intellectual property, including inventions, discoveries, processes, marks, methods, compositions, formulae, techniques, information, source code, brand names, graphics, user interface design, text, logos, copyrights, moral rights, images, information and data pertaining to the NAC Websites, AML Token Wallets, AML BitCoin Wallets, AML Tokens, and AML BitCoins or that of NAC's subsidiaries and/or affiliates (hereinafter "NAC's IP") whether or not patentable, copyrightable or protectable in trademark, and any trademarks, copyrights or patents based thereon. You may not use any of NAC's IP for any reason, except with its prior express written consent. You will not modify, publish, transmit, reverse engineer, participate in the transfer or sale, create derivative works, or in any way exploit any of NAC's IP, in whole or in part, found on the NAC Websites or associated products and services, or otherwise. NAC's IP is not for resale. Your use of the NAC's IP does not entitle You to make any unauthorized use of any NAC's IP, and in particular You will not delete or alter any proprietary rights or attribution notices in any NAC's IP. You will use NAC's IP solely for Your personal use, and will make no other use of NAC's IP without the express written permission of NAC and the copyright, trademark, tradename, and/or patent owner. You agree that You do not acquire any ownership rights in any NAC's IP. We do not grant You any licenses, express or implied, to the intellectual property of NAC except as expressly authorized by these Terms Conditions.

48. You have no claim of ownership or in any of NAC's IP, including, but not limited to, any NAC Website, the AML Tokens, AML BitCoins, AML Token Wallet, AML BitCoin Wallet, or any other of NAC's IP or that of NAC's affiliates, subsidiaries, and/or licensors, and you shall not assert, claim or file any allegation that you own any copyright, trademark, tradename, and/or patent in any NAC Website, the AML Tokens, AML BitCoins, AML Token Wallet, AML BitCoin Wallet, or any other of NAC's IP or that of NAC's affiliates, subsidiaries, and/or licensors. You shall never file any action, lawsuit or arbitration in any forum asserting a claim of infringement against NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, as to any of NAC's IP, including, but not limited to, any NAC Website, the AML Tokens, AML BitCoins, AML Token Wallet and AML BitCoin Wallet.

49. None of the Terms and Conditions herein shall be deemed waived unless a waiver is in writing and signed by NAC, and in no event, shall there be a waiver solely by reason of a failure to assert or delay in asserting a term or condition.

50. In the event any one or more of these Terms and Conditions, or part thereof, is declared to be void or otherwise unenforceable, the remainder of such term and condition and of these Terms and Conditions shall survive and be deemed modified or amended so as to fulfill the intent of these Terms and Conditions and comply with any applicable law or order of a court.

51. To give notice to NAC under these Terms and Conditions, You must contact NAC by email to Legal@amlbitcoin.com.

52. All communications to be made or given pursuant to these Terms and Conditions shall be in the English language.

53. **Ownership of AML Tokens and AML BitCoins by Non-Natural Persons; Non-Transferability and Non-Assignability** As stated above, in order to obtain an AML BitCoin Wallet and to purchase, sell, hold, exchange, and use AML BitCoins, You must obtain a certified digital identity profile, and this process requires a biometric scan of one or more of an individual's face, iris, retina, and fingerprint. Accordingly, only an individual can obtain an AML BitCoin Wallet. While the AML BitCoins and AML Tokens can be held in the name of an entity, such as a corporation, limited liability company, partnership or trust, the owner of the AML BitCoin Wallet must be and can only be an individual associated with that entity.  Accordingly, an AML BitCoin Wallet cannot be transferred or assigned, unless an individual associated with the transferee independently obtains a certified digital identity profile in accordance with the process that creates a biometric scan of one or more of such individual's face, iris, retina, and fingerprint and complies with all other procedures to obtain an AML BitCoin Wallet.

