ERIN E. SCHNEIDER (Cal. Bar No. 216114)
  schneidere@sec.gov
MARC D. KATZ (Cal. Bar No. 189534)
  katzma@sec.gov
JOHN K. HAN (Cal. Bar No. 208086)
  hanjo@sec.gov
ALICE L. JENSEN (Cal. Bar No. 203327)
  jensena@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2500

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 3:20-cv-4188-RS |
| Plaintiff, | PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| v. | |
| NAC FOUNDATION, LLC and ROWLAND MARCUS ANDRADE, | Date: January 7, 2021 |
| Defendants. | Time: 1:30 p.m. |
| | Courtroom: 3, 17th Floor |
| | Judge: Richard Seeborg |

**TABLE OF CONTENTS**

I.    INTRODUCTION .......................................................................................... 1

II.   FACTS: DEFENDANTS OFFERED AND SOLD THE ABTC
      TOKENS AS INVESTMENT CONTRACTS ................................................ 2

III.  LEGAL STANDARD FOR MOTION TO DISMISS ...................................... 5

IV.   ARGUMENT ............................................................................................... 6

      A.    Defendants Improperly Rely on Extrinsic Evidence. ......................... 7

      B.    Under the *Howey* Test, the SEC Has Properly Pleaded that Defendants
            Offered and Sold ABTC Tokens As Investment Contracts. ............... 9

            1.    The *Howey* Test Is Flexible and Anchored in Objective
                  Economic Reality........................................................................ 9

            2.    The *Howey* Test Is Applied at the Time of Sale of the
                  ABTC Tokens. ........................................................................ 10

            3.    The Complaint Adequately Pleads the *Howey* Factors.......................... 11

                  a) *Howey* Prongs 1 and 2—Investment of Money and Common
                  Enterprise—Are Readily Met. ................................................ 11

                  b) *Howey* Prong 3—A Reasonable Expectation of Profits Based
                  on the Efforts of Others—Is Also Present. ............................. 13

            4.    Defendants' Disclaimers, Labels, and Characterizations Do
                  Not Alter the *Howey* Analysis. ............................................ 16

            5.    The ABTC Tokens Were Not "Forward Contracts" on a
                  Commodity. ............................................................................ 18

      C.    There Was No Misconduct by the SEC. ........................................... 19

V.    CONCLUSION............................................................................................21

**TABLE OF AUTHORITIES**

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 5

*Balestra v. ABTCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................ 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 5

*Brodt v. Bache & Co.*, 595 F.2d 459 (9th Cir. 1978) .................................................. 12

*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) ...................................... 19

*CFTC v. Midland Rare Coin Exchange, Inc.*, 71 F. Supp. 2d 1257 (S.D. Fla. 1999) ........... 18 n.6

*CFTC v. Monex Credit Co.*, 931 F.3d 966 (9th Cir. 2019) ......................................... 18 n.6

*Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928 (9th Cir. 2002) ...................... 5

*Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ................................................................................. 19

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997) .................................... 6

*Glen-Arden Commodities v. Constantino*, 493 F.2d 1027 (2d Cir. 1974) .................. 18

*Hocking v Dubois*, 885 F.2d 1449 (9th Cir. 1989) ..................................................... 11

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ............................... 5

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) .............. 7, 8

*In re Tezos Sec. Litig.*, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ........................ 6

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .................... 6, 7, 8

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ....................................................... 7

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ........................................................ 6

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) .............................................. 12

*SEC v. Aqua–Sonic Prods. Corp.*, 524 F. Supp. 866 (S.D.N.Y. 1981) ........................ 11

*SEC v. Blockvest, LLC*, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ....................... 2, 10

*SEC v. Edwards*, 540 U.S. 389 (2004) ....................................................................... 9

*SEC v. Hui Feng*, 935 F.3d 721 (9th Cir. 2019) ........................................................ 13

*SEC v. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ................................................... 17

*SEC v. Kik Interactive Inc.*, 2020 WL 5819770 (S.D.N.Y. Sept. 30, 2020) ......................... *passim*

*SEC v. Lorin*, 1991 WL 576895 (S.D.N.Y. June 10, 1991) .................................................... 19 n.7

*SEC v. Musella*, 1983 WL 1297 (S.D.N.Y. Apr. 4, 1983) ..................................................... 19 n.7

*SEC v. Mut. Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) ........................................... 15

*SEC v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) ................................................................... 10

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ...................................................................... 10

*SEC v. Shavers*, 2014 WL 12622292, (E.D. Tex. Aug. 26, 2014) ............................................ 11

*SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ................................. *passim*

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ...................................................................... *passim*

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) ........................................................................ 10

*United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) .........................................10, 11, 15

*United States v. Edenfield*, 995 F.2d 197 (11th Cir. 1993) ................................................... 19 n.7

*United States v. Field*, 592 F.2d 638 (2d Cir. 1978) ............................................................ 19 n.7

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ............................................................ 7, 9

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) ................................................................. 13, 17

**STATUTES AND REGULATIONS**

15 U.S.C. § 77b(a)(1) .......................................................................................................... 9

Fed. R. Civ. P. 11(b)(1) ...................................................................................................... 19

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 5, 6, 7

**OTHER AUTHORITIES**

Guidelines for Prof'l Conduct, U.S. Dist. Ct., N.D. Cal. ................................................... 19

# I.    INTRODUCTION

Since the Supreme Court's *Howey* decision 75 years ago, courts have ruled that the objective "economic reality" determines whether something is an "investment contract," and thus a security subject to the SEC's jurisdiction. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Labels, disclaimers, and other self-serving protestations to the contrary by promotors do not alter the outcome. *Howey* and its progeny make clear that if it looks like a duck, quacks like a duck, and has the genetic makeup of a duck, it is, indeed, a duck. It matters not if the seller puts a sign on the bird exclaiming, "this is not a duck."

