1  KATHERINE D. COOPER *(appearance pro hac vice)*
   Murphy & McGonigle, P.C.
2  1185 Avenue of the Americas, 21st Floor
   New York, NY 10036
3  Tel.: 212.880.3630
   Fax: 212.880.3998
4  kcooper@mmlawus.com
5
   MAURICIO S. BEUGELMANS (Bar No. 201131)
6  Murphy & McGonigle, RLLP
   44 Montgomery Street, Suite 3750
7  San Francisco, CA 94104
   Tel.: 415.651.5707
8  Fax: 415.651.5708
9  mbeugelmans@mmlawus.com

10 LIONEL ANDRÉ *(appearance pro hac vice)*
   Murphy & McGonigle, P.C.
11 1001 G Street NW, 7th Floor
   Washington, DC 20001
12 Tel.: 202.661.7039
   Fax: 202.661.7059
13 landre@mmlawus.com
14
   Attorneys for Defendants NAC Foundation, LLC and
15 Rowland Marcus Andrade

16
17                     **UNITED STATES DISTRICT COURT**
18                     **NORTHERN DISTRICT OF CALIFORNIA**
19                         **SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | CASE NO.: 20-cv-4188-RS |
| Plaintiff, | **DEFENDANTS' REPY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT;** |
| vs. | |
| NAC FOUNDATION, LLC and ROWLAND MARCUS ANDRADE, | Date: January 7, 2021<br>Time: 1:30 pm PT<br>Courtroom: 3, 17th Floor |
| Defendants. | Honorable Richard Seeborg, District Judge |
| | Filed: December 3, 2020 |

## Table of Contents

POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS ................................................................................................................................ 1
  Preliminary Statement ........................................................................................................... 1
  Legal Discussion .................................................................................................................... 2
    I. The Defendants' Extrinsic Evidence is Properly Before the Court ............................. 2
    II. The SEC has not Alleged Sufficient Facts Showing the Second and Third Prongs of the Howey Test Have Been Satisfied .......................................................................... 6
      A. *No Common Enterprise* ........................................................................................ 7
        1. Horizontal Commonality ..................................................................................... 7
        2. Vertical Commonality ......................................................................................... 9
      B. *No Reasonable Expectation of Profit* ................................................................. 10
    III. The ABTC Token is a Forward Contract .................................................................. 13
    IV. Regulation by Enforcement ...................................................................................... 14
  CONCLUSION ..................................................................................................................... 15

**Table of Authorities**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 3, 6, 7, 8

*AtPac, Inc. v. Aptitude Solutions, Inc.*, 787 F. Supp.2d 1108 (E.D. Cal. 2011) ........................... 12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 1, 3, 7, 8

*Brodt v. Bache & Co., Inc.*, 595 F.2d 459 (9th Cir. 1978) ................................................................ 9

*Epstein v. Wash. Energy Co.*, 83 F.3d 1136 (9th Cir.1996) ......................................................... 3, 6

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) .................................................................. 6, 12

*Howey Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293 (1946)* .... 1, 2, 13

*Hsu v, Puma Biotechnology, Inc.*, 213 F. Supp.3d 1275 (C.D. Cal. 2016) ..................................... 5

*In re Immune Response Securities Litigation*, 375 F. Supp.2d 983 (S.D. Cal. 2005) ................. 5, 6

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .................................... 4, 5, 12

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........................................................................ 3, 4

*Marine Bank v. Weaver*, 455 U.S. 551 (1982) ............................................................................. 13

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ............................................................................. 7

*Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir.1998) ...................................................................... 3, 4

*Reves v. Ernst & Young,* 494 U.S. 56 (1990) ............................................................................... 13

*SEC v. Eurobond Exchange, Ltd.*, 13 F.3d 1334 (9th Cir. 1994) ..................................................... 9

*Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035 (9th Cir. 2010) ............................. 7

*United States v. Richie*, 342 F.3d 903 (9th Cir. 2003) ................................................................... 4

**Other Authorities**

*A CFTC Primer on Virtual Currencies* (CFTC Oct. 17, 2017) ....................................................... 8

*Authority of a National Bank to Provide Cryptocurrency Custody Services for Customers* (OCC
   July 22, 2020)  https://www.occ.gov/topics/charters-and-licensing/interpretations-and-
   actions/2020/int1170.pdf ........................................................................................................... 8

H. Pierce, How We Howey (SEC May 29, 2019) https://www.sec.gov/news/speech/peirce-how-
   we-howey-050919 .................................................................................................................... 14

https://www.google.com/search?q=dictionary&rlz=1C1GCEU_enUS902US902&oq=dictionary
   &aqs=chrome..69i57j69i60l3j69i61.4490j0j15&sourceid=chrome&ie=UTF-8#dobs=tout ..... 11

