1

2

3

4

5

6

7               UNITED STATES DISTRICT COURT

8              NORTHERN DISTRICT OF CALIFORNIA

9

10  SECURITIES AND EXCHANGE              Case No. 20-cv-04188-RS
   COMMISSION,

11                        Plaintiff,

12            v.                          **ORDER DENYING MOTION TO
                                         DISMISS**
13  NAC FOUNDATION, LLC, et al.,

14                        Defendants.

15                              **I. INTRODUCTION**

16        In successfully raising millions through an "initial coin offering" ("ICO"), the NAC

17  Foundation (a blockchain development company), along with its CEO, Marcus Rowland Andrade

18  (collectively, "defendants"), also raised a few governmental eyebrows. Two enforcement actions

19  followed: a criminal indictment against Andrade for wire fraud and money laundering, and this

20  civil suit, brought by the Securities and Exchange Commission ("SEC"), alleging the fraudulent

21  and unregistered sale of digital securities in violation of the 1933 Securities Act and 1934

22  Securities Exchange Act. Apparently keen to punch back, defendants now move to dismiss,

23  insisting the SEC's complaint is legally deficient, factually erroneous, and borderline malicious.

24  The SEC counters that it has stated plausible claims for relief. For the reasons set forth herein, the

25  motion is denied.

26                              **II. BACKGROUND**

27        Into the sometimes uncertain world of cryptocurrency transactions, defendants sought to

28  introduce AML BitCoin: a regulatorily compliant digital asset. Expounding their project around

the time of its ICO fundraising event, defendants produced an October 2017 publication entitled "White Paper of AML BitCoin (AMLBit) and its Business Model" (the "White Paper"). There, defendants stated "AML BitCoin rests on a privately regulated public blockchain that facilitates . . . anti-money laundering [and] 'know your customer' [] compliance and identifies criminals associated with illicit transactions, while maintaining and strengthening the privacy protections for legitimate users." "[A]s a result," the White Paper went on, AML BitCoin "is compliant with a host of laws," including those of the United States.

Beyond promoting these novel features, the White Paper—which was posted to the NAC Foundation website—made three additional pertinent points about AML BitCoin. First, it explained that because certain aspects of the "privately regulated public blockchain" upon which AML BitCoin would operate were still under development, ICO participants would not be issued actual AML BitCoin tokens, but rather stand-in "ABTC tokens." These latter tokens could be exchanged on a one-for-one basis with AML BitCoin once AML BitCoin (or, more accurately, its complementary blockchain) was completed; otherwise, ABTC tokens lacked any practical use. Second, the White Paper clarified that both ABTC and its successor would be subject to "trade, [sale] and purchase . . . on participating exchanges and trading websites," and that AML BitCoin "can appreciate in value through speculative trading . . . ." Third, it took considerable pains to disclaim any theory by which the ICO might interact with U.S. securities law. This final effort accounted for a substantial portion of the White Paper. Plucking legal standards directly from the Supreme Court, defendants forcefully and repeatedly advised that ICO participation did not result in "investment contracts."

The ICO ran from October 2017 to February 2018,[1] with participants exchanging either fiat currency or other digital assets (e.g. Bitcoin) for ABTC tokens. Hoping to spur the buying along, defendants ran a parallel marketing campaign comprising press releases, social media posts,

---

[1] Certain ABTC selling activity took place before and after this period, such that the complaint pegs "at least August 2017" through "December 2018" as the timespan in which all of defendants' allegedly offensive conduct occurred.

United States District Court
Northern District of California

and other forms of AML BitCoin-friendly online content. Most colorfully, these efforts—which portrayed AML BitCoin's core anti-money laundering and know-your-customer features as fully functional and market-ready—included the assertion that defendants had nearly aired a Super Bowl commercial, only to be rebuffed at the last minute by the NFL and NBC.

Per the White Paper, defendants intended to distribute 76 million ABTC tokens to the public, retain 115 million tokens for internal use, and raise $100 million in the process. Ultimately, though, only $5.6 million was raised, attributable principally to purchases from some 2,400 retail U.S. participants. These proceeds were pooled in the NAC Foundation's bank accounts and digital asset wallets, for use in connection with future business activities. Although defendants took steps to ensure that ABTC tokens were available for online trading, and the tokens did indeed trade on numerous such platforms, at no time was any effort made to register ABTC (or AML BitCoin) as a security with the SEC. Accordingly, after determining that ABTC had been offered as an investment, and that defendants had made materially false statements in connection with that offering, the SEC brought suit in June 2020, seeking disgorgement of the ICO proceeds, monetary penalties, and enjoinment of the defendants from further securities-related activity.[2] Defendants now move to dismiss the action in its entirety, contending that the SEC has failed to establish, with sufficient particularity, that ABTC tokens are "securities" within the meaning of federal law.

