Charles C. Morgan (pro hac vice)
ccmlegalfirm@yahoo.com
**CHARLES C. MORGAN LEGAL PRACTICE, LLC**
4151 Pelicans Nest Drive
Bonita Springs, FL 34134
Tel. 609-636-0544

Attorney for Defendant
ROWLAND MARCUS ANDRADE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NAC FOUNDATION, LLC, et al.,<br><br>Defendants. | Case No. 3:20-cv-04188-RS<br><br>**ATTACHMENT-B OF DEFENDANT ROWLAND MARCUS ANDRADE'S NOTICE OF MOTION AND MOTION FOR DISQUALIFICATION OF THE HONORABLE RICHARD SEEBORG PURSUANT TO 28 U.S.C. §§ 144 AND 455 AND CIVIL LOCAL RULE 3-14; MEMORANDUM OF POINTS AND AUTHORITIES** |

# Exhibit B

MICHAEL J. SHEPARD (SBN 91281)
*mshepard@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: +1 415 318 1200

KERRIE C. DENT (Admitted *pro hac vice*)
*kdent@kslaw.com*
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone: +1 202 626 2394

CINDY A. DIAMOND (SBN 124995)
*cindy@cadiamond.com*
58 West Portal Ave #350
San Francisco, CA 94127
408.981.6307

Attorneys for Defendant
ROWLAND MARCUS ANDRADE

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>ROWLAND MARCUS ANDRADE,<br>Defendant. | Case No. 3:20-cr-00249-RS-LBx<br><br>**DEFENDANT ROWLAND MARCUS ANDRADE'S *EX PARTE* CIPA SUBMISSION (corrected version)**<br><br>No. 3:20-cr-00249-RS<br><br>Judge: Hon. Richard Seeborg |

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1

II. CIPA MUST BE APPLIED IN A MANNER THAT PROTECTS MR. ANDRADE'S RIGHT TO DISCOVERY OF INFORMATION MATERIAL TO THE PREPARATION OF HIS DEFENSE ........ 5

III. INTERNATIONAL WRONGDOING BY ABRAMOFF AND OTHERS – AND THEREFORE CLASSIFIED INFORMATION – IS CENTRAL TO MR. ANDRADE'S DEFENSE ........ 6

a. International Wrongdoing By Abramoff and Others Helps Provide A Defense to Government Claims of Misrepresentations by Mr. Andrade About the Development of AML Bitcoin's Technology ........ 6

b. International Wrongdoing By Abramoff and Others Helps Provide A Defense to Government Claims that Mr. Andrade Knowing Participated in a "Rejection Campaign" for a Super Bowl Advertisement ........ 10

c. Numerous Other Potential Examples Underscore the Need For Additional Discovery About Abramoff's International Wrongdoing, Abramoff's Relationship with the Government, and the Wrongdoing Of Those Working with Abramoff ........ 12

d. The Government Has Proven Itself to be a Poor Judge of What Is Material to the Defense, Despite Repeated Adverse Rulings By Judge Beeler ........ 178

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Roviaro v. United States*,
353 U.S. 53 (1957) .....5

*United States v. Fernandez*,
913 F.2d 148 (4th Cir. 1990) .....5

*United States v. Sedaghaty*,
728 F.3d (9th Cir. 2013) .....1, 5, 6

*United States v. Brady,*
373 U.S. 83, 87 (1963) .....6

**Statutes**

CIPA .....1, 5

Classified Information Procedures Act section 4 .....1, 5

**Other Authorities**

Federal Rule of Criminal Procedure 16(a)(1)(E)(i) .....4

Fed. R. Crim. Proc. Rule 16 .....5

S. Rep. No. 96-823, *reprinted in* 1980 U.S.C.C.A.N. .....5

**I. Introduction**

Defendant Rowland Marcus Andrade submits this *ex parte* statement to aid in the Court's consideration of the discoverability of the classified materials the government has asked the Court to review under section 4 of the Classified Information Procedures Act ("CIPA"). The law permits Mr. Andrade to make an *ex parte* submission to the Court on his theory of the case and its potential impact on the need for classified materials, and the government does not oppose the filing.[1]

Mr. Andrade does not have access to the government's CIPA filing and cannot therefore address the reasons the government may be offering to assert that the classified information it possesses should not be produced. Nor can this submission describe all the ways in which wrongdoing by Abramoff impacted Mr. Andrade and AML Bitcoin and may support Mr. Andrade's defense to the indictment -- such a description would be too lengthy, the defense has access to some but not all of the facts, some discovery has been belated (for example, the government just produced the iPhone and iPad of one of Abramoff's partners in international wrongdoing),[2] and other discovery, including about Abramoff and his work for the government, remains incomplete. Mr. Andrade acknowledges the challenges facing the Court, given that what is described below was not immediately apparent, took a long time to ferret out, and required digging based on small clues that required considerable context that the Court is unlikely to have.

Nonetheless, this submission provides the Court with some perspective on Mr. Andrade's defense, and on the importance to that defense of information – some of which is likely

---

[1] *See* Gov't Brief (Dkt #342 at 2:11-16) ("To address a separate concern raised by the defendant, the government has made clear that it does not oppose the defendant filing his own *ex parte* submission at this stage. A defendant may be permitted to file his own *ex parte* submission outlining his theory of the defense to aid the court in the review of any classified materials. *See United States v. Sedaghaty*, 728 F.3d, 885 906 n.10 (9th Cir. 2013))."