54. **Changes to these Terms and Conditions.** NAC reserves the right, at its sole discretion, to modify, change, alter or amend any of these Terms and Conditions from time to time and at any time. Notification of such changes, alterations, modifications or amendments, shall be made via the NAC Website(s) or via email to You (at the email address You provided previously). You shall be responsible for reviewing and shall be bound by such changes, alterations, modifications or amendments to these Terms and Conditions. Your continued use of the NAC Website after the posting or notice by email of such changes, alterations, modifications or amendments shall be deemed Your acceptance and agreement to such changes, alterations, modifications or amendments.

55. **Applicable Law, Jurisdiction and Venue.** These Terms and Conditions, including the representations, warranties, covenants, limitations on liability, and indemnities, contained therein as well as any other written or oral agreements between You and NAC, and any and all claims between the Parties, including their agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, related to or arising from these Terms and Conditions, said agreements, whether in contract or tort, and seeking damages or equitable remedies, shall be governed, construed and enforced in accordance with the laws of the State of Nevada, USA and applicable federal law of the United States, without giving effect to Nevada's or the United States' conflicts of laws principles. You agree that only federal courts, state courts, and arbitration forums located in the State of Nevada, United States of America shall have jurisdiction to determine and adjudicate any such matters or disputes, and You agree that such courts shall have jurisdiction over You as well as Your agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, and You, and on behalf of each of Your agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, waive any objection that such courts or arbitration forums do not have personal jurisdiction over You and them. You agree that venue for the determination or adjudication of any and all matters in controversy or disputes between the Parties, and each of their agents, representatives, employees,

Confidential treatment requested by NAC Foundation, LLC

affiliated entities, trustees, conservators, successors and assigns, shall be solely and exclusively in Clark County, Nevada, United States of America, and You agree that such venue is intended to be mandatory and not permissive.  You agree, on behalf of Yourself and each of Your agents, representatives, employees, affiliated entities, trustees, conservators, successors and assigns, that You and they waive any objection that venue in Clark County, Nevada, United States of America is an inconvenient forum.

56. **Important Warning Concerning Activity in Prohibited Locations** Persons located in certain territories, currently including countries subject to sanctions imposed by laws or regulations of the United States or any governmental agency, department or office of the United States (such as the Office of Foreign Assets Control within the U.S. Department of the Treasury), or executive orders of the President of the United States, or treaties to which the United States is a party, or otherwise imposed by other organizations, such as the United Nations, European Union, any European Union country, the United Kingdom's Department of Treasury, or any other sanctions list recognized and enforced by the United States, such as, without limitation and solely by way of example, the Democratic People's Republic of North Korea and its territories, Iran, and Iraq, are not permitted to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML Tokens, and/or use the AML BitCoin Wallet, AML Token Wallet and/or an NAC Website. This restriction applies to residents and citizens of other nations while located in a prohibited jurisdiction. The fact that the NAC Website may be accessible in a prohibited jurisdiction, or that the NAC Website allows the use of the official language of a prohibited jurisdiction, shall not be construed as a license to use purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML Tokens, and/or use the AML BitCoin Wallet, AML Token Wallet and/or an NAC Website in such prohibited jurisdiction.  Any attempt to circumvent this restriction, for example, by using a "vpn", proxy or similar service that masks or manipulates the identification of Your true location, or by otherwise providing false or misleading information regarding citizenship, location, place of residence, or by using the NAC Website through a third party or on behalf of a third party located in a prohibited jurisdiction is a breach of these Terms and Conditions. If NAC has reasonable grounds to suspect that You are located in any of the prohibited jurisdictions, NAC may, without notice, and in accordance with applicable laws, close Your account, deactivate Your AML BitCoin Wallet, and refuse to process, and may rescind, cancel or reverse, any purchase or sale of AML BitCoins and/or AML Tokens.