Defendants move to dismiss this action, arguing that there are no securities at issue. Their argument is based mostly on "this-is-not-a-duck" language in a "Terms and Conditions" document that is not even properly before the Court on a motion to dismiss. *See, e.g.,* Mot. to Dismiss, Dkt. 17 at 2:22-28; 4:9-19; 5:1-8; 12:8-14; 14:10-19 (disclaimers state the tokens are "not for investment purpose" and "[y]ou are not . . . an investor in any . . . common enterprise"). But application of the *Howey* test shows that the SEC has properly pleaded that Defendants offered and sold investment contracts—which are securities—in the form of their ABTC Tokens. That is, the complaint has sufficiently alleged, in satisfaction of *Howey*, that there was: (1) an investment of money (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

Defendants induced persons to invest into Defendants' enterprise (through the purchase of ABTC Tokens, which had no use at the time of sale, other than as a speculative investment), by promoting the potential for profit based on the managerial and entrepreneurial efforts of NAC, the largest single holder of ABTC Tokens after their ICO (Compl., Dkt. 1 at ¶ 37), in developing a blockchain. Moreover, Defendants pooled the investors' money to fund the NAC enterprise.

Treating Defendants' sale of ABTC Tokens as a sale of securities is also consistent with court decisions in SEC enforcement actions involving digital asset cases nationwide. In every enforcement action brought by the SEC where the issue has been contested, the district courts applied *Howey* and ruled that the digital assets at issue were offered and sold as

investment contracts, and thus securities subject to the federal securities laws and SEC jurisdiction. *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020) (preliminary injunction granted, finding that the SEC had shown substantial likelihood of proving that defendant's plan to distribute its digital asset was unregistered offering of a security); *SEC v. Kik Interactive Inc.*, 2020 WL 5819770, at **1, 9 (S.D.N.Y. Sept. 30, 2020) (summary judgment granted, finding digital tokens were offered and sold as investment contracts and therefore securities); *SEC v. Blockvest, LLC*, 2019 WL 625163, at *7 (S.D. Cal. Feb. 14, 2019) (on reconsideration, court granted preliminary injunction, holding "promotion of the ICO of the [digital] token was a 'security' and satisfies the *Howey* test").

In what appears to be an attempt to shore up a losing argument, Defendants further contend that SEC attorneys have intentionally and "purposely" committed misconduct. Defendants argue that it was "misconduct" for SEC attorneys to allege in the complaint that Defendants misrepresented the status of their efforts to develop the technology for certain features of their supposedly revolutionary future digital asset (called "AML BitCoin"), when Defendants' White Paper posted on NAC's website indicated that they had received certain patents. Defendants, however, fail to explain how these unfounded allegations of misconduct are relevant to their motion to dismiss. Moreover, the SEC properly alleged in the complaint that Defendants' representations were false when they claimed that certain features of the future digital asset were complete and functional. These features were not completed or functional during the offering. Defendants do not argue in their motion to dismiss that the SEC's pleadings relating to fraud are insufficient. Rather, they invite error by arguing that the Court should deviate from the standards for a motion to dismiss to consider their extraneous and dubious "evidence."

Accordingly the Court should deny Defendants' motion to dismiss.

## II.     FACTS: DEFENDANTS OFFERED AND SOLD THE ABTC TOKENS AS INVESTMENT CONTRACTS.

The SEC's complaint alleges that: (1) Defendants offered and sold digital asset securities in the form of ABTC Tokens in an unregistered transaction/offering; (2) Defendants deceived

investors through a slew of misrepresentations—ranging from the status of Defendants' technology to the bogus claim that they were on the cusp of airing a Super Bowl commercial; (3) Defendant Rowland M. Andrade took steps to manipulate the market for ABTC Tokens; and (4) Andrade misappropriated over $1 million of the offering proceeds for his personal use. Because Defendants' motion focuses on whether the complaint has properly pleaded that there are securities at issue, the SEC highlights below the complaint's allegations supporting this issue.

Between August 2017 and December 2018, Defendants offered and sold digital assets called ABTC Tokens. The offering was to raise money for Defendants' enterprise, which was supposedly aimed at creating a revolutionary new type of digital asset and blockchain. Compl., Dkt. 1 at ¶ 36.

Defendant NAC was in early-stage development of a blockchain-based digital asset (called "AML Bitcoin"), which NAC claimed would be superior to the original bitcoin because it would have purported anti-money laundering and other security features encoded in the smart contracts for the token. Defendants also claimed the new token would be superior because it was purportedly compliant with regulatory requirements relating to digital assets, including in the United States. Compl., Dkt. 1 at ¶ 1.

On or about August 2017, NAC began posting materials promoting this supposed future digital asset on its website, through social media outlets, and by paying authors to write positive articles about the future digital asset. One way that Defendants pitched their future digital asset was through the White Paper for the future digital asset, which was posted on NAC's website on or about October 4, 2017, and accessible to the investing public worldwide. Compl., Dkt. 1 at ¶ 29.

NAC also claimed that it was developing its own blockchain that would include additional, novel features, such as certified digital identity verification. NAC referred to this blockchain as a "privately regulated public blockchain," which it claimed would be faster and more efficient than the original bitcoin blockchain. Compl., Dkt. 1 at ¶ 32.

Defendants' White Paper stated that the process of integrating the future digital asset's features into the new blockchain was ongoing, and that purchasers in the offering would first

receive ABTC Tokens that could be traded on various platforms but would not have any of the features of the future digital asset. NAC represented to purchasers that they could exchange the ABTC Tokens for functional future digital assets on a one-for-one basis as soon as the new blockchain and future digital assets were ready. Compl., Dkt. 1 at ¶ 33.