*No Action, Interpretive and/or Exemptive Letter: The Ticket Reserve, Inc*.

https://www.sec.gov/divisions/corpfin/cf-noaction/ticketreserve091103.htm ......................... 14

*Not All Virtual Currencies are Created Equal: Regulatory Guidance in the Aftermath of CFTC v.*

*McDonnell*, 8 Am. Univ. Bus. L. Rev. 198 (2019) .................................................................... 8

**Statutes**

7 U.S.C. § 2(c)(2)(D) ................................................................................................... 13

# POINTS AND AUTHORITIES IN FURTHER SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS

## *Preliminary Statement*

The SEC's duck analogy belies its simplistic approach to this case and lack of attention to the details underlying the Defendants' ABTC token sales. (ECF Dkt. 21, *SEC's Opposition to Defendants' Motion to Dismiss* "Opp." at 1 & 17.)  The SEC will have the Court adopt a simplistic view that if something looks like a duck, quacks like a duck, it is indeed a duck.  The SEC's argument is to point to other cases involving the sale of digital tokens that have been found to be securities, to conclude that the ABTC tokens must be securities too – the ABTC tokens looks like a security, quacks like a security, so it must be a security.  But this argument overlooks the details in this case and how the ABTC tokens differ in material ways from other digital tokens that have been deemed securities.  If something looks like a duck, quacks like a duck, but does not have feathers and webbed feet, it probably is not a duck.

The SEC's Complaint (ECF Dkt 1 ("Complaint" or "Cmplt.")) has only alleged generalized and conclusory facts that the Defendants' ABTC token looks enough like other digital tokens that have been found to be securities.  These allegations do not meet the SEC's burden for the purpose of this motion to dismiss.  When taken in the context of the White Paper (ECF Dkt. 17-1 Ex. A), Terms and Conditions (ECF. Dkt 17-1 Ex. B ("T&C")), patents listing Mr. Andrade as inventor and source code copyrighted in 2015 – all extrinsic evidence properly before the Court on this motion to dismiss – it becomes clear that all the SEC has put before this Court are mere "threadbare recitals of the elements of the cause of action, supported by mere conclusory statements."[1]  The SEC has not alleged sufficient, specific facts to support that the Defendants' sale of the ABTC token satisfied either the second or third prong of the *Howey* test.  Finally, the Complaint's bald assertion that "NAC had not developed *any*" of the AML, KYC and security features, Cmplt. ¶ 9 (emphasis added), is flatly, inconsistent with patents on file with the U.S. Patent & Trademark Office ("USPTO") listing Mr. Andrade as the inventor and source code copyrighted in 2015 which provides a personal legal identity linked credential

---

[1] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

authentication protocol functionality. The bald assertion is even more troubling given that the first patent had been brought to the SEC's attention more than two years before it filed its complaint in this matter. ECF Dkt. 17-1 Ex. C. This intentional or reckless omission is clearly relevant to Defendants' motion to dismiss. The SEC's repeated assertion that the technology did not exist is key to its *Howey* analysis and the foundation for its imagined "reasonable expectation of profit" on the part of ABTC token purchasers. The SEC alleges because none of the technology existed, ABTC token buyers could reasonably expect a profit if Defendants successfully developed and implemented the technology. Cmplt. ¶ 39. The problem with the SEC's argument is that the technology did exist as evidenced by the patents and source code copyrighted in 2015.

Rather than provide clear and straightforward guidance regarding what makes a digital token a security or not, the SEC has engaged in a campaign of regulation by enforcement. It is up to the Court to end this dangerous policy which threatens the development of key, groundbreaking technologies on America's shores and forcing American inventors and entrepreneurs to take their inventions to other countries.

The SEC includes in its complaint serious charges of fraud which the Defendants vigorously contest. But those same allegations of fraud are the subject of a parallel criminal prosecution pending before this Court. There is no need for the Court to strain the Securities Act to find that ABTC tokens are securities simply to ensure that there is a remedy for those alleged acts of fraud. The criminal case will provide ample opportunity for that. The SEC's complaint should be dismissed.

## *Legal Discussion*

### I. <u>The Defendants' Extrinsic Evidence is Properly Before the Court</u>

The SEC acknowledges the acceptance within the Ninth Circuit of the "incorporation-by-reference" doctrine under which a defendant may append to its motion to dismiss a document where "the plaintiff's claim depends on the contents of a document" and the parties do not dispute the authenticity of the document. Opp. at 7:9-12. Moreover, the SEC does not object to the Court's consideration of the White Paper but argues that "the Court should not accept the

DEFENDANTS' MTD REPLY                                                    CASE NO. 20-CV-4188-RS
2

representations in the White Paper as true where the SEC has pled facts describing their falsity. Id. at 7:27-28.