### III. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint must contain a short and plain statement of the claim showing the pleader is entitled to relief. Fed. R. Civ. P. 8(a). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[2] Working solely off the allegations contained in the SEC's complaint, which must be taken as true in the context of a motion to dismiss, the factual backdrop of this controversy ends there. Yet as addressed below, defendants premise much of their motion on extrinsic evidence. Specifically, defendants urge attention be paid to (i) the "Terms and Conditions" to which every ABTC purchaser purportedly agreed, and (ii) various blockchain-related patents sought by Andrade prior to the ICO, and granted to him by the USPTO thereafter. *See generally infra* Part IV.A.

United States District Court
Northern District of California

1   (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A motion to dismiss under Rule

2   12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus.,*

3   *Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be

4   based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts

5   alleged" under a cognizable legal theory. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*,

6   718 F.3d 1006, 1014 (9th Cir. 2013). When evaluating such a motion, courts generally "accept all

7   factual allegations in the complaint as true and construe the pleadings in the light most favorable

8   to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However,

9   "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

10   statements, do not suffice." *Iqbal*, 556 U.S. at 678.

11       Generally, courts may not consider material outside the pleadings when assessing the

12   sufficiency of a complaint under Rule 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th

13   Cir. 2001). "There are two exceptions to this rule." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

14   988, 998 (9th Cir. 2018). First, "[j]udicial notice under Rule 201 permits a court to notice an

15   adjudicative fact if it is 'not subject to reasonable dispute.'" *Id.* at 999 (citing Fed. R. Evid.

16   201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be

17   accurately and readily determined from sources whose accuracy cannot reasonably be

18   questioned.'" *Id.* (citing Fed. R. Evid. 201(b)(1)–(2)). "Accordingly, a court may take judicial

19   notice of matters of public record . . . [b]ut a court cannot take judicial notice of disputed facts

20   contained in such public records." *Id.* (internal citation and quotations omitted). Second, under the

21   incorporation-by-reference doctrine, "a defendant may seek to incorporate a document into the

22   complaint if the plaintiff refers extensively to the document or the document forms the basis of the

23   plaintiff's claim." *Id.* at 1002 (internal quotation marks and citation omitted).

24                                **IV. DISCUSSION**

25       Defendants' motion stumbles on two levels. First, it improperly relies upon evidence

26   drawn from beyond the four corner corners of the complaint. Second, it falls well short of

27   demonstrating that the SEC's characterization of ABTC as a "security" is implausible for pleading

28

purposes.

### A. Extrinsic Evidence

Defendants' motion advances two types of extrinsic evidence: the "Terms and Conditions" to which ABTC purchasers purportedly agreed, and certain of Andrade's blockchain-related patents.[3] Regarding the latter, the language of a patent—either as it is applied for, or as it is granted—"can be accurately and readily determined" by reference to USPTO filings, and is therefore, as the SEC agrees, subject to judicial notice. *Khoja*, 899 F.3d at 998 (citing Fed. R. Evid. 201(b)(1)–(2)). The patent issued to Andrade for "Systems and methods for providing block chain-based multifactor personal identity verification" (the "'964 patent"), as well as sundry other patents defendants mention in passing, consequently may be brought to bear upon this stage of the litigation.[4] U.S. Patent No. 9, 985,964 (issued May 29, 2018); *see generally* Defs.' Mot. to Dismiss, Dkt. 17 at 27-28 (cataloguing, without elaboration, other "patents awarded to Andrade which cross-reference[]" the '964 patent).

Not so for the ICO's "Terms and Conditions" document. Under controlling Ninth Circuit precedent, incorporation of an extrinsic document into a complaint is permissible only where the defendant can show either that the plaintiff has "refer[red] extensively to the document" or that

---

[3] Although defendants' motion also seeks to incorporate two additional sources of evidence—namely, the entirety of the White Paper and a pair of declarations from NAC Foundation employees—these efforts do not warrant prolonged consideration. The SEC agrees that the full White Paper effectively is incorporated into the complaint, and argues only that, to the extent portions emphasized by the defendants are considered, they ought not be considered as true. As for statements from employees, "[a]ffidavits and declarations . . . are not allowed as pleading exhibits unless they form the basis of the complaint." *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted). Because the declarations proffered by defendants are divorced entirely from the SEC's complaint, they will not be evaluated here.