[2] Mr. Andrade requested Levin's devices in July 2022, Judge Beeler ruled on April 7, 2023 that the devices were material to Mr. Andrade's defense, and – after 25 briefs were filed by the parties, numerous hearings were held, and several orders were issued – the government finally handed over the Levin devices on September 25, 2024.

classified[3] – about the activities of Mr. Andrade's alleged co-schemer, Jack Abramoff, and those with whom he was working around the world, behind Mr. Andrade's back. More specifically, this submission explains how Abramoff used Mr. Andrade's company and his cryptocurrency to both advance and camouflage his wrongdoing, and how Abramoff's international wrongdoing informs and contributes to Mr. Andrade's theory of defense to several allegations in the indictment, including allegations that he misrepresented the status of the development of AML Bitcoin, and that he orchestrated a Super Bowl rejection campaign to mislead potential purchasers about AML Bitcoin.

The connection between Abramoff's international wrongdoing and Mr. Andrade's defense grows out of Mr. Andrade's likely theme at trial that Abramoff – and not Mr. Andrade – had the intent to defraud, and that Abramoff – a sophisticated and twice convicted fraudster with a unique ability to continue to engage in frauds while convincing the government he has changed his ways and deserves another sweetheart plea deal – saw Mr. Andrade as an unsophisticated, naïve cryptocurrency entrepreneur who was ripe for manipulation. While Mr. Andrade saw Abramoff as a mentor and even a father figure, Abramoff and his fellow wrongdoers privately called him an idiot, a lamebrain, a putz, a sucker, and someone who was living in another world; they acted on their perception of Mr. Andrade by hijacking his business for their own purposes. To give the Court a flavor of how Abramoff's international wrongdoing, done using Mr. Andrade's business but behind his back, will aid Mr. Andrade's defense, two representative examples are highlighted in this submission.

*First*, Abramoff persuaded Mr. Andrade in June 2017 to do an Initial Coin Offering ("ICO") for AML Bitcoin, before Mr. Andrade planned to do so, and proceeded to enthusiastically hype and market the ICO, including arranging favorable press, support from the

---

[3] As demonstrated below, some of this wrongdoing was with and/or on behalf of pro-Russian oligarchs in Ukraine, reports about which may be classified. The wrongdoing also includes money laundering through unfriendly countries, reports about which may also be classified. Needless to say, Mr. Andrade cannot anticipate all the types of classified information that might be triggered by his defenses and discovery requests.

floor of the Congress, and even a planned TV show. Mr. Andrade proved to be the sucker that Abramoff and his fellow wrongdoers called him; he was so drawn in by Abramoff's hype that be believed he would have access to people and to funds that would fuel the development of his technology and help his business take off. That Mr. Andrade was misled was of no moment to Abramoff, who rushed the ICO because doing so furthered his plan to use AML Bitcoin to engage in and camouflage a billion-dollar money laundering scheme in Angola. Abramoff acknowledges – in writing – the plan to launder money in Angola using AML Bitcoin, and discovery suggests that the Angolan money laundering scheme was designed to support notorious international money launderer Gennadiy Bogolyubov and Abramoff's pro-Russia agenda.

Additional evidence about the Angolan money laundering scheme and its purposes will assist in preparing Mr. Andrade's defense because the evidence will help the jury understand how his representations about the state of his technology, *see, e.g.*, Indictment para 9(a), were influenced by Abramoff's persuading him to do an ICO before he had planned, and persuading him that Abramoff would provide him with the resources he needed to get AML Bitcoin up and running more quickly. This evidence will help show that any representations Mr. Andrade made about the development of the technology were made in good faith, and will show the jury who the real villain was and why Abramoff was orchestrating the wrongdoing alleged in the indictment and doing so behind Mr. Andrade's back.

*Second*, a different part of Abramoff's strategy for using Mr. Andrade's business for his own independent wrongdoing was the creation of the Super Bowl ad campaign alleged in the indictment. Not only was this campaign another way to romance Mr. Andrade and hype his business, but for Abramoff the campaign was primarily designed to get money and launder money for his pro-Russia campaign, and to assist his closest friends with siphoning money out of Mr. Andrade's business, camouflaging some of the money exchanges through payments purportedly relating to the funds that could be used to purchase the Super Bowl advertisement.

All this was done without Mr. Andrade's knowledge; he believed in good faith that money would be coming to pay for the advertisement. Additional discovery about Mr. Abramoff's siphoning of funds under cover of raising money for the advertisement will help show that Abramoff had criminal intent, and will help explain why he engaged in this wrongdoing behind Mr. Andrade's back – all of which will further underscore Mr. Andrade's good faith.

There are many more examples known to Mr. Andrade, and likely many more of which Mr. Andrade is not aware; some other names and countries connected to international wrongdoing by Abramoff and his fellow wrongdoers that used Mr. Andrade's business are listed in the argument below. As with the money laundering (and other wrongdoing) involving Angola and the Super Bowl, additional discovery into that wrongdoing could not only help Mr. Andrade defend against other misrepresentations alleged in the indictment, but also would provide further insight into the reasons for, the timing of, and the impact on his company of, Abramoff's illegal activity – all of which would further bolster Mr. Andrade's defense. Such discovery, including additional discovery into Abramoff's relationship with the government and possible use as an informant, could add to Mr. Andrade's defense in other ways, including the identification of affirmative defenses depending upon, for example, how much of Abramoff's wrongdoing may have been authorized by the government.