57. **Arbitration and Dispute Resolution; Class Action Waiver**

1. Except as to claims for injunctive relief requiring immediate restraining orders, all disputes, controversies or claims between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents arising out of or relating to these Terms and Conditions, the purchase, sale or exchange of AML Tokens or AML BitCoins, the NAC Websites, Your relationship with NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners,

Confidential treatment requested by NAC Foundation, LLC

partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, or as to any other matter between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, including concerning the interpretation of these Terms and Conditions, or any agreement between You and NAC, whether for breach of contract, for a tort, or otherwise, shall be resolved and adjudicated by binding arbitration before ADR Services, Inc. (if available in the venue for adjudication of disputes or before JAMS, Inc. if ADR Services, Inc. is not available in such venue, or if neither is available in the venue for adjudication, then before the American Arbitration Association) and shall be conducted in accordance with the commercial arbitration rules of the such arbitration forum, except as otherwise provided herein. The arbitration shall be conducted in Clark County, Nevada, United States of America. The arbitration shall be conducted by a single arbitrator. The arbitration shall be conducted in the English language and all documents filed, notices, claims responses, counter-claims, counter-responses, briefs, or other papers shall be in the English language. All evidentiary documents in a language other than English shall be translated into the English language and shall be translated by a person certified and authorized under the laws of the State of Nevada.  The arbitrator shall be selected in accordance with the rules of the selected arbitration organization.

2. The arbitration is to be expedited. The arbitration shall be commenced by a demand for arbitration.  If a party fails to respond to the demand to arbitrate within ten (10) business days, the aggrieved party may apply ex parte to the Court in Clark County, Nevada, United States of America for an order to arbitrate, unless the rules of the arbitration forum do not require such an order.  An arbitration award may be enforced by applying to a court in Clark County, Nevada, United States of America. The law the State of Nevada shall be applied in any arbitration proceedings, without regard to that jurisdiction's choice-of-law principles and rules. The parties shall not be entitled to discovery in the arbitration and the arbitrator shall have no authority to order any party to submit to discovery with the exception that the Arbitrator may request the parties or their agents to produce such documents as are pertinent and relevant to the dispute. The arbitrator shall have no authority to award punitive, consequential, special, or indirect damages.  The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs) shall be borne by the unsuccessful party, as determined by the arbitrator, and shall be awarded as part of the arbitrator's award.  The arbitration shall be binding.

3. In the event that the arbitration includes or would include the adjudication of facts, law or claims common to parties not bound by an arbitration

Confidential treatment requested by NAC Foundation, LLC

provision such that adjudication in the arbitration may result in inconsistent and/or conflicting findings, rulings or orders, or if such adjudication is based on transactions or series of transactions that involve parties who would not be bound by this arbitration provision, the parties hereto agree that the dispute will be adjudicated in a court in the jurisdiction and venue provided elsewhere in these Terms and Conditions, unless such parties agree to participate in the arbitration, so that all necessary parties can be joined to avoid inconsistent and/or conflicting findings, rulings or orders.

4.  Prior to initiating an arbitration proceeding, the parties shall make a good faith attempt to resolve the dispute through mediation by providing written notice to the other party of a demand for mediation and the responding party shall have ten (10) business days to respond in writing. No party shall be entitled to recover any fees or costs in arbitration if they have failed to mediate in good faith.  The mediator will be selected from the same alternative dispute provider specified above, unless the parties agree in writing to a different mediator.

5.  If the provisions for arbitration in these Terms and Conditions are, for any reason, invalidated or deemed unenforceable, then the dispute shall be adjudicated in a federal or state court located in Clark County, Nevada, USA. This includes any dispute concerning the AML Tokens, AML BitCoins, NAC Websites, these Terms and Conditions, any agreement between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents, or any other aspect of the relationship between You and NAC, its subsidiaries, affiliates, or licensors and their shareholders, owners, partners, joint venturers, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, and agents. You agree that the forum selection clause contained herein is mandatory and not permissive and You agree not to object to adjudication in Clark County, Nevada on grounds of forum non-conveniens.