The ABTC Token offering included a pre-sale phase from August 2017 through October 2017, during which Defendants sold ABTC Tokens at prices ranging from $0.35 to $0.45 per token, and a public phase from October 2017 through February 2018 that Defendants referred to as the initial coin offering or "ICO." Defendants sold ABTC Tokens at prices ranging from $1.00 to $1.50 per token in the ICO and through the end of the offering. Compl., Dkt. 1 at ¶ 35. NAC advertised the ABTC Tokens as available for purchase by individuals in the United States and worldwide through their website, Facebook, Telegram, and other internet forums and social media pages. Compl., Dkt. 1 at ¶ 36.

According to Defendants' White Paper, NAC generated a total of 200 million ABTC Tokens, of which 76 million were available for purchase in the offering, which aimed to raise $100 million. The remainder of the ABTC Tokens were retained by NAC and its management team, including Andrade. NAC ultimately raised at least $5.6 million from approximately 2,400 primarily domestic, retail investors during the offering. Compl., Dkt. 1 at ¶ 37.

After the ICO phase of the offering was completed, NAC took steps to make the ABTC Tokens available for trading on various digital asset trading platforms. ABTC Tokens began trading on one such platform in May 2018. Thereafter, ABTC Tokens were traded on at least two additional platforms, which they then highlighted to investors. Compl., Dkt. 1 at ¶¶ 38, 41.

ABTC Tokens had no use apart from their investment potential. NAC did not have a platform where ABTC Tokens could be used to purchase goods or services or transact any business. Instead, the tokens' value derived entirely from trading on digital asset trading platforms. Compl., Dkt. 1 at ¶ 40. Defendants recognized this fact. In one of NAC's social media channels, company representatives highlighted the availability of secondary market trading to attract investors. Defendants' White Paper also stated that "users may trade, sell and purchase

[tokens] as they desire, including on participating exchanges and trading websites," and "to speculate." *Id.* at ¶ 41.

The NAC marketing plan was designed to create demand and market price appreciation for the ABTC Tokens, independent from and in the absence of any practical consumptive use for the Tokens. Defendants promoted the value of the ABTC Tokens to investors based on the success of the token sale and the expected demand for tokens when NAC and Andrade were successful in launching their future digital asset and blockchain; they did not promote the value based upon any theory that the ABTC Tokens had any consumptive use when they were issued in the offering. Compl., Dkt. 1 at ¶ 42. Indeed, NAC tied the value of the ABTC Token to purchasers' ability to quickly resell it to other investors, not to any immediate use for the Token. *Id.* at ¶ 43.

As part of the scheme to defraud investors in the offering, Andrade arranged for NAC employees and third parties to buy ABTC Tokens on digital asset trading platforms to support the price of the tokens and artificially inflate trading volume, and to avoid ABTC Tokens being removed from the platforms due to low trading volumes. Whenever a platform threatened to remove ABTC Tokens from trading due to low trading volumes, Andrade directed employees to buy more Tokens to generate the appearance of legitimate market-driven demand and trading volume. Compl., Dkt. 1 at ¶ 67.

## III.    LEGAL STANDARD FOR MOTION TO DISMISS

In evaluating Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court considers whether the complaint "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion to dismiss, all material allegations in the complaint are taken as true and construed in the light most favorable to the plaintiff. *See, e.g., In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008); *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939 (9th Cir. 2002); *accord*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint survives a motion to dismiss when the plaintiff pleads facts that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677

(2009). Dismissal is proper only where there is no cognizable legal theory or the complaint does not allege sufficient facts to support a cognizable legal theory. *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *4 (N.D. Cal. Aug. 7, 2018) (Seeborg, J.) (citing *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The Court does not determine whether the plaintiff will ultimately win the case, but whether the plaintiff is entitled to offer evidence to support the allegations in the complaint. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

Generally, a court may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). There are two exceptions: the incorporation-by-reference doctrine and judicial notice under Federal Rule of Evidence 201. *Khoja*, 899 F.3d at 998. However, in *Khoja*, the court noted a "concerning pattern in securities cases" that defendants were attempting to "exploit[] these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Id.* The court explained that, "Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint and hopefully dismiss the case at an early stage" but that this "risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Id.*

## IV.    ARGUMENT

Defendants challenge the SEC's complaint, arguing that the investments they offered were not securities and that the complaint thus fails to state a claim upon which relief may be granted. But to make this argument, Defendants rely heavily on extrinsic evidence. Below, the SEC first addresses the threshold issue of Defendants' misuse of extrinsic evidence on a motion to dismiss. Next, the SEC explains why the investment contracts offered and sold by Defendants are securities under the controlling *Howey* test, and how Defendants' various self-serving labels both in their solicitations to investors, and in their current brief, do not change that analysis. Finally, the SEC responds to Defendants' utterly specious argument that the SEC's counsel engaged in "misconduct."

### A. Defendants Improperly Rely On Extrinsic Evidence.

As a threshold matter, Defendants have grounded their motion to dismiss on their theory that the Court should plow through a raft of documentary evidence to determine whether the SEC's complaint states a claim upon which relief may be granted, under Rule 12(b)(6). Defendants stretch the incorporation-by-reference doctrine, which permits a court to treat certain documents as though they are part of the complaint itself, past its limit. *See Khoja*, 899 F.3d at 1002 (doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting the portions that weaken their claims).

Pursuant to the incorporation-by-reference doctrine, the Court may "incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim'" and the parties do not dispute the authenticity of the document. *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)). The incorporation-by-reference doctrine should be applied narrowly to preserve the distinction between a motion to dismiss and a motion for summary judgment. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 995 (S.D. Cal. 2005).