This is a red herring. The SEC alleges that the White Paper is part of the "offering materials" for the sale of ABTC tokens. Defendants do not point to the White Paper on this motion to dismiss for the veracity of the White Paper's contents, but, rather, Defendants are merely noting that the White Paper's tone and representations refute the SEC's conclusory allegations that it "reasonably created an expectation of profits" from the purchase of ABTC tokens. For instance, the SEC alleges that "[b]ased on NAC's statements in the White Paper . . . purchasers would have reasonably believed they could pursue . . . profits by holding or trading the ABTC tokens they received in the offering." Cmplt. ¶ 39. A fair and unbiased reading of the White Paper in no way supports that conclusion. Accordingly, to be clear, the Defendants are not offering the White Paper for the truth of its statements (at this procedural juncture), but, rather, to show that the SEC's so-called "offering materials" do not support its conclusory allegations about what the White Paper actually says. It is hornbook law that "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555) ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true).

When it comes to the Court's consideration of the Terms and Conditions, the SEC's argument is simply bizarre. By citing *Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005), Opp. at 7, the SEC appears to concede that the Ninth Circuit has extended the incorporation-by-reference doctrine to the situation in this case:

> We have extended the "incorporation-by-reference" doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, ***even though the plaintiff does not explicitly allege the contents of that document in the complaint***.

*Knievel*, 393 F.3d at 1076 (emphasis added) *citing Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998). Nonetheless, the SEC furiously objects to the Court's consideration of the Terms and Conditions, complaining that the Terms and Conditions document "is not cited or quoted in the

complaint." Opp at 8:6. Under *Knieval* and *Parrino*, it is plain that Ninth Circuit law does not require that the plaintiff explicitly allege the contents of a document in its complaint for such extrinsic evidence to be considered on a motion to dismiss. The Court may consider such a document if the plaintiff's claims ***depend on the document***. *Knievel*, 393 F.3d at 1076.

As observed in Defendants' opening brief, the Complaint refers to the "offer" or "offering" of securities *sixty times* and the sale of securities *eleven times*. Of course, the SEC's claims ***depend on*** the terms and conditions of the offer or offering or sale of tokens. In spite of that obvious fact, the SEC argues:

> [b]y Defendants' theory, any document that is even tangentially related to Defendants' offer or sale of securities would necessarily be incorporated by reference. Defendants cite no law supporting this argument, which would effectively allow any extrinsic evidence to be considered on a motion to dismiss.

Opp. at 8:10-14. The Terms and Conditions are ***by definition*** a component of the offer or offering that the SEC refers to in the Complaint and not some mere tangentially related document. Moreover, the SEC's reference to the offer or offering sixty times and the sale of ABTC tokens that the SEC refers to eleven times in the twenty-page Complaint are more than "extensive," as required under Ninth Circuit law for the incorporation-by-reference doctrine. *United States v. Richie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers ***extensively*** to the document or the document forms the basis of the plaintiff's claim." (emphasis added)).

Citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018), the SEC, however, misleadingly argues that

> the decision in *Khoja* specifically disallows the incorporation of a document that it [sic] is neither referred to in the complaint at all, much less "extensively," and which does not form the basis of an SEC claim.

Opp. at 8:14-16. This is incredibly misleading. The Ninth Circuit in *Khoja* explicitly stated that the incorporation-by-reference doctrine ***does include*** documents not referenced by the complaint at all: "in *Knievel v. ESPN* . . ., we affirmed the incorporation of materials the complaint did not reference at all." *Khoja*, 899 F.3d at 1002.

In *Khoja*, the Ninth Circuit considered whether the district court's acceptance of ***twenty-one*** extrinsic documents offered by the defendants on their motion to dismiss as matter of judicial notice or under the incorporation-by-reference doctrine was an abuse of discretion. The SEC cites the court's rejection of one Wall Street Journal blog post, which was one of six blogs or press articles that the district court had accepted, where the Ninth Circuit determined that "the blog post [did not] form the basis of any claim in the Complaint." *Id.* at 1003. The SEC fails to mention that the Ninth Circuit affirmed the district court's acceptance of the five other blog and press articles as proper under the incorporation-by-reference doctrine. *Id.* at 1004-05. Here Defendants do not propose that the Court entertain Wall Street Journal or other media posts or publications. Defendants ask that the Court consider the Terms and Conditions that are part and parcel of Defendants' offer and sale of the ABTC tokens.