[4] Somewhat curiously, though, while defendants labor to subject these patents to judicial notice, they neglect to explain how such notice factors into their motion's central thesis (e.g. how the patents undermine the SEC's claim of an unregistered securities offering). To the extent the patents are meant to bolster the notion of the SEC's allegations being made in bad faith (e.g. to demonstrate that the agency *knew* defendants did not materially misrepresent the state of their technology), they do not render that charge any less doubtful. *See infra* Part IV.B, note 5; *see also* Pl.'s Opp'n Brief, Dkt. 21 at 24 ("Such 'method' patents simply protect the techniques of what was patented, they do not prove that the technology has been developed.")

1    "the document forms the basis of the plaintiff's claims." *Khoja*, 899 F.3d at 1002 (internal

2    quotation marks and citation omitted). To put it mildly, neither circumstance is present here. The

3    "Terms and Conditions" of the ICO are not so much as hinted at, let alone "refer[red] extensively

4    to," in the complaint; and defendants' strained interpretation of caselaw notwithstanding, that the

5    complaint references an "offering" of unregistered securities does not mean the claims of the SEC

6    "depend on" all documents associated with that offering. *Khoja*, 899 F.3d at 1002 (internal

7    quotation marks and citation omitted); Defs.' Mot. to Dismiss, Dkt. 17 at 8. Instead, the

8    complaint's depiction of an unregistered securities sale, marred by deceptive and outright false

9    statements, "depends on" precisely what one would imagine: the sale of unregistered securities,

10   accompanied by the promulgation of deceptive and false statements. Of course, should defendants'

11   contentions concerning the "Terms and Conditions" document prove true—that is, should it

12   become apparent, as a factual matter, that every ICO participant acknowledged that document's

13   many variations on the theme of it being impossible to "purchas[e] AML BitCoins and/or [ABTC]

14   for investment purposes"—that truth doubtlessly will factor into later motions practice, if not trial.

15   For the time being, however, "the document merely creates a defense" to the SEC's allegations,

16   and thus may not be incorporated into the complaint. *Id.*

17         **B. Sufficiency of the Complaint**

18         The remainder of defendants' motion distills down to a straightforward application of the

19   *Howey* test.[5] "To establish a claim for violation of federal securities law, it is necessary to show

20   that the violation involved a 'security,'" which federal securities law in turn defines as, "among

21   other things, an 'investment contract.'" *SEC v. Rubera*, 350 F.3d 1084, 1089-90 (9th Cir. 2003)

22   (citations omitted). "Under the *Howey* test, 'an investment contract . . . means a contract,

23

24   ───────────────
     [5] Or at least, the remainder of the *serious* aspects of defendants' motion so distills. After lodging
     an earnest (if unpersuasive) argument that ABTC is not a security under *Howey,* defendants spill

25   ink on two plainly spurious propositions: that the ICO resulted in "forward contracts"—as in,
     contracts akin to those an oil trader might make, for deferred delivery of a cash commodity—

26   outside the SEC's jurisdiction, and that the SEC's lawsuit is rooted in a malicious intent, and
     characterized by ongoing misconduct. The first of these propositions is legally mistaken; the latter,

27   both legally mistaken *and* strategically misguided. Neither is supported by applicable fact and law.

28                                                    ORDER DENYING MOTION TO DISMISS
                                                      CASE NO.  20-cv-04188-RS

6

transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (quoting *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298-99 (1946)).

The Ninth Circuit has "distilled *Howey's* definition into a three-part test requiring (1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Id.* (internal quotation marks and citation omitted). Here, only the second and third *Howey* prongs are in dispute. Bearing in mind "the Supreme Court's repeated rejection of a narrow and literal reading of the definition of securities," both prongs are pled sufficiently in the SEC's complaint. *Warfield*, 569 F.3d at 1020; *see also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[I]n searching for the meaning and scope of the word 'security' . . . form should be disregarded for substance and the emphasis should be on economic reality.")

### 1. __Common Enterprise__

In the Ninth Circuit, a common enterprise exists where the investment scheme involves either "horizontal commonality" or "strict vertical commonality." *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989). "Horizontal commonality describes the relationship shared by two or more investors who pool their investments together and split the net profits and losses in accordance with their pro rata investments." *Hocking v. Dubois,* 339 F.2d 560, 566 (9th Cir. 1988), *aff'd in relevant part,* 885 F.2d 1449, 1459 (9th Cir. 1989). By contrast, "vertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters." *SEC v. R.G. Reynolds Enterprises, Inc.,* 952 F.3d 1125, 1130 (9th Cir. 1991) (internal quotation marks and citation omitted).