Finally, in this submission, Mr. Andrade will provide the Court with details of a few of the more than a dozen times that Judge Beeler has rejected the government's unreasonable and narrow view of relevance, to demonstrate that the Court should not rely on the government's assessment of the relevance or helpfulness of classified information. As set forth in more detail below, Judge Beeler – who has read thousands of pages of briefs and supporting materials about this case – has repeatedly rejected the government's view that information about the international wrongdoing of Abramoff and others is not material to the preparation of the defense. *See* Federal Rule of Criminal Procedure 16(a)(1)(E)(i). Instead, Judge Beeler has held that "Mr. Andrade has established a connection to this case surrounding Mr. Abramoff's involvement"

with others, and "limiting the production to references to Mr. Andrade and AML Bitcoin is too narrow. … It is not just about Mr. Abramoff or Mr. Andrade and AML Bitcoin. It is about the larger context of the business model for cryptocurrency, whether Mr. Abramoff may have been working against Mr. Andrade, and how that affects Mr. Andrade's responsibility and scienter." Discovery Order, Dkt. #165 at 12:15-22 (Apr. 7, 2023). In evaluating the government's claims of irrelevance, the Court should consider the fact that, despite Judge Beeler's ruling, the government has continued to resist the notion that evidence about Abramoff and his international wrongdoing must be produced – resulting in its losing subsequent discovery motions based on this same principle.

## II. CIPA Must Be Applied in a Manner that Protects Mr. Andrade's Right to Discovery of Information Material to the Preparation Of His Defense

CIPA is not just about the government's interest in protecting classified information to protect national security. It also is about "protecting a defendant's right to a full and meaningful presentation of his claim to innocence." *United States v. Sedaghaty*, 728 F.3d 885, 903 (9th Cir. 2013) (quoting *United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990)). Under section 4 of CIPA, a district court must determine whether the classified materials are discoverable under Rule 16 and whether the state-secrets privilege applies, and then it must determine whether the evidence is "relevant and helpful" to the defense of the accused. *Id.* at 904 (quoting *Roviaro v. United States*, 353 U.S. 53, 60 (1957)). If the information is both "relevant and helpful," then CIPA section 4 permits the district court to determine the terms of discovery. *Id.* "CIPA does not expand or restrict established principles of discovery." *Id.* at 903, citing S. Rep. No. 96-823 at 8, *reprinted in* 1980 U.S.C.C.A.N. at 4301–03. The *Sedaghaty* court explained that, under the *Brady* standard, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution . . . society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice

suffers when any accused is treated unfairly." *Sedaghaty*, 728 F.3d at 899 (citing *Brady*, 373 U.S. 83, 87 (1963)).

## III. International Wrongdoing by Abramoff and Others – and Therefore Classified Information – Is Central to Mr. Andrade's Defense

Discovery into Abramoff's international wrongdoing will help fuel one of the central themes of Mr. Andrade's defense: that while he was proceeding in good faith, Abramoff was using Mr. Andrade's business behind his back to engage in Abramoff's independent, pro-Russia money laundering and other frauds, and that Abramoff did so in ways that help Mr. Andrade explain or answer specific allegations in the indictment. The examples below illustrate how discovery received to date fuels the defense, but, as the descriptions below reflect, the defense does not yet have the complete story.

### a. International Wrongdoing By Abramoff and Others Helps Provide A Defense to Government Claims of Misrepresentations by Mr. Andrade About the Development of AML Bitcoin's Technology

The first example of how Abramoff's international wrongdoing aids Mr. Andrade's defense relates to Abramoff's plan to launder money in Angola to benefit a Ukrainian oligarch and to support his pro-Russia public relations campaign. Abramoff found himself in need of a cryptocurrency ICO on May 8, 2017, when he learned from Eliezer (a.k.a. Lou) Scheiner that Gennadiy Bogolyubov needed his help. Abramoff responded: "On it," and met Scheiner the next evening for dinner to discuss the situation in more detail.[4] Dent Decl., Exh. 3 (May 8, 2017). The two men arranged to meet in person with Bogolyubov in New York City on June 7 to hash out the details of how Abramoff could assist Bogolyubov with his money problems. Using the name "Steve Stephens," Abramoff cautioned Scheiner that "we probably need to be very quiet

[4] In discovery produced by the government, we have seen that Eliezer Scheiner is a pro-Russian who attended meetings in Grenada with Abramoff in late 2016, and whom Abramoff kept updated on his African travels in January and February 2017. Scheiner also helped to arrange a meeting between Bogolyubov and Abramoff in May 2017, almost immediately after Abramoff learned that Bogolyubov was having money issues.

about Genady [sic].” Dent Decl., Exh. 3 (June 4, 2017). The day before meeting Bogolyubov, on June 6, Abramoff identified AML Bitcoin as one possible solution to Bogolyubov’s money problems. Abramoff proposed to Mr. Andrade on June 19, 2017, that they do an ICO together,[5] and he promptly began to entice Mr. Andrade to do so, while simultaneously taking steps that underscore his view that Mr. Andrade was an idiot, a lamebrain and a sucker. Among other things, Abramoff put together a reality TV show about AML Bitcoin, which he used as a basis to have Mr. Andrade travel to Beverly Hills and meet with celebrities; he also told Mr. Andrade that Senators were introducing a bill that “calls for more oversight of digital currency business activity” – legislation that would have been a boon to the AML and KYC-compliant digital currency that Mr. Andrade developed.