6.  Waiver of Trial by Jury. THE PARTIES UNDERSTAND AND FULLY AGREE THAT BY AGREEING TO THESE TERMS AND CONDITIONS TO ARBITRATE THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE A TRIAL BY JURY, AND ARE GIVING UP THEIR NORMAL RIGHTS OF APPEAL FOLLOWING THE RENDERING OF A DECISION, EXCEPT AS THE FEDERAL ARBITRATION ACT AND APPLICABLE FEDERAL LAW PROVIDE FOR JUDICIAL REVIEW OF ARBITRATION PROCEEDINGS.

7.  You HEREBY AGREE to WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION. Any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. If for any reason a claim proceeds in court rather than in arbitration, we each waive any right to a jury trial. If a court or federal regulator with oversight over NAC determines that applicable law precludes enforcement of any of this

Confidential treatment requested by NAC Foundation, LLC

section's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court, subject to Your and NAC's right to appeal the court's decision.

58. You acknowledge the following risks and You accept them:

1. Digital coins and tokens, such as AML Tokens and AML BitCoin, blockchain technology, and other associated and related technologies are new and relatively untested and to a degree are outside of NAC's exclusive control. Moreover, in some jurisdictions the AML Token and AML BitCoin or other digital coins or cryptocurrencies may be considered to be a security, or in the future, may be determined to be a security. NAC makes no warranties or guarantees that the AML Token and AML BitCoin are not a security in all jurisdictions. Regulatory bodies around the world are in the process of forming their opinions as to the purchase, sale, and use of digital coins and cryptocurrencies and laws concerning them are being considered in various jurisdictions throughout the world; the process of developing such laws is currently fluid and the laws are not uniform. Likewise, blockchain technologies have been the subject of scrutiny by various governments and regulatory bodies throughout the world. Furthermore, exchanges which enable the exchange of digital coins and cryptocurrencies with other such digital coins or cryptocurrencies or the exchange of such for fiat money, if any, might be subject to regulatory oversight, and such exchanges are currently the subject of reviews by governments and regulatory bodies; and governments and regulatory bodies are currently enacting laws and regulations permitting, prohibiting and regulating such exchanges. Laws and regulations could be enacted that could impede or limit the ability to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML Tokens, and/or use the AML BitCoin Wallet, the AML Token Wallet and/or an NAC Website, and accordingly, the value of the AML BitCoin or AML Token could be diminished as a result. You shall bear the legal or financial consequences of AML Token and AML BitCoin being considered a security in Your respective jurisdiction. NAC makes no representation or warranty of any kind as to the legality of purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and/or using the AML BitCoin Wallet, AML Token Wallet and/or an NAC Website in Your jurisdiction, and by accepting these Terms and Conditions, You agree that You will not purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML Tokens, and use the AML BitCoin Wallet, AML Token Wallet and/or an NAC Website in a jurisdiction which prohibits same.

2. Hackers or other groups or organizations may attempt to interfere with Your AML Token Wallet, Your AML BitCoin Wallet, the NAC Websites or the availability of AML Tokens or AML BitCoins in any number of ways, including without limitation denial of service attacks, Sybil attacks, spoofing, smurfing, malware attacks, or consensus-based attacks.

Confidential treatment requested by NAC Foundation, LLC

3. There is a risk that the NAC Websites and AML Token and AML BitCoin may unintentionally include weaknesses or bugs in the source code interfering with the use of or causing the loss of AML Token and AML BitCoin.

4. Advances in cryptography, or technical advances such as the development of quantum computers, could present risks to cryptocurrencies, which could result in the theft or loss of or loss of use of AML Tokens, AML BitCoins, Your AML Token Wallet and/or Your AML BitCoin Wallet.

5. As with other decentralized cryptocurrencies, the blockchain is susceptible to mining attacks, including but not limited to double-spend attacks, majority mining power attacks, "selfish-mining" attacks, and race condition attacks. Any successful attacks present a risk to the expected proper execution and/or sequencing of digital coins. Despite the best efforts of NAC, the risk of unknown or novel mining attacks exists. Mining attacks, as described above, may also target other blockchain networks, with which the AML Token and AML BitCoin may interact with and consequently the AML Token and AML BitCoin may be impacted as a result thereof.