Defendants, however, do not narrowly tailor their use of this doctrine, but rather use it as an excuse to ask the Court to inappropriately make factual findings on a motion to dismiss. For instance, Defendants seek to introduce the "White Paper [of the future digital asset] and its Business Model" ("White Paper") but argue that its introduction is tantamount to proof of its veracity. *See* Mot. Dismiss, Dkt. 17 at Ex.1. The SEC does not object to the Court's consideration of this document; the complaint refers to the White Paper numerous times and the misrepresentations contained in Defendants' White Paper form the basis of several of the SEC's claims. Indeed, the SEC's complaint refers to certain portions of the White Paper, not for their truth, but for their falsity. Accordingly, while the Court may consider the entirety of the White Paper for context, in keeping with this Circuit's precedent, *Knievel*, 393 F.3d at 1076, the Court should not accept the representations in the White Paper as true where the SEC has pled facts describing their falsity. *See Khoja*, 899 F.3d at 1003 ("It is improper to

assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint.").

Defendants further stretch the incorporation-by-reference doctrine by seeking to introduce documents that are not appropriately considered on a motion to dismiss. Thus, Defendants seek to introduce a document titled, "Terms and Conditions" (Mot. Dismiss, Dkt. 17 at Ex. 2). The document is not cited or quoted in the complaint. Defendants don't dispute this, but instead make the attenuated argument that the complaint refers to the "offer" or "sale" of securities; that the "offer or sale" came with terms and conditions; that the "resulting sales" were made pursuant to a "contract of sale"; and the "contract of sale" included the document at issue, titled, "Terms and Conditions." Mot. Dismiss, Dkt. 17 at 7:5-11. By Defendants' theory, any document that is even tangentially related to Defendants' offer or sale of securities would necessarily be incorporated by reference. Defendants cite no law supporting this argument, which would effectively allow any extrinsic evidence to be considered on a motion to dismiss. In contrast, the decision in *Khoja* specifically disallows the incorporation of a document that it is neither referred to in the complaint at all, much less "extensively," and which does not form the basis of an SEC claim. *See Khoja*, 899 F.3d at 1003 (finding that district court abused its discretion by incorporating Wall Street Journal blog post). Rather, Defendants improperly offer the "Terms and Conditions" document for the purpose of attempting to provide evidentiary support for their defense that they did not commit securities violations.[1] *See Immune Response*, 375 F. Supp. 2d at 995 (declining to incorporate documents where the complaint did not rely on them and the defendants offered the documents as evidence that the defendants did not commit a securities violation).

Defendants push their incorporation argument well beyond the breaking point in seeking to introduce two declarations. One declaration, from a purported ABTC Token purchaser, and the second, from a purported NAC technical support employee, are explicitly used as evidentiary support for Defendants' argument that purchasers of the ABTC Token

---

[1] But, as set forth below (in Section IV.B.4 at 16), even if the Court were to consider the "Terms and Conditions" document, Defendants' motion would still fail.

were required to read and agree to the "Terms and Conditions" document. Winczura Decl.,

Dkt. 17-2; Agrawal Decl., Dkt. 17-3. Of course, these declarations are not referred to in the

complaint at all (let alone "extensively"), and neither declaration forms the basis of a claim.

*See Ritchie*, 342 F.3d at 908 ("declarations are not allowed as pleading exhibits unless they

form the basis of the complaint").[2] Accordingly, the Court should exclude these declarations

in considering the motion to dismiss.

> **B.** **Under The *Howey* Test, the SEC Has Properly Pleaded that Defendants Offered and Sold ABTC Tokens As Investment Contracts.**

Section 2(a)(1) of the Securities Act defines a "security" to include an "investment

contract" as well as other instruments such as stocks and bonds. 15 U.S.C. § 77b(a)(1). *Howey*

and its progeny set forth the operative test for evaluating whether an offering, in this case of the

ABTC Tokens, involves investment contracts and therefore "securities." Defendants

acknowledge that. Mot. Dismiss, Dkt. 17 at 8:12-10:3. But Defendants misapply the governing

law to the facts alleged in the complaint. The pertinent facts here echo those in the recent

*Telegram* and *Kik* cases, in which the courts granted the SEC a preliminary injunction and

summary judgment, respectively, finding that the offerings of digital assets at issue involved

securities. *Telegram*, 448 F. Supp. 3d at 358; *Kik*, 2020 WL 5819770, at **1, 9. As the district

court in *Telegram* observed: "Congress' purpose in enacting the securities laws was to regulate

investments, in whatever form they are made and by whatever name they are called." *Telegram*,

448 F. Supp. 3d at 364 (quoting *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (internal citations

and quotation marks omitted)).

> **1.** **The *Howey* Test Is Flexible and Anchored in Objective Economic Reality.**

The Supreme Court has defined an "investment contract" as "a contract, transaction or

scheme whereby a person invests his money in a common enterprise and is led to expect

profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298-99.

---

[2] Additionally, since the declarants have not been interviewed by the SEC, the SEC cannot stipulate to the authenticity or completeness of the declarations.

The term "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. In evaluating purported investment contracts, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975) (the "economic realities underlying a transaction" are what matter and not "the name appended thereto"); *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001) (disclaimers are not dispositive if contrary to the apparent economic reality of the transaction); *Telegram*, 448 F. Supp. 3d at 375 (disclaimers insufficient to negate substantial evidence that reasonable purchaser expected to profit).

Indeed, district courts have applied the *Howey* test in similar digital asset offerings, relying on the flexibility of the analysis. *See, e.g.*, *Kik*, 2020 WL 5819770, at *5. "*Howey's* three-part test requires: '(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others.'" *Blockvest*, 2019 WL 625163, at *5 (citing *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003)). Indeed, these courts have recognized that for over seven decades, the *Howey* test has been used to evaluate "unconventional schemes" to determine if they are investment contracts. *See Telegram*, 448 F. Supp. 3d at 365 (digital tokens found to have been offered as investment contracts and listing a host of "schemes and contracts governing a range of intangible assets" to be securities, from whiskey casks to chinchillas to digital tokens).