*Khohja* is more generally inapposite. To the extent the Ninth Circuit there expressed reservations about the use of the incorporation-by-reference doctrine, it was in the context of private securities actions where the court was concerned with the asymmetry in information held by the parties in such actions "where a defendant starts off with sole possession of the information about the alleged wrongdoing." *Id.* at 999 *quoting Hsu v, Puma Biotechnology, Inc.*, 213 F. Supp.3d 1275, 1281-82 (C.D. Cal. 2016). Here, there is no such concern. The SEC could have exhaustively investigated this matter prior to bringing its case, and, indeed, had the White Paper and Terms and Conditions for over two years prior to filing the Complaint.

The SEC's reliance on *In re Immune Response Securities Litigation*, 375 F. Supp.2d 983 (S.D. Cal. 2005) is equally unavailing. There the defendants sought to have the court incorporate by reference some twenty-eight documents, twelve of which plaintiffs opposed. The court rejected defendants' request reasoning that

> None of the opposed document are central to, or form the basis of, Plaintiffs' claims. Moreover, the Complaint does not "extensively" refer to any of them; nor do Plaintiffs' claims necessarily rely on them.

*Id.* at 995. Here, the Complaint's allegations regarding what the terms of the offer or offering and sale of the ABTC tokens necessarily rely on the Terms and Conditions, and the Complaint's sixty references to the offer or offering, and eleven references to the sale, of the ABTC tokens are plainly extensive.

Importantly, the *Immune Response* decision goes on to note that "*[t]here is no indication that Plaintiffs intentionally omitted material facts to disguise any deficiency in their claims*." *Id.* at 996. Here there is. The SEC failed to be straight with the Court that the USPTO had granted a patent listing Mr. Andrade as the inventor when the SEC had known about that patent for over two years prior to filing the Complaint and knew that the source code running the personal legal identity linked credential authentication protocol had been copyrighted in 2015. Nonetheless, the SEC alleged that "NAC had not developed *any* of the claimed features of the AML BitCoin tokens." Cmplt. ¶ 9 (emphasis added). In addition, even a cursory comparison of the White Paper, which the SEC does not object to the Court considering, to the Complaint's numerous descriptions of the White Paper demonstrates a level of misleading cherry-picking that crosses the border of legitimate advocacy. Given these facts, it is more than appropriate for the Court to consider the Terms and Conditions on this motion to dismiss.

Nowhere in its Opposition does the SEC challenge the authenticity of the Terms and Conditions. As a document that all of the SEC's claims necessarily rely upon, the authenticity of which is not disputed by the parties, it is proper and appropriate for the Court to consider the Terms and Conditions in concluding what the overall "offer" was. Although the Ninth Circuit has stated that the "offer" is broader than what was contained "in the contract or other written instrument," the Ninth Circuit is clear that what is contained in the written contractual language is still relevant to the analysis. *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989). The SEC's claim that it is improper for the Court to consider the Terms and Conditions is simply at odds with the law of this Circuit.[2]

II. **The SEC has not Alleged Sufficient Facts Showing the Second and Third Prongs of the Howey Test Have Been Satisfied**

"[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) "[T]hreadbare recitals of the

---

[2] The SEC's objection to the Winczura and Agrawal Declarations is misplaced. Defendants simply offered the Declarations to provide a foundation for the authenticity of the Terms and Conditions. As the SEC does not contest the authenticity of the Terms and Conditions, issues around the admissibility of the Declarations are moot.

elements of the cause of action, supported by mere conclusory statements," are not taken as true on a motion to dismiss. *Twombly*, 550 U.S. at 555. In addition, a complaint must plead "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Iqbal*, 556 U.S. at 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (internal quotation marks omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully .... When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 557 U.S. at 678.

Here the SEC only offers conclusory allegations and threadbare recitals of the elements of causes of action where these allegations are at odds with the documents on which the allegations are supposedly based. As discussed below, the SEC has failed to allege specific facts – as opposed to conclusions – to state a claim proving that the ABTC tokens were securities. Specifically, the SEC fails to allege plausible facts other than conclusions that establish that purchasers of ABTC tokens were investing in (1) a common enterprise (2) with (i) a reasonable expectation of profit from (ii) the managerial efforts of others.

        A.    *No Common Enterprise*

The SEC argues that it has sufficiently alleged that both horizontal and vertical commonality were present in the sale of ABTC tokens. Opp. at 12:6-7 (horizontal citing Cmplt. ¶ 35) & 12:23 – 13:5 (vertical citing ¶¶ 37 & 40). These allegations are not sufficient.