On the facts as the SEC has alleged them, it is quite plausible—and indeed, probable—that there is strict vertical commonality between the defendants and the ICO participants. Per the complaint, retail U.S. investors exchanged capital for ABTC tokens, which could, at the time of the exchange, be put to no use aside from online trading. Simultaneously, defendants retained a healthy share of ABTC tokens for their personal and corporate coffers. The ICO proceeds would fund the development of the AML BitCoin ecosystem, and each ABTC token could (eventually)

be redeemed for an AML BitCoin. Thus, the "fortunes" of ICO participants—as measured by

either the trading value of their ABTC tokens *or* the future trading value of AML BitCoin—were

"linked" to the "fortunes" of defendants—as measured by the trading value of their ABTC tokens,

the future trading value of AML BitCoin, *or* the general success of their enterprise (which would,

as a matter of efficient market theory, drive the price of both digital assets). *Howey*'s second prong

is therefore satisfied.[6]

## 2. Expectation of Profits

The third *Howey* prong, "requiring an expectation of profits produced by the efforts of

others, involves two distinct concepts: whether a transaction involves any expectation of profit and

whether the profits are a product of the efforts of a person other than the investor." *Warfield,* 569

F.3d at 1020 (internal quotation marks omitted); *see also id.* at 1020 n.6 (observing that other

circuits "have identified *Howey's* test as a four-part test"). "[W]hile the subjective intent of the

purchasers may have some bearing" on these questions, a court's work must consist chiefly of "an

objective inquiry into the character of the instrument or transaction offered based on what the

purchasers were led to expect." *Id.* at 1021 (internal quotation marks and citations omitted).

Consistent with this mandate, "court have frequently examined the promotional materials

associated with an instrument or transaction in determining whether an investment contract is

present." *Id.* (collecting cases).

Here, the SEC has averred ample facts to meet both components of *Howey's* final prong.

With the White Paper, ICO participants were "led to expect" that both ABTC tokens and AML

BitCoins would be tradeable on stock market-like exchanges, and that the latter (and, implicitly,

---

[6] This finding comports with that made by another district court, outside this circuit, scrutinizing a similar ICO-based fact pattern. In *SEC v. Telegram Group, Inc.,* the court found that "the SEC ha[d] made a substantial showing of strict vertical commonality" where each ICO participant's "anticipated profits were directly dependent on [defendants'] success in developing and launching" the underlying blockchain project. 448 F.Supp.3d 352, 370 (S.D.N.Y. 2020). So too here. Moreover, whereas the *Telegram* defendants had pledged eventually to relinquish control of all tokens they had retained during the ICO process, no such pledge has been made here. *Id.* In this respect, defendants' "financial fortunes" are, in this case, more closely tied to that of ICO participants than were the fortunes of the *Telegram* defendants.

the former) could "appreciate in value through speculative trading." *Id.*; *see also SEC v. Hui Feng,* 935 F.3d 721, 730-31 (9th Cir. 2019) (explaining that an "expectation of profit" under *Howey* does not require the investor to be motivated solely by profit). Tellingly, even as the White Paper made all this clear, it failed to apprise participants of *any* practical ABTC token use: while they could be redeemed for AML BitCoin at some future point, they were, at the time of the transaction, solely objects for trading. Nor, given the totality of circumstances, can defendants brush away the inference that an objectively reasonable ABTC purchaser likely viewed his or her prospective trading success as a function of the defendants' efforts: after all, the demand for ABTC or AML BitCoin, as reflected in those assets' pricing, would rely almost exclusively on market perception of defendants' work product.[7] Proceeding with a mind toward "economic reality," the complaint therefore meets the final *Howey* prong. *Tcherepnin,* 389 U.S. at 336. All told, then—and over defendants' strenuous protestations—the SEC adequately has pled the defendants' sale of an unregistered security.

### V. CONLCUSION

Consistent with the foregoing, the motion to dismiss is denied.

**IT IS SO ORDERED**.

Dated: January 8, 2021

RICHARD SEEBORG
United States District Judge

---

[7] Put differently, ICO participants "recognized that an investment in [ABTC tokens] was a bet that [defendants] could successfully encourage the mass adoption of [AML BitCoin], thereby enabling a high potential return" on either the "resale of [ABTC tokens]" or the future sale of AML BitCoin, for which ABTC tokens could be redeemed. *Telegram,* 448 F.Supp.3d 352, 377 (citations omitted); *see also SEC v. Kik Interactive, Inc.,* 2020 WL 5819770, at *7 (S.D.N.Y. Sep. 30, 2020) (citations omitted) (explaining, on analogous facts, that "the value of" an ICO investment relies heavily on the developers "entrepreneurial and managerial efforts"; without the developers' "promised digital ecosystem," a cryptocurrency token "would be worthless").

United States District Court
Northern District of California