Using these events as an explanation, Abramoff insisted that “we need to move our ICO along as quickly as we can” and “we have to get moving.” Dent Decl., Exh. 1 (June 30, 2017). On July 13, 2017, Abramoff added that he wrote a statement advocating for tighter rules on digital currencies that Congressman Dana Rohrabacher (a long-time friend of Abramoff) would read on the House Floor (Exh. 1, Jul. 24, 2017) and repeated exclamations of “so exciting!!!” (Exh. 1, Jul. 23 and 29, 2017). Andrade told Abramoff: “I look up to you Jack. Your kids are lucky to have you as a father.” Abramoff responded: “The feeling is very very mutual!” (Exh. 1, Aug. 28, 2017).

Mr. Andrade was taken in. He shared with his friend and associate Terrence Poon his excitement about the ICO Abramoff encouraged him to do and all of the hype around it, stating that “[w]e are getting a letter [of] support from President of Angola next week.” (Exh. 5, Aug. 4, 2017). A few days later, on August 9, Andrade reported that “the [TV] show will happen,” that “congress is on our side,” that “we will sell out the ICO,” and that “Angola which is in Africa, the president there will endorse AML Bitcoin.” (Exh. 5, Aug. 9, 2017). Poon responded,

---

[5] Abramoff wrote: “I was approached today by one of my friends in the NY finance world who is very bullish on [ICOs] and wants me to get involved, but I figured I should do so only with you, if you are into it.” Dent Decl., ¶6, Exh. 3 (June 19, 2017).

"Brother, U have found a great guy, Jack … How did u find him? … recently I have tried to learn more about Jack. After reading more, I found he is more amazing." Mr. Andrade summed up for Poon that Abramoff's marketing strategy consists of "reality shows," "Congress," and "various presidents [of foreign countries] issuing [] public letters of support." Dent Decl. at ¶7, Exh. 5 (Aug. 9, 2017).

Unbeknownst to Mr. Andrade, Abramoff explained to others what his real agenda was in joining forces with Mr. Andrade and pushing to do an accelerated ICO: facilitating money laundering through Angola. In an October 10, 2017 message to long-time friend Roger Engone,[6] Abramoff sketched out a deal, the complete terms of which are not explained, but which began: "We will use digital currencies (bitcoin) to get this done. In particular, we'll use AML Bitcoin (AML), which is the only digital currency that is designed to be accepted by governments." Dent Decl., Exh. 6 (Oct. 11, 2017). He then discussed the procedure, which would include Engone getting at least two Angolan participants who designate an Angolan bank (where they have deposits) that they will use to "participate in the transaction." *Id.* As directed by Abramoff, the designated banks must be able to transfer South African Rand to a U.S. account; each participant must sign a contract to purchase AML Bitcoin and will receive AML Bitcoin wallets; and several complicated transactions will ensue that involve transferring millions of dollars between the two participants, with AML selling one of the participants $100 million of AML coins, and that purchaser selling $100 million worth of AML to the second participant and then depositing $100 million in a Dubai bank account, minus the 20% of the funds that will go to Engone. Dent Decl. at ¶ 8, Exh. 6 (Oct. 11, 2017). Abramoff stated, "This approach could enable deposits of more than US$1B per month in each Dubai account." *Id.*

//

[6] Engone is a former employee at the Gabonese Embassy in Washington, D.C. and appears to have known Abramoff since the early 2000s, when Abramoff was investigated and sent to prison for three felony counts conspiracy, fraud, and tax evasion—involving charges stemming principally from his lobbying activities on behalf of Native American tribes. Jack thanks Roger Engone in the acknowledgments of his book, "Capitol Punishment."

A few days later, Abramoff told Engone to let him know as soon as it was confirmed that the Angolan bank can do South African rand transfers, then email Abramoff to his printer (not his computer), and then go to Abramoff's house "so we can take the next steps, which will be you calling my guys while I'm in the room." Dent Decl. at ¶ 8, Exh. 6 (October 11, 2017). Five days later, Engone sent Abramoff a photograph of a huge stack of Angolan money piled high in an otherwise empty room, to which Abramoff responded, "Looks like my living room! Hahahaha." Dent Decl., Exh. 6 (Oct. 16, 2017).

This use of Mr. Andrade's business and cryptocurrency to aid Abramoff's international, pro-Russia money laundering gives the Court the flavor of how discovery of classified information could further fuel Mr. Andrade's defense. For example, part of the defense to the government's accusation that Mr. Andrade was intending to defraud when he made representations about the state of his technology, *see, e.g.*, Indictment para 9(a), will be that Abramoff persuaded Mr. Andrade to do an ICO for his cryptocurrency before Mr. Andrade planned, and hyped all the resources and connections he could bring to the company – helpful Congressmen, relationships with the Panama Canal, a television show, and connections to a lot of people with a lot of skill and money to buy AML Bitcoin. Proving to be the sucker Abramoff and his fellow wrongdoers believed him to be, Mr. Andrade brought into the hype and believed that, with Abramoff's support, the development of his business and his technology would proceed like gangbusters. The defense will use Abramoff's wrongdoing, and the romancing of Mr. Andrade it required to allow Abramoff to use AML Bitcoin to advance Abramoff's own wrongdoing, to show Mr. Andrade's good faith, and to show that Abramoff was responsible for the crimes charged in the indictment, which were collateral damage to Abramoff's international wrongdoing. The frenetic pace at which Mr. Andrade worked to meet the schedule Abramoff set up for his own purposes also provides important context in assessing his good faith.