6. While there are currently online services available which enable the possibility of exchange of digital coins and cryptographic coins with other such coins or the exchange of digital coins and cryptographic coins for fiat money, and particularly the exchange of AML Tokens and AML BitCoins on such exchanges, NAC makes no warranties and/or guarantees that AML Token and AML BitCoin will be listed or made available for exchange with other digital coins and cryptographic coins and/or fiat money in the future, and no warranties or guarantees are given whatsoever with respect to the capacity (volume) of such potential exchanges or the demand for AML BitCoins or AML Tokens in the future. Accordingly, NAC does not give any warranties or guarantees regarding any exchange services providers.  Furthermore, You may be exposed to fraud and/or failures concerning such exchanges.

7. The value of AML Token and AML BitCoin may fluctuate and You may suffer loss in value of the AML Tokens or AML BitCoins that You purchase and own.

8. AML Token and AML BitCoin are unlike bank accounts or accounts at some other financial institutions, which may be insured by such organizations as the Federal Deposit Insurance Corporation, and therefore are entirely uninsured. NAC does not offer any indemnity in case of any losses in relation to AML Token and AML BitCoin. You assume all risks regarding a loss of Your AML BitCoins or AML Tokens.

9. You acknowledge that, given that the transmission of AML Tokens and AML BitCoins is entirely dependent on the use of computers, computer software, and Internet connections, malfunctions, delays, failures, disruptions, errors, or distortions may be experienced, and You accept all

Confidential treatment requested by NAC Foundation, LLC

risks associated therewith and agree that NAC shall have no liability for such malfunctions, delays, failures, disruptions, errors, or distortions.

## C. Safe Harbor Statement/Agreement

NAC Foundation, LLC ("NAC"), a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business and infrastructure in Las Vegas, Nevada, processes information obtained through the registration and validation process for securing an AML Token Wallet and AML BitCoin Wallet, and through the amlbitcoin.com, amltoken.com.com and amlbitcoinwallet.com websites in the United States of America.  By registering for an AML BitCoin Wallet and purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and by using the AML Token Wallet and/or AML BitCoin Wallet, a user consents to permit NAC to process and his or her information.


## KYC/AML

NAC prides itself on the integrity and transparency of its business. Resting on a privately-regulated public blockchain, NAC has introduced a personal legal identity-linked credential authentication protocol into the source code of AML BitCoin that permits tracing and tracking of the identities of senders and receivers of the coin when activity with the use of the AML BitCoin indicates suspicious activities in violation of AML laws. AML BitCoin transactions and their associated IP locations of senders and receivers will be monitored and analyzed in United States with monitoring and detecting software that allows NAC to identify suspicious activities. Records of such transactions will be maintained by NAC for six-years (or such other period of time required under applicable law). Suspicious activities associated with AML BitCoin transactions together with personal information and IP locations of corresponding senders and receivers may, in NAC's sole judgment, be reported to relevant government entities. In the event NAC receives or possesses information that would lead to a suspicion that a transaction in AML BitCoins is violating or is about to violate or facilitate a violation of money laundering, anti-terrorist financing, or anti-fraud laws a violation of a validly issued court order or other valid governmental order, NAC may refuse to process, or may rescind, cancel or reverse, any purchase, sell, exchange, transfer, use or mine with and of AML BitCoins and/or AML Tokens, and freeze the associated AML BitCoin Wallet.

The purchase, sale, exchange, transfer, use or mining of AML BitCoins and/or AML Tokens and/or use of the AML Token Wallet and/or AML BitCoin Wallet involves a degree of relinquishment privacy relating to NAC's monitoring and reporting of transactions as stated above.