### 2. The *Howey* Test Is Applied at the Time of Sale of the ABTC Tokens.

The SEC's allegations that Defendants offered and sold securities in violation of the registration requirements under Section 5 of the Securities Act specifically relate to Defendants' offer and sale of the ABTC Tokens, as set forth in the complaint. Compl., Dkt. 1 at ¶¶ 2, 35, 37. Accordingly, the *Howey* analysis should be considered as of the time when the ABTC Tokens were offered and sold, not at some indeterminate later time when Defendants' future digital asset ecosystem would be fully developed. *See Telegram*, 448 F.3d at 368

(digital asset to be evaluated at the time of the original sale, not the time of the delivery of the later-to-be-developed token to the purchasers); *SEC v. Aqua–Sonic Prods. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) (transaction must be examined as of the time that the transaction took place (citing *Forman*, 421 U.S. at 852-53), *aff'd*, 687 F.2d 577); *Telegram*, 448 F. Supp. 3d at 368 (*Howey* requires examination at the time of sale).

### 3. The Complaint Adequately Pleads the *Howey* Factors.

The three prongs of the *Howey* test, when applied to the SEC's complaint, fully support the conclusion that Defendants offered and sold "investment contracts," and hence, securities.

#### a) *Howey* Prongs 1 and 2—Investment of Money and Common Enterprise—Are Readily Met.

The first *Howey* prong, which examines whether an investment of money was part of the relevant transaction, does not appear seriously in dispute. In any event, the complaint specifically alleges that Defendants raised at least $5.6 million from 2,400 mostly retail investors, and that ABTC Tokens could be purchased with fiat currency or certain digital assets at prices ranging from $0.35 to $1.50 per token at various stages of the ICO. Compl., Dkt. 1 at ¶¶ 1, 35, 37. Defendants do not dispute that there was this investment of money, nor do they argue that *Howey*'s first prong has not been met. Nor could they. *SEC v. Shavers*, 2014 WL 12622292, at **5-6 (E.D. Tex. Aug. 26, 2014) (Bitcoin "constitutes something of value" and satisfies the first *Howey* prong); *Kik*, 2020 WL 5819770, at *5 (parties agree that first element of *Howey* satisfied).

*Howey*'s second prong, the existence of a common enterprise, may be demonstrated through either horizontal commonality or strict vertical commonality. *Hocking v Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989) (*en banc*) ("The Ninth circuit accepts either traditional horizontal commonality, or . . . a strict version of vertical commonality.").

Horizontal commonality is established when investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise. "Where horizontal commonality is present, 'the fortunes of each

investor depend upon the profitability of the enterprise as a whole.'" *Kik*, 2020 WL 5819770 at *5 (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994)). Strict vertical commonality "requires that the fortunes of investors be tied to the fortunes of the promoter." *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978).

Here, the SEC has pleaded facts that demonstrate both horizontal and strict vertical commonality. Horizontal commonality is established because NAC pooled the money it received from the sale of ABTC Tokens and used it for the enterprise. Compl. Dkt. 1 at ¶ 35. The ability of each ABTC buyer to profit was dependent on NAC's successful development and launch of the future digital asset and blockchain. Compl., Dkt. 1 at ¶ 40. Logically, if the future digital asset development failed, all ABTC Token holders would equally lose their opportunity to profit. Consequently, horizontal commonality existed as of the time of ABTC Token sales. *See Telegram*, 448 F. Supp. 3d at 369-70 ("The Court finds that the SEC has made the required showing of horizontal commonality because the record demonstrates that there was a pooling of assets and that the fortunes of investors were tied to the success of the enterprise as well as to the fortunes of other investors . . . ."); *Kik*, 2020 WL 5819770, at *5 (horizontal common enterprise found where "Kik deposited the funds in a single bank account"; "used the funds for its operations, including the construction of the digital ecosystem it promoted"; and "the success of the ecosystem drove demand for [the token] and thus dictated investors' profits."). As in *Kik*, here: "[T]he value of the [digital asset] was dictated by the success . . . of the enterprise as a whole, thereby establishing horizontal commonality." *Kik*, 2020 WL 5819770, at *6 (citing *Balestra v. ABTCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019)).[3]

The SEC's complaint also alleges facts demonstrating strict vertical commonality. ABTC Token purchasers' anticipated profits were directly dependent on Defendants' success in

_____

[3] As noted in *Telegram* and in *Kik*, a *pro rata* distribution is not a requirement for horizontal commonality, and the ability to sell tokens "and thereby exit the common enterprise, does not mean that the [token purchasers] are not part of a common enterprise while they continued to possess the [tokens]." *Telegram*, 448 F. Supp. 3d at 369, 370 nn.8, 9 (citations omitted); *Kik*, 2020 WL 5819770, at *5.

developing and launching their future digital asset and blockchain. Compl., Dkt. 1 at ¶ 40. And even after the offering—as the public knew from the White Paper—the majority of the ABTC Tokens were retained by Defendants. Compl., Dkt. 1 at ¶ 37. Thus, because of their large holdings of ABTC Tokens, NAC's own fortunes were similarly dependent on the successful development and launch of the future digital asset and blockchain. *See Telegram*, 448 F. Supp. 3d at 370-71 (finding that the SEC made a showing of strict vertical commonality and stating that "Telegram's fortunes are directly tied to the fortunes of the Initial Purchasers, which will rise and fall with the success or failure of the TON Blockchain."). So, the first two *Howey* factors are present.