        1. Horizontal Commonality

The SEC argues that "[h]orizontal commonality is established because NAC pooled the money it received from the sale of ABTC Tokens and used it for the enterprise" (Opp. at 12:5) citing paragraph 35 of the Complaint. But Paragraph 35 nowhere alleges that the Defendants "pooled the money" or other consideration paid by purchasers of the ABTC tokens – nor could it. Paragraph 35 specifically alleges that "ABTC tokens could be purchased with fiat currency, bitcoin, ether, litecoin, and other digital assets . . . ." It was not until July 22, 2020 that the Office of the Comptroller of the Currency issued guidance that national banks could hold cryptocurrencies on behalf of customer such as the cryptocurrencies that the Defendants accepted

in payment for ABTC tokens.³ By definition fiat currency and cryptocurrencies could not be "pooled in the same account" at a national bank. Moreover, it defies logic that bitcoin could be "pooled" in the "same account" as ether, litecoin and other digital assets as each consist of entries recorded on the unique and separate distributed ledger for that currency. A Kogan, *Not All Virtual Currencies are Created Equal: Regulatory Guidance in the Aftermath of CFTC v. McDonnell*, 8 Am. Univ. Bus. L. Rev. 198, 200 (2019) ("contrary to popular belief, the term 'virtual currency' encompasses many distinct, independently developed applications of Distributed Ledger Technology"); *see also A CFTC Primer on Virtual Currencies*, at 5 n.† (CFTC Oct. 17, 2017). Such cryptocurrencies cannot be "pooled" with each other as a matter of basic blockchain functionality.

The SEC has not alleged sufficient facts that if proved would establish that horizontal commonality existed in the sale of ABTC tokens. First, Paragraph 35 does not allege the consideration paid by ABTC token purchasers was "pooled." The SEC's argument now in opposition to this motion to dismiss that the disparate types of consideration were "pooled" in 2017 and 2018 is an impossibility as matter of regulatory policy and the basic mechanics of how cryptocurrency distributed ledgers work. Although courts should accept allegations in a complaint "even if doubtful" on a motion to dismiss,⁴ plaintiffs must offer plausible alleged facts. *Iqbal*, 556 U.S. at 678. To say the least, it is not plausible that Defendants pooled the different types of consideration they received from buyers of the ABTC tokens. Finally, to the extent that Paragraph 35 alleges that "NAC sold the ABTC tokens to raise capital for the enterprise" this is merely a conclusion. It is a conclusion with no basis in the White Paper and is flatly contradicted by the Terms and Conditions. (T&C 13, 14 & 18.) The Defendants had no obligation to use the consideration received as capital to be invested in the Defendants' business. (T&C 12 - 18.) The SEC has not alleged ***provable*** facts that are reasonably consistent with the documents on which their claims rely which if proven would establish that horizontal commonality existed.

---

³ Interpretative Letter #1170, *Authority of a National Bank to Provide Cryptocurrency Custody Services for Customers* (OCC July 22, 2020) available at: https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2020/int1170.pdf

⁴ *Twombly*, 550 U.S. at 570.

## 2. Vertical Commonality

The SEC argues that the Complaint alleges vertical commonality in Paragraphs 37 and 40. Opp. at 12:23-13:3. Vertical commonality required under Ninth Circuit law requires a showing that the purchasers' fortunes are tied to the fortunes of the promoters. *SEC v. Eurobond Exchange, Ltd.*, 13 F.3d 1334, 1340 (9th Cir. 1994); *see also Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 460 (9th Cir. 1978). The SEC now argues that because the White Paper stated that the majority of the ABTC tokens would be held by the Defendants, the purchasers' fortunes are necessarily tied to those of the Defendants as generally alleged in Paragraph 37 of the Complaint. Opp. at 13:2-3.

First, the SEC's argument that the majority of ABTC Tokens were retained by Defendants . . . [and] because of their large holdings of ABTC Tokens, NAC's own fortunes were" congruent with the purchasers' fortunes is flatly inconsistent with the White Paper. The White Paper*, which in this instance the SEC offers for its truth*, does not state that "a majority" of the ABTC tokens would be held by the Defendants. Rather, the White Paper states that the 200 million ABTC tokens created would be distributed as follows:

- 76 million would be sold to the public;
- 9 million held for current Aten Coin Holders;
- 10 million for the NAC Administration team (the Defendants);
- 50 million to be used for intellectual property licensing, bounties for software debugging, employees and consultants; and
- 55 million for Decentralized PoW/PoS.

(WP at 3.) Perhaps the SEC needs help with the math, but 10 million is not a majority of 76 million. Again, the SEC only selectively cites portions of the White Paper, and when it does it either takes the White Paper's statements misleadingly out of context or flatly misstates what the White Paper says.