//

//

**b. International Wrongdoing By Abramoff and Others Helps Provide A Defense to Government Claims that Mr. Andrade Knowing Participated in a "Rejection Campaign" for a Super Bowl Advertisement**

The scheme and artifice to defraud detailed in the Indictment alleges that Mr. Andrade "orchestrated and approved a false 'rejection campaign' regarding a purported advertisement that ANDRADE and his associates stated was going to be aired during the 2018 Super Bowl. . . . In fact, the NAC Foundation did not have the funds to purchase the advertising time and the advertisement was never reviewed or rejected by the network or the NFL." Indictment ¶9(b). The Super Bowl rejection campaign not only was orchestrated *by Abramoff* rather than by Mr. Andrade, but also was orchestrated by Abramoff as part of an effort to siphon money, using AML Bitcoin, behind Mr. Andrade's back.

Abramoff tapped his close friend John Bryan to assist with putting the rejection campaign together in hopes of raising awareness of AML Bitcoin. Chet Fenster, a content and advertising expert, told the FBI that he was contacted by Abramoff and John Bryan to assist with the Super Bowl ad (FBI-302-003247). Fenster said that Bryan and Abramoff misrepresented to him how much money was in the budget for an AML Bitcoin ad. Ultimately, it became clear that AML Bitcoin was not going to follow through with the ideas proposed by Fenster.

On December 27 2017, Abramoff and Richard Naimer (Israeli lawyer and longtime friend and business partner of Abramoff) discussed the Super Bowl, and Abramoff sent Naimer an AML Bitcoin Special Purpose Agreement. Dent Decl., Exh. 8 (Dec. 27, 2017). This agreement, which was modified from the usual AML Bitcoin purchase agreements and provided far greater compensation to the recipient of the funds, was used by Abramoff, purportedly to bring in money for the Super Bowl ad, but in reality to siphon off some money away from AML Bitcoin and direct it to some of his friends and fellow wrongdoers. All of this was done behind Mr. Andrade's back, at his expense. Once again, Mr. Andrade proved to be a sucker, and believed that money for the advertisement would be coming in. Naimer said to Abramoff, in reference to Mr. Andrade: "BTW, as far as he's concerned, you already raised the money for the

ad..." Abramoff responded: "as far as he's concerned, the ad already ran! And we sold $100M in the ICO in 40 seconds and. . . and. . . and. . ."). Dent Decl., Exh. 8 (Dec. 27, 2017).

Abramoff sent a similar contract to his friend Eli Zicherman[7] on the same day. Abramoff (using the name Steve Stephens) also wrote to his trusted friend and associate Alex Prasievi (a friend of Abramoff from the Republic of Georgia) and offered him the same deal. Abramoff informed him that he had a "guy in NYC" who had a $1 million investor group and was going to purchase 1,428,572 tokens at .70 each, sell them to the investors at .90 each and keep a commission fee for $285,715. Dent Decl. at ¶ 12. Abramoff offered to Prasievi that he could do the same if he wanted to. Abramoff then sent Prasievi an AML Bitcoin Special Purchase Agreement that set forth a scheme similar to the one he had described. Dent Decl., Exh. 9 (Dec. 27, 2017). Abramoff and Prasievi exchanged emails on January 2, 2018, regarding the opportunities for AML Bitcoin in the Georgia Republic. Showing that this siphoning plan was connected to the Super Bowl ad, Abramoff asked Prasievi the next day, "[A]ny progress on the Super Bowl ad front?" (produced by Prasievi). Dent Decl., Exh. 10 (Jan. 1, 2017).

Although the indictment suggests otherwise, Mr. Andrade had reason to believe that the company could afford a Super Bowl ad. Among other things, this belief was based on the fact that on January 14, 2018, he was told by Japheth Dillman, a friend of Abramoff whom Abramoff brought into Mr. Andrade's business, that Dillman's company Block Bits Capital was putting in an order for $50 million worth of AML Bitcoin. Dent Decl. at ¶13. The money never came. Whether it never came because, Abramoff was using AML Bitcoin to launder it or diverting the funds to himself or to his network of shell companies that his fellow wrongdoers created for his benefit, or because Dillman was lying, perhaps at Abramoff's direction, is unknown to the defense.

[7] Defense counsel understands that Eli Zicherman was introduced to Abramoff by the prison rabbi when Abramoff was in imprisoned almost 20 years ago. Zicherman owns SEPO Holdings, one of the many "front" companies that Abramoff controls.

Additional discovery about Abramoff's international money laundering and siphoning of funds in connection with the Super Bowl would aid Mr. Andrade's defense because it would provide more information about how Abramoff – not Andrade – orchestrated the Super Bowl ad and how Abramoff and a handful of his friends profited from it. While Mr. Andrade believed in good faith that money would be coming to pay for the advertisement, Abramoff had different ideas about the use of those funds. Learning more about what Abramoff and his fellow wrongdoers were doing will more fully establish how and why he used the prospect of a Super Bowl ad to further his own wrongdoing, at the expense of Mr. Andrade's business. That Abramoff engaged in this wrongdoing behind Mr. Andrade's back will show both Abramoff's responsibility for the wrongdoing charged in the indictment, and Mr. Andrade's good faith.