To obtain an AML BitCoin Wallet and to purchase, sell, exchange, hold, mine and use AML Tokens and AML BitCoins, a user must complete, obtain, and comply with the procedures for and to obtain a certified digital identity profile, which includes a biometric scan of one of more of the face iris, retina, and fingerprint, and documents and

Confidential treatment requested by NAC Foundation, LLC

information such as passport, driver's license, address, social security number, email address, and bank account information.  While at this time, NAC intends to use and rely upon the Digital Identity Trust Network to administer and process the certified digital identity profile, in the future, NAC may rely upon an alternative vendor for the creation, administration and processing of certified digital identity profiles by means of biometric scans.

Users located in certain territories, currently including countries subject to sanctions imposed by laws or regulations of the United States or any governmental agency, department or office of the United States (such as the Office of Foreign Assets Control within the U.S. Department of the Treasury), or executive orders of the President of the United States, or treaties to which the United States is a party, or otherwise imposed by other organizations, such as the United Nations, European Union, any European Union country, the United Kingdom's Department of Treasury, or any other sanctions list recognized and enforced by the United States, such as, without limitation and solely by way of example, the Democratic People's Republic of North Korea and its territories, Iran, and Iraq, are not permitted to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML Tokens, and/or use the AML Token Wallet, AML BitCoin Wallet and/or an NAC Website. This restriction applies to residents and citizens of other nations while located in a prohibited jurisdiction. The fact that the NAC Website may be accessible in a prohibited jurisdiction, or that the NAC Website allows the use of the official language of a prohibited jurisdiction, shall not be construed as a license to use purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML Tokens, and/or use the AML BitCoin Wallet, AML Token Wallet and/or an NAC Website in such prohibited jurisdiction. If NAC suspects that a user is located in a prohibited jurisdiction, NAC may, without notice, and in accordance with applicable laws, close, suspend and/or deactivate an AML BitCoin Wallet, and/or refuse to process, rescind, and/or deactivate an AML BitCoin Wallet, and/or refuse to process, rescind, cancel or reverse, any purchase, sale, use, exchange and/or mine or any other transaction or use of and/or by and/or with AML BitCoins and/or AML Tokens.

<u>Forward-Looking Statements:</u> Statements, other than statements of historical facts, included in NAC's white paper, public statements, press releases, marketing, and/or advertising materials address activities, events or developments that the NAC anticipates will or may occur in the future. These forward-looking statements include such things as regulatory compliance, computer security, the anticipated use of AML BitCoin and/or AML Token or other similar matters. These statements are based on certain assumptions and analyses made by NAC in light of its experience and perception of historical trends, current conditions and expected future developments. However, the actual results of the plan for AML BitCoin Tokens and AML BitCoins might not conform with NAC's expectations due to a number of risks and uncertainties, many of which are beyond NAC's control, including, cybersecurity matters, changes in laws or regulations, secondary market conditions and other risks. Thus, all of the forward-looking statements made in NAC's white paper, public statements, press releases, marketing, and/or advertising materials are qualified by these cautionary statements. There can be no assurance that actual results will conform to NAC's.

Confidential treatment requested by NAC Foundation, LLC

**The Distribution of AML Tokens to AML Wallet Addresses**

Once users upload AML Wallet Addresses to the Token Sale platform in their account profile page, users are signifying that their AML Wallet Address is correct and that purchased AML Tokens are to be sent to the AML Wallet Address listed. If the AML Wallet Address changes for any reason including AML Wallets being accidentally deleted, etc., it is the responsibility of users to delete the incorrect AML Wallet Address and add the correct AML Wallet Address to their Token Sale account profile page as soon as possible.

It is the responsibility of users to ensure that the correct AML Wallet Address is listed in their Token Sale account profile page.

When the NAC Foundation distributes AML Tokens from the Token Sale platform to a user's AML Wallet Address and if it turns out that the user deleted the wallet, created another wallet, and forgot to upload the new wallet address to the platform, or a different circumstance in which the incorrect AML Wallet Address was not listed in the platform, then the user's tokens will be lost and the NAC Foundation bears no responsibility.

The above is the reason that the NAC Foundation highly recommends that all users create a wallet backup. In the event that users accidentally delete their wallet or open up a new wallet and do not update the platform with a new AML Wallet Address, users can still recover the coins sent to their old AML Wallet Address, if the wallet backup was kept.