### b) *Howey* Prong 3—A Reasonable Expectation of Profits Based on the Efforts of Others—Is Also Present.

The third *Howey* prong looks to whether investors who purchased the ABTC Tokens had a reasonable expectation of profits, and further, whether those profits were to be generated by the efforts of persons other than the investors. Here, the complaint's well-pled facts establish that Defendants themselves induced purchases of ABTC Tokens by fueling these expectations with "*Howey*"-like promises.

The first part of *Howey's* third prong, an "expectation of profit," occurs when investors partake in a transaction for the "prospects of a return on their investment." *Howey*, 328 U.S. at 301; *SEC v. Hui Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019) ("expectation of profit" found even when this investment intent was secondary to a motive unrelated to profit). This is an objective inquiry, not a search for each investor's individual, subjective motivation. *See Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'").

The totality of the facts alleged in the complaint demonstrates that a reasonable investor at the time of the offer and sale of the ABTC Token would have had *no reason other than* an "expectation of profit" for buying the tokens. Defendants advertised the ABTC Tokens as an investment—being available for purchase in the United States and around the

world—and company representatives highlighted the availability of secondary market trading to attract investors. Compl., Dkt. 1 at ¶¶ 36, 41. And the "value" of ABTC Tokens would derive from the investor's speculation that NAC would successfully develop its supposedly revolutionary future digital asset and blockchain, and the investor could then sell the Tokens for a profit, or convert them to the more valuable future digital asset; that is, investors were betting that Defendants could create and encourage the widespread use of their future digital asset ecosystem. *Telegram*, 448 F. Supp. 3d at 375-76 (initial purchasers understood that investment in digital asset was a bet that the asset would be become widely used, and thus enable potential profits upon a resales of the digital asset). Also, importantly, the ABTC Tokens had no use outside of their investment opportunity. Compl., Dkt. 1 at ¶ 40. For example, NAC did not have a platform where ABTC Tokens could be used to purchase goods or services or transact any business. Instead, the potential value derived entirely from speculative trading on digital asset trading platforms. *Id*.

Again, the *Telegram* decision is analogous. There, the court found that many factors that are also present in this case indicated an investment intent, including: the tiered purchase pricing structure—with a significant "discount" for the early purchasers—that provided a substantial incentive for the initial purchasers to profit from their resale of their tokens; the economic reality of the promised technological advances; and the promotional materials targeting buyers with an investment intent, including highlighting the opportunity for profit based on the discounted purchase price. *Telegram*, 448 F. Supp. 3d at 371-73.

Like here, the defendants in both the *Telegram* and *Kik* cases claimed that token purchasers had a consumptive, not investment, intent. Mot. Dismiss, Dkt. 17 at 15:24-26. And as in *Telegram* and *Kik*, that argument fails here in the face of the economic reality. The court in *Telegram* noted that "consumptive uses for Grams were not features that could reasonably be expected to appeal to the Initial Purchasers targeted . . . ." *Telegram*, 448 F. Supp. 3d at 374. That is also true here: There were no possible consumptive uses—no uses at all—for the ABTC Tokens. Compl., Dkt. 1 at ¶ 40. As the court in *Kik* explained, none of this alleged "'consumptive use' was available at the time of the distribution. It would materialize only if

the enterprise advertised by *Kik* turned out to be successful"; and "[u]nlike real estate, [the tokens] have no inherent value and will generate no profit absent an ecosystem that drives demand." *Kik*, 2020 WL 5819770, at *7. Just as in the *Kik* case, the value of the ABTC Tokens would materialize only if Defendants brought to fruition the enterprise they promoted to investors.

Finally, the second question asked in the third prong of the *Howey* test involves whether the profits reasonably expected "were derived from the entrepreneurial or managerial efforts of others." *Telegram*, 448 F. Supp. 3d at 375 (citing *Howey*, 328 U.S. at 299 and *Forman*, 421 U.S. at 852); *Kik*, 2020 WL 5819770, at *6 (same). The efforts of promotors, undertaken either before or after gaining control over investor funds, are relevant considerations due to *Howey*'s focus on economic realities." *Telegram*, 448 F. Supp. at 375 (citing *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 743-44 (11th Cir. 2005)).

Here, the facts alleged in the complaint and the reasonable inferences drawn therefrom demonstrate that purchasers of ABTC Tokens had a reasonable expectation of profits that would be generated from the entrepreneurial and managerial efforts of Defendants. According to Defendants' statements at the time, the entire value of an investment in ABTC Tokens would be derived from NAC's eventual development and execution of its purportedly superior future digital asset and blockchain, with allegedly revolutionary security features that were supposedly compliant with regulatory requirements. Compl., Dkt. 1 at ¶¶ 1, 23. Again, these facts are on all fours with *Telegram*. There, as here, the initial investors provided capital to fund the blockchain development. *Telegram*, 448 F. Supp. 3d at 375. As in *Telegram*, "to realize a return on their investment, the Initial Purchasers were entirely reliant on [Defendants'] efforts to develop, launch, and provide ongoing support for the [future digital asset and] Blockchain; [and] the Initial Purchasers' dependence on [Defendants] to develop, launch, and support the [future digital asset and] Blockchain is sufficient to find that the

Initial Purchasers' expectation of profits was reliant on the essential efforts of [Defendants]."[4]

*Id.*, at 375-76; *see also Kik*, 2020 WL 5819770, at *7 ("[t]he demand for [the digital asset] Kin, and thus the value of the investment, would not grow on its own. Growth would rely heavily on Kik's entrepreneurial and managerial efforts.") The district courts' assessments of the economic reality in *Telegram* and *Kik* are equally apt here:

> The Initial Purchasers recognized that an investment in Grams was a bet that Telegram could successfully encourage the mass adoption of Grams, thereby enabling a high potential return on the resales of Grams.
>
> ***
>
> Those efforts by Kik were crucial because without the promised digital ecosystem, Kin would be worthless. . . . It is undisputed that Kik had to be the primary driver of that ecosystem.[5]

*Telegram*, 448 F. Supp. 3d at 375-76; *Kik*, 2020 WL 5819770, at *7.