Second, the SEC's argument, however, ignores the SEC's own allegations in Paragraph 35 of the Complaint. Paragraph 35 alleges that the Defendants sold the ABTC tokens at prices ranging from 35 cents to a $1.50 per token. If the Defendants chose to sell their remaining 10 million ABTC token holdings tokens for 30 cents per token, flooding the market with tokens causing the market price to fall to 30 cents per token, all of the purchasers would suffer a loss if

they sold their tokens at 30 cents. The Defendants, however, would realize a profit as each ABTC token sold at 30 cents would represent new cash in the door. It is utterly simplistic to allege in conclusory fashion that the purchasers' fortunes were tied to the Defendants' fortunes. Moreover, the Terms and Conditions flatly contradict that any sort of common enterprise was being formed through the sale of the ABTC tokens. (T&C 14 & 18). Again, the SEC has failed to allege provable facts which are reasonably consistent with the documents on which their claims rely to establish that vertical commonality existed.

### B. *No Reasonable Expectation of Profit*

The SEC now argues that the "totality of the facts alleged in the complaint demonstrates that a reasonable investor at the time of the offer and sale of the ABTC Token would have had *no reason other than* an 'expectation of profit' for buying the tokens." Opp. at 13:25-27 (emphasis in original). Obviously, calling the buyers of the ABTC tokens "investors" does not make them so or their purchase of ABTC tokens an "investment." More importantly, the SEC's new argument is inconsistent with the SEC's own Complaint. In Paragraph 3, provides a very real reason for buyers' purchase of the ABTC token: that the ABTC token could be "exchanged one-for-one for functional AML BitCoin tokens." (*See also* Cmplt. ¶ 25 "ABTC tokens . . . could eventually be exchanged one-for-one for AML BitCoin tokens."). Arguing there was no other reason for buying ABTC tokens other than expectation of profit, the SEC is ***cherry picking its own allegations***. In addition, in coming up with its mythical totality of the facts, the SEC again cherry picks portions of the White Paper that it thinks are helpful to its claims, ignores large chunks of the White Paper that are not helpful and furiously argues that the Court not look behind the curtain at the Terms and Conditions which governed the offer and sale of the ABTC tokens.

Whatever the SEC argues now, what matters is what the SEC alleged in its Complaint. The Complaint claims that buyers of ABTC tokens had a reasonable expectation of profit in four paragraphs. In Paragraph 25, the Complaint alleges "offering materials touted the prospect that NAC's efforts to further develop the AML BitCoin token and blockchain, and to establish relationships with third parties for use of AML BitCoin in their payment systems, would increase demand for AML Bitcoin and yield profits for buyers." The Dictionary.com definition of "tout"

is to "attempt to sell (something), typically by pestering people in an aggressive or bold manner."[5] In contrast, the White Paper reads:

> NAC will make its white-labelled AML/KYC compliant platform available to pre-approved users, In that regard NAC will assist businesses, institutions, and governments interested in using NAC's AML-KYC compliant blockchain technology to create their own AML-KYC compliant solutions, including by providing technical support services through NAC's white-labeled blockchain platform (Those pre-approved users who create a modified AML compliant product may make the transaction time-lock feature reference above mandatory or optional.) NAC will evaluate applications for participating in its platform to ensure compliance with NAC's legal and ethical standards.

WP at 11. First, the White Paper did not tout the establishment of relationships with third-parties (or anything else for that matter). Second, the White Paper's discussion of providing white-labelled versions of its platform does not necessarily promise that demand will increase for AML BitCoins and therefore offer a profit opportunity to ABTC token holders. Although providing white-label version of its platform to third-parties would likely provide additional revenue to NAC, the Terms and Conditions make clear that ABTC token holders do not have an ownership interest in NAC (T&C ## 13 & 14). Even if NAC did enjoy increased revenue from third-party relationships, it is clear from the Terms and Conditions that the ABTC token holder had no right to share in those increased revenues. Again, the SEC's allegations are at odds with the documents on which their claims rely.

In Paragraphs 2 and 39, the Complaint makes similar, generalized and conclusory allegations regarding the expectation of profit. Paragraph 2 alleges "[i]nvestors in Defendants' offering reasonably viewed the offering as an opportunity to profit if NAC and Andrade were successful in further developing the advertised features of the token and blockchain." Similarly, Paragraph 39 alleges:

> NAC marketed the ABTC tokens and the offering in a manner consistent with an investment. Purchasers would have reasonably viewed the offering as an opportunity to profit if Andrade and NAC were successful in their entrepreneurial and managerial efforts to further develop the advertised features of the token and blockchain. Based on NAC's statements in the White Paper and on its website and in other online forums, purchasers would have reasonably believed they could pursue such profits by holding or trading the ABTC tokens they received in the offering.