**c. Numerous Other Potential Examples Underscore the Need For Additional Discovery About Abramoff's International Wrongdoing, Abramoff's Relationship with the Government, and the Wrongdoing Of Those Working with Abramoff**

The complete picture of what Abramoff was doing behind Mr. Andrade's back with AML Bitcoin is clouded by the cryptic nature of the communications, the use of aliases, and the number of deleted messages on the WhatsApp threads.[8] Books have been written, and movies made, about Abramoff's life of prolific crime, and his subsequent cooperation with the government. Below are a handful of examples of the activities in which Abramoff was engaged (and people who joined him) during the general time period covered by the indictment that we expect, with further discovery, could be connected with AML Bitcoin in ways similar to the two examples identified above:

---

8 That whatever was happening between Abramoff and his associates at any given time was likely not legal is often reflected in admonitions to delete messages or to jump on a phone call. For example, in September 2017, Naimer told Abramoff that all communications should be through WhatsApp so the history can be erased and "lost in cyberspace." Abramoff responded that he sets his WhatsApp application so that messages do not archive. Similarly, John Bryan, on January 17, 2018, sent a text message to Abramoff explaining that "[t]he written proposal will pretend we really are buying a Super Bowl ad because if anybody ever gets this in Discovery or something I don't want to look like we planned to do this . . . is that okay?"

- **Natko Vlahovic**: Messages between Abramoff and Natko Vlahovic (a Croatian, pro-Russian lobbyist) reflect that Abramoff sent Vlahovic a recording entitled "Call to Arms"[9] in which Abramoff calls for a grass roots campaign across America to organize Trump voters to pressure Congress to reverse what Abramoff called the "horrific" anti-Russian trends in American politics. Abramoff Recording (3:35-4:10; 4:50-5:30; 7:45-9:10). The Call to Arms recording calls for: "pressure on Congress" to support Trump's position on Russia (6:50); production of "media that is more pro-Russia and pro-Putin" (6:54); good documentaries that "portray the good work Putin has done for Russia" (7:07). Abramoff calls for this movement to happen "as soon as possible," "Through social media," "through approaches in the churches" (8:15 ). And ***Abramoff states that the effort will require $20 million per year for five years, and therefore will be best funded by five or six "successful Russians who are supporters of Putin.***" (9:00-9:45) (emphasis added).

  Abramoff and Vlahovic discussed topics ranging from Russia-related work, to Vlahovic getting commissions for selling AML Bitcoin, to a statement apparently designed for an official of the Angolan government about Angola exclusively accepting AML Bitcoin. While the two were working together on lobbying campaigns, Abramoff introduced Vlahovic to AML Bitcoin and helped him acquire AML Bitcoin tokens, ultimately resulting in Vlahovic working on the drafts of what appear to be press releases for AML Bitcoin related to adoption of AML Bitcoin by the governments of Angola, Slovenia, and Estonia. Dent Decl. at ¶18, (Nov. 8, 2017) (WhatsApp exchange between Abramoff and Vlahovic)

- **Landfair Capital Consulting**: Discovery shows a pattern of Abramoff using Landfair Capital Consulting to hide his wrongdoing, often describing the consulting he was providing as relating to cryptocurrency. Whether this description is true or false can be hard to determine. Landfair was owned by his son Alex, who was a college student at the time, and the case agents referred to the company as "the money connection" for Abramoff's activities, including those relating to AML Bitcoin.[10]

  - **Alexander Levin**: Abramoff issued a $750,000 invoice from Landfair Capital to Alexander Levin, a pro-Russia, Ukrainian-American businessman who retained Abramoff as a consultant to assist him with, among other things, efforts to interfere with Ukrainian politics based on a pro-Russia agenda. A 302 report produced by the government, which is a

[9] If the Court would like a copy of Abramoff's Call to Arms recording, which is 10 minutes long, defense counsel will provide it to the Court on a thumb drive.

[10] Recording 1D-39, interview of Abramoff during the FBI's search of his home (Sept. 13, 2018). If the Court would like a copy of Abramoff's Call to Arms recording, which is 10 minutes long, defense counsel will provide it to the Court on a thumb drive.

partial review of evidence from one of Abramoff's cell phones, indicates that Levin communicated with Abramoff frequently during the timeframe relevant to this case. Through those discussions, Abramoff also introduced Levin to AML Bitcoin and discussed cryptocurrency more generally. Additionally, the 302 shows that Levin's payments to Abramoff for his consulting services were paid into the same Landfair Capital bank account Abramoff used for the Angola plan and other likely wrongdoing in which Abramoff engaged. Dent Decl., ¶20, Exh. 17.

- **Gennadiy Bogolyubov:** Abramoff used Landfair Capital to obtain $1.5 million in "consulting fees" from Bogolyubov on August 10, 2017. Abramoff wrote to Bogolyubov's associate Moti Korf: "I spoke yesterday with [Gennadiy]. Our LA company will do a consultancy with your company regarding digital currencies, providing investment guidance and opportunities. The consulting fee will be $1.5 million. . . . You will receive a W9 from the LA company - Landfair Capital Consulting, Inc., and have a business expense for the consulting effort. Landfair will provide periodic written reports as well." Dent Decl., ¶21. A few weeks later, Abramoff also described to Bogolyubov that he would be setting up a "C4 non-profit" to use for handling certain issues. Abramoff wrote on September 1, "I can write up something generic, like "supports and advocates for issues that ensure that the United States does not support corrupt regimes and leaders throughout the world…[11] His projects related to Alexander Levin, Ihor Kolomoisky, and the U.S. public relations effort that also involved cutting off government funding for Ukraine, influencing the Presidential Election, and setting up President Joe Biden for criminal activity.