**Other Risks**

The purchase of AML Tokens and AML BitCoins involves a high degree of speculation.

Digital coins and tokens, such as AML Tokens and AML BitCoin, blockchain technology, and other associated and related technologies are new and relatively untested and to a degree are outside of NAC's exclusive control.  Moreover, in some jurisdictions the AML Token and AML BitCoin or other digital coins or cryptocurrencies may be considered to be a security, or in the future, may be determined to be a security. NAC makes no warranties or guarantees that the AML Token and AML BitCoin are not a security in all jurisdictions. Regulatory bodies around the world, are in the process of forming their opinions as to the purchase, sale, and use of digital coins and cryptocurrencies and laws concerning them are being considered in various jurisdictions throughout the world; the process of developing such laws is currently fluid and the laws are not uniform.  Likewise, blockchain technologies have been the subject of scrutiny by various governments and regulatory bodies throughout the world. Furthermore, exchanges which enable the exchange of digital coins or cryptocurrencies with other such digital coins or cryptocurrencies and/or the exchange of such for fiat money, if any, might be

Confidential treatment
requested by NAC Foundation,
LLC

subject to regulatory oversight, and such exchanges are currently the subject of reviews by governments and regulatory bodies; and governments and regulatory bodies are currently enacting laws and regulations permitting, prohibiting and regulating such exchanges. Laws and regulations could be enacted that could impede or limit the ability to purchase, sell, exchange, transfer, use or mine AML BitCoins and/or AML Tokens, and/or use the AML BitCoin Wallet, AML Token Wallet and/or an NAC Website, and accordingly, the value of the AML BitCoin or AML Token could be diminished. NAC makes no representation or warranty of any kind as to the legality of purchasing, selling, exchanging, transferring, using or mining AML BitCoins and/or AML Tokens, and/or using the AML BitCoin Wallet, AML Token Wallet and/or an NAC Website in a particular user's jurisdiction.

Hackers or other groups or organizations may attempt to interfere with an AML Token Wallet, an AML BitCoin Wallet, an NAC Website or the availability of AML Tokens or AML BitCoins in any number of ways, including without limitation, by denial-of-service attacks, Sybil attacks, spoofing, smurfing, malware attacks, and/or consensus-based attacks.

There is a risk that an NAC Website and AML Token and AML BitCoin may unintentionally include weaknesses or bugs in the source code interfering with the use of or causing the loss of AML Token and AML BitCoin.

Advances in cryptography, or technical advances such as the development of quantum computers, could present risks to digital coins and cryptocurrencies, which could result in the theft or loss of or loss of use of AML Tokens, AML BitCoins, AML Token Wallet and/or an AML BitCoin Wallet.

As with other decentralized cryptocurrencies, the blockchain is susceptible to mining attacks, including but not limited to double-spend attacks, majority mining power attacks, "selfish-mining" attacks, and race condition attacks. Any successful attacks present a risk to the expected proper execution and/or sequencing of digital coins.  Despite the best efforts of NAC, the risk of unknown or novel mining attacks exists. Mining attacks, as described above, may also target other blockchain networks with which the AML Token and AML BitCoin may interact, and consequently AML Tokens and AML BitCoins may be impacted as a result thereof.

While there are currently online services available which enable the possibility of exchange of digital coins and cryptographic coins with other such coins or the exchange of digital coins and cryptographic coins for fiat money, and particularly the exchange of AML Tokens and AML BitCoins on such exchanges, NAC makes no warranties and/or guarantees that AML Token and AML BitCoin will be listed or made available for exchange with other digital coins and cryptographic coins and/or fiat money in the future. Further, no warranties or guarantees are given whatsoever with respect to the capacity (volume) of such potential exchanges or the demand for AML BitCoins or AML Tokens in the future. Accordingly, NAC does not give any warranties or guarantees regarding any exchange services providers.  Furthermore, a user may be exposed to fraud and/or failures concerning such exchanges.