As has been true with these analogous, recent digital asset cases, the *Howey* test is readily satisfied by the allegations in the SEC's complaint, which sufficiently alleges that Defendants offered and sold investment contracts, and therefore securities, in violation of the Securities Act. Defendants' motion should be denied.

### 4. Defendants' Disclaimers, Labels, and Characterizations Do Not Alter the *Howey* Analysis.

Defendants attempt to escape the conclusion mandated by *Howey* and its progeny by relying on disclaimers, labels, and characterizations contained in a potpourri of documents, all of which are at odds with the economic reality of the investors' transactions. For instance,

---

[4] Defendants also claim that they did not have a "general plan of distribution" Mot. Dismiss, Dkt. 17 at 16-17, and that their marketplace "was necessarily discrete" *Id.* at 17:11. But Defendants' offering material was available on the internet worldwide (Compl., Dkt. 1 at ¶ 29), and the ABTC Tokens were purchased by "approximately 2,400 retail investors." *Id.* at ¶¶ 1, 27, 37. Indeed, Defendants purported to offer for sale 76 million ABTC Tokens, and aimed to raise $100 million. *Id.* at ¶ 37. *See Howey*, 328 U.S. at 299-300 (offering the opportunity to "persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of citrus products. . . . [T]hey are attracted solely by the prospect of a return on their investment.").

[5] Defendants also assert that their offering materials are "completely unlike" those in *Telegram* and *Kik* (Mot. Dismiss, Dkt. 17 at 13:2-4), but, as noted, it is the economic reality that governs.

Defendants repeatedly cite assertions in the "Terms and Conditions" document—ranging from the tokens not being an investment, to the stated non-expectation of a return, to a declared non-common enterprise. Mot. Dismiss, Dkt. 17 at 2:22-28; 4:7-20; 5:1-8; 12:5-14; 14:10-19. As discussed above, the "Terms and Conditions" document and the two related declarations are not properly before the Court on a motion to dismiss.

But even were the Court to consider these extrinsic documents, Defendants' self-serving disclaimers are merely their attempt to create "not-a-duck" signs that contradict the economic realities that are apparent under a proper *Howey* analysis. For example, Defendants contend that the "Terms and Conditions" document negates both horizontal and vertical commonality. Mot. Dismiss, Dkt. 17 at 12:15-28. In particular, they point to a nonsensical "term" that investors were not purchasing the tokens as "investments." *Id*. But the economic reality of the transactions, and any common sense reading of the complaint, compel the opposite conclusion: purchasers had no reason to buy the ABTC Tokens except as an investment. Furthermore, despite Defendants' self-serving, and false, statements referenced in their motion that investors' funds would not be "pooled," the money from the ABTC Token sales was pooled to fund NAC's development of its future digital asset and blockchain, and all of the investors' prospects—as well as the prospects for NAC—were aligned with and hinged upon Defendants' successful development and execution of the future digital asset and blockchain. Equally unpersuasive is Defendants' contention that *Howey's* expectation-of-profit prong is not met because there are no *express* claims of profitability in the White Paper or the "Terms and Conditions" document. *See* Mot. Dismiss, Dkt. 17 at 13:5-14:2. But there need not be *express* mentions of possible profit; the objective economic reality controls. And here there is no other reasonable understanding other than purchasers of ABTC Tokens— which had *no use*—had a reasonable expectation of profit. *Warfield*, 569 F.3d at 1021 (courts conduct an "objective inquiry" into "the character of the instrument," and the test is "what character the instrument is given in commerce" by the terms, plan of distribution, and economic inducements) (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 at 352-53 (1943)).

### 5. The ABTC Tokens Were Not "Forward Contracts" on a Commodity.

Defendants also argue that the ABTC Tokens were "forward contracts" for deferred delivery of a cash commodity and therefore outside the SEC's jurisdiction. Mot. Dismiss, Dkt. 17 at 18:18-21:4. Although Defendants' argument is not entirely clear, they appear to argue that the cash commodity at issue is the future digital asset that may be developed at some indefinite later time, using the proceeds of the offering, and Defendants analogize this alleged cash commodity (that admittedly does not yet exist) to oil. *Id.* at 19:6-20:2. Therefore, Defendants argue, the ABTC Tokens were excluded from SEC regulation under the Commodity Exchange Act. *Id.* at 18:25-26.

This argument is a red herring. The complaint does not allege violations of the Commodity Exchange Act; it alleges violations of the Securities Act, and the *Howey* analysis outlined above is the correct framework for determining whether the ABTC Tokens were offered and sold as securities, in the form of investment contracts, subject to the SEC's jurisdiction. Even if the ABTC Tokens might have *also* constituted forward contracts on a cash commodity, the *Howey* test remains the relevant analysis.[6]

As numerous courts since *Howey* have held, the investment contract analysis turns on an objective analysis of the economic realities of the offering, and an instrument can be offered and sold as an investment contract, and therefore a security, even if the investment scheme involves an underlying physical asset like land or oranges, as in *Howey*, or something that is arguably a commodity or medium of exchange that may be subject to regulation in some capacity by another agency. *See Howey*, 328 U.S. at 299-300; *Glen-Arden Commodities*

---

[6] In reality, Defendants' supposedly revolutionary future digital asset did not exist at the time of the offering; it therefore could not reasonably be interpreted as a "cash commodity," much less one sold for actual delivery. *See CFTC v. Monex Credit Co.*, 931 F.3d 966, 972-74 (9th Cir. 2019) (defendant who relies on actual delivery exception to CEA has burden of proof). Defendants' ABTC Tokens were also offered and sold via exchanges and used standardized terms, making them unlike a forward contract. *See CFTC v. Midland Rare Coin Exchange, Inc.*, 71 F. Supp. 2d 1257, 1261-62 (S.D. Fla. 1999) (the "narrow" exception for forward contracts contemplates non-standardized contracts exchanged by parties who actually use the underlying commodity in their business).