---

[5] https://www.google.com/search?q=dictionary&rlz=1C1GCEU_enUS902US902&oq=dictionary&aqs=chrome..69i57j69i60l3j69i61.4490j0j15&sourceid=chrome&ie=UTF-8#dobs=tout

The allegations in Paragraphs 2 and 39 are premised on the need for the Defendants to further develop their technology in order for the purchasers to profit. But these allegations are gutted by the material omission in the SEC's Complaint that the USPTO had awarded patents listing Mr. Andrade as the inventor – several relevant patents by the time the SEC filed its Complaint, and the source code copyrighted in 2015 – showing that necessary further development was minimal.[6] All of these patents are patents of which the Court can take judicial notice.[7] The White Paper explains that the AML BitCoin was a successor digital currency to the Aten Coin which already had the AML compliant and theft resistant features that the AML BitCoin would have. WP at 2. As explained in the White Paper, the AML BitCoin is an updated Aten Coin with the addition of a functionality to allow users to create new digital assets on the AML Bitcoin blockchain. *Id*. Although the SEC accepts the White Paper's statements as true for some purposes, it rejects the truth of the White Paper for other purposes. Even if the Court rejects these statements for their truth, it should consider them for what the expectation of the ABTC token purchasers reasonably had. *Hocking*, 885 F.2d at 1457.

Based on a fair reading of the White Paper and the Terms and Conditions, the reasonable expectation of the ABTC token purchasers was that they were simply buying in advance the new model year version of the Aten Coin – not that they were investing in something that would take a considerable time to develop at significant risk of failure. The SEC's allegations to the contrary are simply conclusory and inconsistent with the documents on which the SEC's claims rely.

---

[6] U.S. Patent App. No. 14/940,142 (filed Mar. 27, 2015) (Systems and Methods for Personal Identification and Verification); U.S. Patent Pub. No. 2,839,41A1 (published Sept. 29, 2016) available at: https://patents.google.com/patent/US20160283941A1/en; EU Patent App. No. EP 15161502.8 (Marcus Andrade/Sergey Petkevich) (filed Mar. 27, 2015) (Systems and Methods for Personal Identification and Verification); EU Patent Pub. No. EP3073670A1 (published Sept. 28, 2016); EU Patent No. EP3073670B1 (granted Sept. 2, 2020); U.S. Patent No. 9,985,964 (granted May 29, 2018) ("Systems and methods for providing block chain-based multifactor personal identity verification") available at: https://patents.google.com/patent/US20160283941A1/en; *ATEN Black Gold Coin and BGC Wallet Software*, Reg. No. TXu001990709 (U.S. Copyright Office July 6, 2015) available at: https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&Search%5FArg=BGC%20Wallet&Search%5FCode=FT%2A&CNT=25&PID=6LJcVtPdq6RvBoJHvCApsU-dMglKs&SEQ=20201201155110&SID=7

[7] *Khoja*, 899 F.3d at 1001-02 (affirming judicial notice of World International Property Organization patent application); *AtPac, Inc. v. Aptitude Solutions, Inc.*, 787 F. Supp.2d 1108, 1112 n.3 (E.D. Cal. 2011) (court takes judicial notice of copyrighted source code); Fed. R. Evid. 201.

DEFENDANTS' MTD REPLY  CASE NO. 20-CV-4188-RS

12

In sum, the SEC's allegations that the purchasers of ABTC tokens had a reasonable expectation of profit from the entrepreneurial efforts are legal conclusions, not factual allegations but rather threadbare statements of causes of action. The Complaint should be dismissed.

### III. The ABTC Token is a Forward Contract

The SEC seems to labor under the misimpression that in order for an agreement, where a seller agrees to deliver a product to the buyer on a deferred basis, to be a forward contract the product has to exist at the time the agreement is made. Opp. at 18:8 (product "admittedly does not yet exist"). Since at least the nineteenth century, farmers have entered into forward contracts with grain elevators to sell their corn, wheat and soybeans before the crops have been planted. Gold mines sell forward gold that has not been extracted from the mine to jewelers who buy the gold forward to hedge their price risk in obtaining gold that they manufacture in the future into jewelry. An agreement to buy a product for deferred delivery is a forward contract.[8] It matters not whether the product is in existence at the time the forward contract is entered into.

Not every sale of a product for future delivery has to be a securities offering. Although the Supreme Court has stated that Congress defined "security" to be sufficiently broad to "so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security," the term security is not without its limits. *Reves v. Ernst & Young,* 494 U.S. 56, 61 (1990). "Congress did not . . . 'intend to provide a broad federal remedy for all fraud'." *Id.* quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982).