- **Jack Abramoff:** Abramoff is the alleged co-schemer and co-conspirator in Mr. Andrade's case. The government has resisted answering defense counsel's questions about whether he also worked as an informant, and whether there is a file containing the government's instructions to Abramoff, which could trigger certain affirmative or other defenses. *See* Dent Decl., ¶24, Exh. 19 (Letter from K. Dent to government summarizing the numerous times that material from Abramoff's informant file has been requested). The government also resisted producing the phone of this twice convicted fraudster, first producing the phone without Abramoff's communications with Levin, Kolomoisky, and others, then changing its mind after promising to produce the entire phone, ultimately producing the phone only after Mr. Andrade filed and won a motion. *See* Andrade's Motion to Compel Production of Abramoff Phone, Dkt. #192 (June 23, 2023), granted on July 13, 2023.

[11] Discovery in this case indicates that the use of non-profits also is a trademark of Abramoff's criminal activity.

- **African Funds Deal**: In either a modification of what Abramoff was doing with the Angola Plan, or a separate plan relating to Angola, Abramoff also was working on an Angolan currency project that involved "assisting a powerful family in Angola (the client) that has a large amount of Kwanzas and wishes to convert them to a foreign currency." Dent Decl., ¶16, Exh. 8 (Oct. 19, 2017). In connection with that effort, Abramoff sent "Angolan Deal Notes" to Naimer on January 8, 2018. Dent Decl., Exh. 8. In those deal notes, Abramoff referenced a Sultan and some real estate developments that would be purchased in a way that avoids "overseas remittance" guidelines, that makes it appear to the banks that would be involved that what was happening was for "investment purposes," and that overstates the amount that would actually be invested. Abramoff adds that "all the banks understand that the funds will be arriving in Angolan Kwanza Cash Notes." Exh. 8. Mr. Weng Kee Leong, from Malaysia, confirmed with all four banks involved that they were ready to move to the next step, which would be ascertaining the exchange rate, but to move forward they would need some sort of Memo of Understanding, and that he would like to have this all completed no later than February 1, 2018. Exh. 8.

- **Carlos Delaguardia:** Delaguardia is a former Panamanian Ambassador to the United States and friend of Abramoff. On September 15, 2017, when Delaguardia was with Andrade in Panama to discuss the possibility of the Panama Canal using AML Bitcoin, Andrade wanted to do a photo op at the Panama Canal, but Delaguardia determined it was not necessary. Reporting this to Abramoff, Delaguardia sent Abramoff a photo of Grima[ce], the grinning purple blob from McDonald Land who was an evil character, known for being stupid and for stealing milkshakes. This nickname was used repeatedly by Delaguardia to describe Mr. Andrade. Dent Decl., Exh. 4. Delaguardia, in connection with his efforts to get AML Bitcoin into Panama, created a new Panamanian company called Zentrum, and Delaguardia served as President. Abramoff tried to persuade Mr. Andrade to use the bank account of Delaguardia's new company as an escrow account to hold the money purchasers used to buy AML tokens. Mr. Andrade never accepted that offer. In addition, Abramoff appointed Delaguardia to serve as VP of Latin American affairs for Mr. Andrade's company, a role through which Delaguardia handled the AML Bitcoin communications with the Panama Canal and even authored the Panama press releases relating to AML Bitcoin. Dent Decl. ¶ 25 and Exh. 6.

- **Joey Allaham**. Abramoff was partners with his then-close friend Joey Allaham in a company called Lexington Strategies, but their WhatsApp chats reflect that the two spent most of their time arguing. On November 3, 2017, Abramoff told Allaham that he wanted to meet and discuss AML Bitcoin. "I just heard that the Crown Prince of Dubai (or his investment fund, not sure) is about to purchase a huge block of the coins." Dent Decl., Exh. 12, Excerpt 3. On January 26, 2018, Abramoff sent Allaham one of the AML Bitcoin Special Purchase Agreements that was used to raise money in connection with the Super Bowl advertisement. Dent Decl., Exh. 12, Excerpt 1. Allaham also signed a purchase agreement for

$500,000 worth of AML Bitcoin tokens on February 23, 2018. Dent Decl., Exh. 12, Excerpt 5.

- **Mariia Butina:** Butina is a Russian spy, a convicted felon, and through her boyfriend Paul Erickson, an associate of Abramoff. When her home was searched, the FBI found AML Bitcoin marketing materials (with the handwritten notes of her boyfriend, convicted felon and Abramoff friend Paul Erickson). Despite knowing those facts, the government initially resisted discovery of AML Bitcoin materials and notes and made light of Mr. Andrade's requests that included the names of people such as Paul Erickson and Mariia Butina, stating that "conspiratorial speculation is not a proper basis for discovery in a criminal case" and that "the *government is aware of nothing beyond such speculation* justifying defendant's request." Dkt. #124 at 1:6-8 (emphasis added).

- Other individuals who schemed with Abramoff during the relevant time period include, but are not limited to:

  - **Dana Rohrabacher:** Former California Congressman and decades-long close friend of Abramoff; read a speech written by Abramoff, promoting AML Bitcoin, on the Floor of the U.S. House of Representatives; assisted Abramoff with introducing AML Bitcoin to foreign countries; and is mentioned in Abramoff's chilling Call to Arms recording referenced above.