Confidential treatment requested by NAC Foundation, LLC

The value of AML Token and/or AML BitCoin may fluctuate and a loss may be suffered in value of the AML Token and/or AML BitCoin.

AML Token and AML BitCoin are unlike bank accounts or accounts at some other financial institutions, which may be insured by such organizations as the Federal Deposit Insurance Corporation, and therefore are entirely uninsured. NAC does not offer any indemnity in case of any losses in relation to AML Token and AML BitCoin. The owner of AML Tokens and AML Bitcoins assumes the risk of loss.

The transmission of AML Tokens and AML BitCoins is entirely dependent on the use of computers, computer software, and Internet connections, malfunctions, delays, failures, disruptions, errors, or distortions may be experienced. NAC shall have no liability for such malfunctions, delays, failures, disruptions, errors, or distortions.


**NAC FOUNDATION, LLC'S REFUND POLICY**

Although we do not provide refunds, where there are extenuating circumstances, NAC may make an exception and provide a refund. Generally, however, where exceptions are made they will be in instances where cryptocurrency was deposited on the platform to purchase AML Tokens, but conversion of the cryptocurrency to the AML Tokens did not occur. Using Etherium as an example, NAC would refund the full amount of the ETH deposited. Or, if there was a conversion of the cryptocurrency to purchase AML, and a balance of crypto exists after conversion, NAC can refund the balance of cryptocurrency.  All refunds will be in US dollars at the rate of exchange of the cryptocurrency on the date of the deposit of the cryptocurrency.

Special consideration may be given to reimburse in digital currency when digital currency was converted to the AML Token. To make a special request, one must submit a notarized statement to NAC stating why a refund is requested and acknowledge that the request for the special consideration will be reviewed after the ICO is completed.

Refund requests are only accepted 45 days after the date that tokens were purchased, or currency deposits were made into accounts, if currency deposits were not converted to tokens.

Confidential treatment requested by NAC Foundation, LLC

*SEC v. NAC Foundation, LLC, et al.*

**CASE NO. 20-CV-4188-RS**

**Defendants' Motion to Dismiss the Complaint**

# EXHIBIT 3

## Fahy – Jensen Emails



DMS-#364130-v1-Al
ice_Jensen_e-mail_0:

**From:** John R. Fahy [mailto:jfahy@whitakerchalk.com]
**Sent:** Wednesday, May 30, 2018 10:44 AM
**To:** Jensen, Alice L.
**Subject:** MSF-4210

Ms. Jensen:

In the NAC Foundation, LLC voluntary production for MSF-4210 we included a notice from the US PTO about a relevant patent involving biometric data and recording identifiers on blockchain transactions.

The US PTO issued the patent yesterday:

http://patft1.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=9985964.PN.&OS=PN/9985964&RS=PN/9985964

Regards,


**JOHN R. FAHY** | Member
Whitaker Chalk Swindle & Schwartz PLLC
301 Commerce Street, Suite 3500
Fort Worth, Texas 76102-4135
817.878.0547 Direct
817.800.3139 Mobile
jfahy@whitakerchalk.com
www.whitakerchalk.com
vCard | Profile



_____

Confidentiality Notice: This e-mail and any attachments are intended only for use by the individual or entity named herein and may contain legally privileged or confidential information.  If you are not the intended recipient of this e-mail, you are hereby

notified that any dissemination, distribution, or copying of this
e-mail or of any attachment is strictly prohibited. If you have
received this e-mail in error, please immediately notify the
sender at Whitaker Chalk Swindle & Schwartz PLLC by
telephone at (817) 878-0500 or return e-mail, do not read it and
permanently delete the original.  ------- Thank You.

**From:** Jensen, Alice L. <JensenA@sec.gov>
**Sent:** Wednesday, May 30, 2018 12:52 PM
**To:** John R. Fahy
**Subject:** RE: MSF-4210


Thanks for letting me know John.


Alice