*v. Constantino*, 493 F.2d 1027, 1033-35 (2d Cir. 1974) (rejecting defendant's argument that because the Scotch whisky receipts underlying the transaction were a commodity, the instrument could not be an investment contract, and citing a "long line of cases where purported sales of tangible property, service contracts, or both were held to be investment contracts"); *Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985) (holding that sales of certificates of deposit, under the facts and circumstances of the offering, were sales of investment contracts). *See also CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228-29 (E.D.N.Y. 2018) ("The jurisdictional authority of the CFTC to regulate virtual currencies as commodities does not preclude other agencies from exercising their regulatory power . . . .").

## C. There Was No Misconduct By the SEC.

Defendants also use their motion as a vehicle for attacking the integrity of SEC counsel. Defendants make the bald assertions that SEC attorneys have intentionally committed misconduct by purportedly making "baseless allegations in the complaint" about the status of the development of their future digital asset and that the "investigative staff at the SEC have purposely attempted to mislead the Court, and by extension the public at large." Mot. Dismiss, Dkt. 17 at 22:14-19. Yet after leveling this serious charge, Defendants are conspicuously silent as to how these claims are relevant to their motion to dismiss. There is no proper purpose for these aspersions. *See* Guidelines for Prof'l Conduct, U.S. Dist. Ct., N.D. Cal.; Fed. R. Civ. P. 11(b)(1) (court documents should not be filed "for any improper purpose.").[7]

---

[7] Even had Defendants attempted to tie their allegations of misconduct to their motion to dismiss, their arguments would fall far short of the high standard required to dismiss a securities enforcement action based on alleged government misconduct, "[i]n view of the strong public policy against dismissing securities enforcement actions prosecuted for the public good." *See SEC v. Lorin*, 1991 WL 576895, at *2 (S.D.N.Y. June 10, 1991) (*citing United States v. Field*, 592 F.2d 638, 648 (2d Cir. 1978)). Only "in the rarest and most outrageous circumstances," where government conduct violates "that fundamental fairness, shocking to the universal sense of justice," is such relief proper. *United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir.1993) (denying motion to dismiss for alleged "outrageous government misconduct"). The misconduct alleged must be egregious and the "resulting

Contrary to Defendants' accusations, the complaint is well pled. The complaint alleges that Defendants, in their White Paper, made false and misleading statements that implied that certain features of the future digital asset token were complete and functional. In paragraph 45, the complaint alleges: "According to the White Paper authored by Andrade, 'using proprietary technology, this identity-based digital currency **is** compliant with laws, statutes, rules, and regulations that govern, regulate, and relate to preventing money-laundering, terrorism, identity theft, financial crimes, and know-your-customer laws." (Emphasis added.) In paragraph 46, the complaint alleges: "The White Paper also falsely claimed that NAC's technology **included** a 'personal legal identity-linked credential authentication protocol' that was built into the source code for the token." (Emphasis added.)

The complaint alleges that, in reality, the future digital asset token did not already have these advertised features. Compl., Dkt. 1 at ¶ 47. Among other things, Defendants had stopped paying the software developers who were hired to develop these features, and these individuals made no progress in developing these features. *Id.* The complaint does not allege that Defendants took no steps in the development of the features of the future digital asset.[8] Certainly, hiring software engineers and even applying for or obtaining patents might be steps toward development. Rather, the complaint alleges that, during the offering, "NAC never developed the technology" for the advertised features of the future digital asset. Compl., Dkt. 1 at ¶ 48. In other words, contrary to Defendants' representations to investors, these features were only nascent, not complete and functional.

---

prejudice to defendant [must also] rise[] to a constitutional level," *i.e.,* a violation of due process. *SEC v. Lorin*, 1991 WL 576895, at *1 (rejecting defense that SEC had committed misconduct); *SEC v. Musella*, 1983 WL 1297, at *2 (S.D.N.Y. Apr. 4, 1983) (same).

[8] Defendants request the Court take judicial notice of Andrade's patents. Mot. Dismiss, Dkt. 17 at 22:22-27. The SEC does not object to the Court's taking judicial notice of the filing of the patents. However, on their face, the patents were for "systems and methods for providing block chain-based multifactor personal identity verification" and "systems and methods for providing block chain or distributed ledger-based entity identity and relation verification." *Id.* at 21:26-27, 22:6-9. Such "method" patents simply protect the techniques of what was patented, they do not prove that the technology has been developed. As properly alleged in the complaint, NAC and Andrade asserted in the White Paper and other offering materials that the enhanced security features of their future digital asset had already been developed when they had not.

The SEC unequivocally rejects the claim that it misstated the evidence—much less "purposely" committed fraud upon the Court. Instead, Defendants misconstrued the SEC's allegations and then unfairly tried to use their misreading to tarnish the SEC's reputation with the Court. The accusations have no merit—and no place in this Court.

## V.      CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion to dismiss.

Respectfully submitted,

DATED: November 19, 2020          /s/ Marc Katz
                                  MARC KATZ
                                  Attorney for Plaintiff
                                  SECURITIES AND EXCHANGE COMMISSION