The SEC's analysis here could make the sale of 49ers football game tickets or Rihanna concert tickets securities. Those tickets have "no use" at the time that they are issued. There are vibrant secondary markets for such tickets, so that tickets holders may reasonably expect to profit by reselling their tickets if the 49ers win more games or Rihanna releases a hit new album. Human scalpers hawking tickets outside of stadiums and performance venues now compete with sophisticated online markets for the secondary sale of tickets. Applying the *Howey* test as the

---

[8] Moreover, the SEC goes further astray in arguing that a "future digital asset did not exist at the time of the offering; it therefore could not reasonably be interpreted as a "cash commodity," much less one sold for actual delivery." Opp. at 18 n.6. The requirement of actual delivery under the Commodity Exchange only arises if a commodity is sold on a margined or leveraged basis to a retail customer where actual delivery does not occur within 28 days. 7 U.S.C. § 2(c)(2)(D).

DEFENDANTS' MTD REPLY

13

CASE NO. 20-CV-4188-RS

SEC purports to apply it here renders these football and concert tickets securities – but they're not.[9] There must be some reasonable limits on what a security is.[10]

### IV. Regulation by Enforcement

The SEC's enforcement actions brought against inventors of new digital currencies is nothing short of regulation by enforcement. Although SEC Commissioner Hester Pierce, a frequent critic of her own agency in the cryptocurrency space, has noted some positive steps the SEC has taken to provide guidance to digital currency innovators, it has been slow and generally unhelpful:

> Our Jackson Pollock approach to splashing lots of factors on the canvas without any clear message leaves something to be desired, so we still have work to do in clarifying what factors are the most important in making that determination. It is time for us to tackle the remaining legitimate legal questions in a way that does not throw merit-based obstacles in the way of socially beneficial innovation. As I said last year, regulators are not in charge of the creative process. . . . Our silence is likely to simply push this innovation and any attendant economic growth into other jurisdictions that have done their work and provided clear guidelines for the market participants to follow. The U.S. securities markets have historically been the envy of the world; I do not want heel-dragging by the SEC in crypto to mar that well-deserved reputation.[11]

The Defendants have been unfairly caught in the SEC's Jackson Pollock approach. Staff have approached this case as if any sale of a digital token is necessarily a securities offering. They have provided only vague, general and conclusory allegations that are disconnected from the documents that are critical to the offer and sale of the ABTC tokens. The SEC also omits material information relevant to their claims.

The Defendants do not diminish the seriousness of the allegations of fraud against them. They vigorously deny them. But that is not relevant on this motion to dismiss. What is relevant is the SEC has cobbled together a case built on general conclusions about other digital token sales and slapped them onto this case without considering the actual text of the White Paper, the

---

[9] *No Action, Interpretive and/or Exemptive Letter: The Ticket Reserve, Inc*. (concluding online ticket exchange which provided secondary market for sports and event tickets did not involve securities trading) available at: https://www.sec.gov/divisions/corpfin/cf-noaction/ticketreserve091103.htm

[10] In traditional department store lay away programs, customers pay in increments over time so that they can buy a flat screen television for their family at Christmas. Lay away programs have never been regulated as securities. iPhones are frequently bought in advance for deferred delivery but iPhones are not securities.

[11] H. Pierce, How We Howey (SEC May 29, 2019) available at: https://www.sec.gov/news/speech/peirce-how-we-howey-050919

Terms and Conditions, the patents listing Mr. Andrade as inventor and 2015 copyrighted source code, all of which the Court can take judicial notice. The Court need not strain the Securities Act to shoehorn this case into an SEC enforcement action merely to preserve a forum to potentially remedy the alleged fraud. The parallel criminal action pending against Defendant Andrade is more than an adequate forum to address those allegations as all of the allegations presented in this case are alleged in the criminal proceeding.

It is the SEC that has hung a sign on an animal. The SEC's sign reads "this is a duck." That doesn't make the animal a duck – particularly if it doesn't have feathers and webbed feet. Just because the ABTC token bears some similarities to other digital tokens that have been found to be securities, doesn't make the ABTC token a security. The ABTC token is not a security. The Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint herein in its entirety and with prejudice.

Date: December 3, 2020

Respectfully submitted,

*/s/ Katherine D. Cooper*
KATHERINE D. COOPER
LIONEL ANDRÉ
Murphy & McGonigle, P.C.
MAURICIO S. BEUGELMANS
Murphy & McGonigle, RLLP
Attorneys for Defendants NAC Foundation, LLC and Rowland Marcus Andrade