  - **Nick Muzin**: Together with Joey Allaham, was a partner of Abramoff in a company called Lexington Strategies. Defense counsel is still investigating and reviewing documents relating to what appears to have been a money laundering scheme involving AML Bitcoin.

  - **Nick Evdokima**. Founded ICOBox, the Russian company that handled the ICO for AML Bitcoin; ICOBox and Evdokima were sued by the SEC in September 2019 for alleged illegal involvement in digital token offerings that raised more than $650 million. https://www.sec.gov/enforcement-litigation/litigation-releases/lr-24601

  - **Ghost Management Group**: Abramoff and his son Alex ran Ghost Management. Defense counsel is still learning about the company. It appears to be part of a plan to conceal lobbying efforts. The company sent several payments to Landfair Capital Consulting, the "money connection" described above. Dent Decl., ¶26.

  - **Pangea LLC**; Pangea, according to the affidavit for probable cause in support of a search of Abramoff's house in September 2018, is operated by James Kahrs and is a company for the benefit of Abramoff. Pangea made several payments to Landfair Capital, and also received payments for illegal lobbying work from Ghost Management.

- **<u>Brian Darling</u>:** Darling received AML Tokens directly from Abramoff for lobbying and writing press releases to promote AML Bitcoin.

▪ The countries used by the characters above include Albania, Angola, Panama, Estonia, Congo, Azerbaijan, and others.

That the full story of what Abramoff was up to in late 2017 and early 2018 is neither clear nor complete does not alter the fact that discovery – classified or not – about Abramoff's international wrongdoing will be helpful to Mr. Andrade's defense. As the Angola money laundering and Super Bowl advertisement reflect, Abramoff's international wrongdoing is a material part of showing that Abramoff was working behind Mr. Andrade's back to use Mr. Andrade's business to advance Abramoff's own wrongdoing, even when it undermined Mr. Andrade's business or led to misrepresentations charged in the indictment. Abramoff's international wrongdoing and the statements he made to Mr. Andrade to further that wrongdoing – such as the hype that preceded the ICO – provide the context as well as a basis for demonstrating that Mr. Andrade was acting in good faith. The full scope of Abramoff's international wrongdoing may be boundless, but the above examples suggest a reasonable chance that the wrongdoing, when fully understood, will connect to AML Bitcoin and to Mr. Andrade's defense.

**d. The Government Has Proven Itself to be a Poor Judge of What Is Material to the Defense, Despite Repeated Adverse Rulings By Judge Beeler**

The Court, when considering the government's *ex parte* arguments for why the unidentified classified information should not be produced to Mr. Andrade, should consider the fact that the government's view of what is "relevant" in this case consistently has been rejected by Judge Beeler – *over a dozen times.* Specifically, on April 7, 2023, Judge Beeler granted all five of the requests before her. (Dkt. # 120). The five requests focused on Abramoff's international crime spree with others, and resulted in Judge Beeler's ruling, quoted above, that

"limiting the production to references to Mr. Andrade and AML Bitcoin is too narrow." On March 17, 2024, Judge Beeler ruled in Mr. Andrade's favor on ten of the eleven requests in his motion to compel filed on January 25, 2024. Dkt. #275. The government's discovery record is 1-15.[12]

The government's poor assessment of relevance in this case also is well illustrated by its resistance (and in some cases refusal) to produce materials relating to alleged co-schemer Abramoff. For example, the government's response to Mr. Andrade's request for Alexander Levin's iPhone and iPad, which were seized by the Southern District of New York in connection with a criminal investigation of Rudy Giuliani and others in that district. Although the government repeatedly has argued that it knows of no connection between Mr. Andrade's case and the case in the Southern District of New York, publicized information from unsealed search warrants relating to the SDNY's investigation that Giuliani was investigated for his removal of the U.S. Ambassador to Ukraine in 2019 – one of the ***very same pro-Russia "lobbying" activities*** about which Abramoff and Levin communicated in June 2018, disguising the work in an invoice as "cryptocurrency consulting."[13] As it turns out, the so-called "lobbying" work that Abramoff discussed with Levin was just one of many examples of how Abramoff worked behind Mr. Andrade's back and used Mr. Andrade's company and his AML Bitcoin to disguise his own international wrongdoing and to promote his pro-Russia agenda – purposes that were contrary to Mr. Andrade's intentions for his company. demonstrates that the government cannot and should not be trusted when it comes to evaluating what is relevant and helpful to Mr. Andrade's case.

[12] The one issue that went in favor of the government in the most recent motion to compel was that it was not required to provide its 404(b) notice yet, a ruling that did not involve relevance. Similarly, the government has prevailed on whether an attorneys' eye only provision was reasonable for Levin's search warrant and whether the government could be required to produce devices in its "unlawful possession" based on the search warrant having expired. Again, there were no relevance determinations to be made on those rulings. The government has since realized that, as the defense suggested in its motion, the defense would need considerable time to prepare for its proposed 404(b) material, and it provided notice on September 13, 2024. Dent Decl., ¶ 27.

[13] Dent Decl. at ¶20 (citing FBI-302-0005158 at 9-10).

The government cannot and should not be trusted when it comes to evaluating what is relevant and helpful to Mr. Andrade's case.

Respectfully submitted,

DATED: October 3, 2024

KING & SPALDING LLP

By: */s/ Michael J. Shepard*

MICHAEL J. SHEPARD
KERRIE C. DENT
CINDY A. DIAMOND

Attorneys for Defendant
ROWLAND MARCUS ANDRADE