Charles C. Morgan (*pro hac vice*)
ccmlegalfirm@yahoo.com
CHARLES C. MORGAN LEGAL PRACTICE, LLC
4151 Pelicans Nest Drive
Bonita Springs, FL 34134
Tel. 609-636-0544

Attorney for Defendant
ROWLAND MARCUS ANDRADE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NAC FOUNDATION, LLC and ROWLAND MARCUS ANDRADE,<br><br>Defendants. | Case No. 3:20-cv-04188-RS<br><br>**DEFENDANT ROWLAND MARCUS ANDRADE'S REPLY IN SUPPORT OF MOTION FOR DISQUALIFICATION OF THE HONORABLE RICHARD SEEBORG PURSUANT TO 28 U.S.C. §§ 144 AND 455 AND CIVIL LOCAL RULE 3-14 (ECF No. 61)**<br><br>Judge: Hon. William H. Orrick<br>Hearing: On the papers (Civil L.R. 7-1(b)) |

## I. INTRODUCTION

The SEC's opposition (ECF No. 65) does not answer the motion's principal argument under 28 U.S.C. § 455(a). This civil action will require adjudication of the same disputed facts the Court has already resolved in the related criminal case: what investors were told, who made the statements, and whether Defendant knew they were false. ECF No. 61 at 14–16. The SEC never mentions *King v. U.S. District Court*, 16 F.3d 992 (9th Cir. 1994), or Judge Reinhardt's concurrence.

The record confirms the concern. In a written order, the Court found that the jury "heard evidence of one scheme, of which Andrade was indisputably a critical part," and that the "overwhelming evidence" showed he controlled the social media accounts on which the

misrepresentations were posted. Crim. Dkt. 694 at 9, 11. At sentencing, it found that he "did repeatedly lie" to obtain investor funds. The Abramoff evidence that will be central here, including the CIPA submission, the Angola plan, and a recording twice filed in the criminal case, was declined, excluded, or deemed irrelevant without an evidentiary hearing. The SEC's "rehash" and timeliness arguments fail on the record.

## II. ARGUMENT

### A. The SEC Does Not Respond to the Section 455(a) Argument That the Motion Actually Makes.

The SEC says Defendant "relies entirely on adverse rulings and remarks." ECF No. 65 at 1. Not so. The motion acknowledged that adverse rulings alone do not establish bias, *Liteky v. United States*, 510 U.S. 540, 555 (1994), and rested on three points. First, the SEC's claims arise from the same offering, investors, and witnesses as the criminal case. Second, *Liteky* and *King* recognize that intrajudicial predispositions will "sometimes (albeit rarely) suffice." 510 U.S. at 554. Third, a reasonable observer would perceive a significant risk that conclusions already announced would be applied without a fresh hearing on a civil record. ECF No. 61 at 14–16.

The rule the SEC invokes, that rulings in the same proceeding are grounds for appeal, ECF No. 65 at 11, has force when a litigant complains of how a judge ruled in the case before him. It has less force when the question is whether a judge who has announced firm views on a disputed fact should be the factfinder on that fact in a second proceeding in which the evidence has never been heard. The SEC cites no authority holding that *Liteky* resolves that question. In *King*, the majority denied mandamus only because the law was then "insufficiently clear," 16 F.3d at 993–94, and the concurrence called the issue "a close one." *Id.* at 998 (Reinhardt, J., concurring). This motion is not governed by the mandamus standard.

*National Abortion Federation v. Center for Medical Progress*, 257 F. Supp. 3d 1084 (N.D. Cal. 2017), involved a remark in the same case about compliance with court orders. ECF No. 65 at 11–12. Here, the statements were made in a different proceeding, and they concern the

dispositive factual questions in this one. That court, moreover, reached the merits despite timeliness concerns "in the interest of completeness and clarity." *Id.* at 1088.

**B. The Court's Actual Words, Including at Sentencing, Confirm the Concern.**

*1. The record correction.*

The SEC states that the quoted language, that Defendant "lied to people about what the purchasers were buying," does not appear at Criminal Dkt. 718, Tr. 28:11–15 or anywhere in that transcript. ECF No. 65 at 9. Defendant acknowledges the error. The quoted language was Defendant's own paraphrase of the Court's statements in his affidavit, and it should not have been presented as a quotation or attributed to page 28 of Docket 718.

Defendant regrets the error. It is a citation error, not a change in the substance of Defendant's showing. The Court's actual words, both at the post-trial hearing and at sentencing, make the point more directly than the paraphrase did.

*2. The Court's statements at sentencing.*

The Court stated at the July 29, 2025 sentencing, applying the § 3553(a) factors:

> At base, Mr. Andrade engineered and embarked upon what I think is a sophisticated fraud scheme whereby he did repeatedly lie and made misrepresentations to obtain investor funds and he used some of those funds for his own personal use.

Crim. Dkt. 733 (July 29, 2025 Sentencing Tr.) at 56:4–8.

The Court continued that Defendant's sincere belief in his technology was "largely irrelevant because he full well knew when he made the representations to get the investors to turn money over to him that he wasn't telling the truth." *Id.* at 56:9–14. When defense counsel argued that portions of the alleged loss did not involve fraud, the Court responded: "I think the fraud was a lot broader than you seem to think it was." *Id.* at 18:14–16.

These were not descriptions of the Government's theory or the jury's verdict. They were the Court's own findings, stated in the first person, at sentencing. They address falsity and scienter, which are the elements the SEC must prove in this action. This is exactly the setting Judge

Reinhardt identified in *King*: findings made at a criminal sentencing that "strongly suggest that [the judge] has expressed firm conclusions regarding the factual issues that are critical to the outcome of [the] civil trial." 16 F.3d at 998 (Reinhardt, J., concurring).

*3. The Court's statements at the post-trial hearing.*

The post-trial hearing is to the same effect. The Court said: "I think the centerpiece of this case is that Mr. Andrade lied to investors." Crim. Dkt. 718, Tr. 15:13–21. It referred to "what I just said about the evidence . . . that he lied to investors," *id.* at 16:5–7, and stated that "he knows he's lying" in "specific [representations] to investors about Panama, about the Port of San Francisco." *Id.* at 19:25–20:6. The SEC's reading, that the Court was describing "the Government's case," ECF No. 65 at 10, cannot be squared with "I think." The Court also declined to hear more about the misconduct motion. Tr. 28:11–15.

*4. The Court's written order denying a new trial.*

These were not passing remarks from the bench. The Court made the same findings in a formal written order. Its June 25, 2025 order denying Defendant's motion for a new trial begins: "This case centered on Defendant Rowland Marcus Andrade's misrepresentations, made to public and private entities and in service of his scheme to defraud." Crim. Dkt. 694 at 1. It found that "[t]he jury heard evidence of one scheme, of which Andrade was indisputably a critical part." *Id.* at 9. It found that "[t]he overwhelming evidence at trial was that Andrade did control the social media accounts when the misrepresentations were made," and that he "reviewed and approved postings to those sites, and was aware of and at times directed the posting of false and fraudulent statements." *Id.* at 11 (tracking Crim. Dkt. 682 at 13). And it described "the substantial showing of Andrade's guilt of the conduct charged." *Id.* at 12.

Each of those written findings maps onto a contested question in this action. Whether Defendant's statements were misrepresentations goes to falsity. Whether he was "indisputably" the critical participant in the scheme goes to scienter and scheme liability. And whether he controlled the social media accounts and approved the postings goes to whether he was the

"maker" of the challenged statements. The SEC calls the Court's statements "isolated remarks." ECF No. 65 at 11. A reasoned written order, entered on the docket and resolving those questions in the Court's own words, is not an isolated remark.

*5. The Court has already declared irrelevant the technology evidence that will be contested here.*

At the same hearing, defense counsel explained that the Court had limited the defense technology expert's testimony to the 2017–2018 period, and that the Government then argued in closing that Defendant "never had his technology in complete form." Crim. Dkt. 718, Tr. 18:17–25. The Court did not dispute that account. It responded that it "thought that was completely irrelevant": "Whether or not Mr. Andrade ever had his technology working or not at the end of the day didn't matter," and "[t]his could have been the greatest technology in the world. It's irrelevant." *Id.* at 19:1–7. At sentencing, the Court reiterated that Defendant's sincere belief in the technology was "largely irrelevant." Sentencing Tr. at 56:9–12.

Whatever the merits of those rulings in the criminal case, the technology and what purchasers were told about it will be contested in this action. The SEC alleges that Defendant promoted AML Bitcoin by misrepresenting its "purported anti-money laundering, know-your-customer, and other encoded security features." ECF No. 65 at 2 (describing ECF No. 1). The Court also limited the defense's cross-examination of undercover FBI agent Bryant Ling, and as a result the jury never heard recorded excerpts in which Defendant told the undercover agent that only a token was being sold and that the AML identity-verification features would operate when the coin launched but were not active in the token. Crim. Dkt. 656-2 ¶¶ 4–5 (citing Trial Tr. 2110:12–2112:23, 2138:1–8, 2142:14–2143:12, 2146:14–25). What Defendant told purchasers about those features is exactly what the SEC alleges was false. A reasonable observer would hesitate before asking a judge to weigh that evidence afresh when he has already declared it irrelevant. That is especially so here: as defense counsel described the record, the jury heard the Government argue that the technology never worked after the defense's expert evidence on that point had been limited.

In short, the SEC's complaint, ECF No. 1, turns on whether Defendant made false and misleading statements to investors about the same offering. A reasonable observer who reads the Court's own words would perceive a significant risk that the answer has already been settled in the Court's mind. *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008); *Clemens v. U.S. Dist. Court*, 428 F.3d 1175, 1178 (9th Cir. 2005). If the SEC intends to rely on the criminal judgment in this action, the risk is only greater, because the Court would then be asked to apply to a civil record a factual determination it has already announced and entered.

### C. A Reasonable Observer Would Also Question Whether the Abramoff Evidence, Which Is Central to This Action, Will Receive a Fresh Hearing.

The motion explained that a reasonable observer who knew the Court had declined to hear argument on the Government's conduct would perceive a significant risk that the same conclusions would be applied here without a fresh hearing on a civil record. ECF No. 61 at 14–15. The SEC's opposition does not answer that point. The two exhibits to the motion, the defense's corrected ex parte CIPA submission and the supporting declaration of former counsel, show why the concern extends to the evidence itself. ECF Nos. 61-1, 61-2.

*1. The defense told the Court exactly why it needed the classified material, and the Court's order said it had not.* The Government stated that it did not oppose an ex parte defense submission explaining the defense theory to aid the Court's CIPA review. ECF No. 61-2 at 5 n.1 (quoting Crim. Dkt. 342 at 2). The defense filed one on October 3, 2024. It explained that its central theme was that Abramoff, not Defendant, "had the intent to defraud," and that Abramoff used Defendant's company and AML Bitcoin "to both advance and camouflage his wrongdoing." *Id.* at 6. It tied that theme to specific allegations in the indictment: the representations about the state of the technology and the Super Bowl "rejection campaign." *Id.* at 6–8, 10–16.

The submission then addressed the informant file directly. It stated that the Government "has resisted answering defense counsel's questions about whether [Abramoff] also worked as an informant, and whether there is a file containing the government's instructions to Abramoff, which

could trigger certain affirmative or other defenses." *Id.* at 18. It explained that discovery "into Abramoff's relationship with the government and possible use as an informant" could identify affirmative defenses "depending upon, for example, how much of Abramoff's wrongdoing may have been authorized by the government." *Id.* at 8. The supporting declaration listed what the file would likely contain: "Instructions given to Abramoff," documents relating to his "Authority to Engage in Otherwise Illegal Activity" and his "Unauthorized Illegal Activity," and payments to him. ECF No. 61-1 at 12–13, ¶ 24. It also recorded that the defense had requested the file at least eight times. *Id.* at 12, ¶ 24 & n.2.

Eleven days later, the Court granted the Government's CIPA motion. Its order stated that the defense had not explained why it needed access to the protected materials. Crim. Dkt. 367 at 3:2–3; Aff. ¶¶ 20–21. The order recites that it rests on "the Government's Motion and the classified declaration(s)." Crim. Dkt. 367 at 2 (quoted in Crim. Dkt. 822 at 3). Defense counsel was prohibited from reviewing the classified material, so the ex parte submission was the only means by which the defense could be heard. Crim. Dkt. 822 at 3. In that posture, the court "must place [itself] in the shoes of defense counsel, the very ones that cannot see the classified record, and act with a view to their interests." *United States v. Sedaghaty*, 728 F.3d 885, 906 (9th Cir. 2013) (citation omitted). As Defendant pointed out in his renewed bond motion, the order does not explain how the Court did so, and it does not appear that any substitute for the withheld material was provided. Crim. Dkt. 822 at 6. Under § 144, the facts the Affidavit states about the order must be accepted as true. *Berger*, 255 U.S. at 36. They are also confirmed by comparing the order with ECF Nos. 61-1 and 61-2.

*2. The Court declined to hear the evidence, and has since described it as irrelevant.* In early 2025, the defense moved for an evidentiary hearing on the Government's suppression of Abramoff-related evidence. The Court denied the motion on February 5, 2025. Crim. Dkt. 535. The next day, the defense moved for reconsideration based on new information. Crim. Dkt. 548. Former defense counsel declared under penalty of perjury that she had learned that then-FBI Special Agent Jonathan Buma could testify, unless the FBI intervened to prevent him, about notes

Abramoff took around May 31, 2018, during a meeting with Ukrainian businessman Alexander Levin and Ukrainian billionaire Igor Kolomoisky. Buma's reading of those notes was that Abramoff's two political-influence campaigns, one of them "a pro-Russia, pro-Putin campaign," were funded "in part, from the promotion and sale of AML Bitcoin." Crim. Dkt. 548-1 ¶¶ 3–4.

The same motion explained how former Treasury official Natalie "May" Edwards's proffered testimony connected to this case. She stated that the suppression of information she witnessed at Treasury from 2016 through 2018 "included information about potential international money laundering by Jack Abramoff," often through "a shell company called Landfair Capital Consulting, LLC." Crim. Dkt. 548 at 2; Crim. Dkt. 548-1 ¶ 5; *see* Crim. Dkt. 529 at 8, ¶¶ 4–6. The case agents themselves called the Landfair Capital account Abramoff's "money connection." Crim. Dkt. 548 at 2 n.3 (citing Recording 1D-39 at 57:24). According to the defense, that account "was used for purchases of AML Bitcoin made by Abramoff and his fellow miscreants and for certain AML Bitcoin expenditures." Crim. Dkt. 548-1 ¶ 5; *see* ECF No. 61-1 at 10–11, ¶¶ 19–21. Separately, former defense counsel declared that counsel for Agent Buma had represented that Buma could confirm Abramoff had been an informant, Crim. Dkt. 657-1 ¶ 9, and other sworn submissions stated that agents were instructed to remove Abramoff-related information from an FBI Form 302. Crim. Dkt. 498-3 ¶¶ 5, 7.

The Court held no evidentiary hearing on any of it. Aff. ¶ 26. It denied the motion for reconsideration the day after it was filed, by a "DENIED" stamp on the defense's proposed order, without a written explanation. Crim. Dkt. 550 (Feb. 7, 2025). At the start of trial, it ruled that it would not allow testimony about matters addressed in the misconduct motion or from witnesses identified in it. Crim. Dkt. 656 at 40 n.57. That ruling kept from the jury Agent Buma's information that Abramoff, contrary to his testimony, had been an informant, as well as further evidence of Abramoff's use of AML Bitcoin for money laundering. *Id.* Then, in denying a new trial, the Court wrote that the defense's misconduct accusations had failed because "Andrade has no evidence beyond his conclusory statements." Crim. Dkt. 694 at 11. The defense had offered that evidence through the very hearing and witnesses the Court declined to hear. At the post-trial hearing, it

declined to hear more about the misconduct motion. Crim. Dkt. 718, Tr. 28:11–15. It called the suggestion that the defense lacked opportunity to pursue Abramoff "laughable," said more Abramoff evidence "would have been completely cumulative," and described Abramoff as "a bit of a sideshow." *Id.* at 14:22–15:22. At trial, it ended the defense's questioning of Agent Quinn about AML Bitcoin materials seized from the home of Russian agent Mariia Butina: "this is not an area — you know this is not an area to go into." Crim. Dkt. 628, Trial Tr. 2283–84; *see* ECF No. 61-2 at 20. In March 2026, it held that the classified information was "utterly irrelevant to the defense" and that "this is a garden-variety fraud case; it is not and has never been about classified information." Crim. Dkt. 828 at 4–5.

3. *The same Abramoff evidence goes to the heart of this action.* The SEC alleges that "[w]ith lobbyist and consultant Jack Abramoff, NAC and Andrade promoted the offering using false and misleading statements." ECF No. 65 at 2 (describing ECF No. 1). The exhibits to this motion describe sworn and documentary evidence that Abramoff, not Defendant, controlled much of that promotion. According to the declaration, Abramoff persuaded Defendant to launch the ICO earlier than planned, issued press releases, orchestrated the Super Bowl advertisement, and wrote a speech promoting AML Bitcoin for a Congressman to deliver on the House floor. ECF No. 61-1 at 4–7, ¶¶ 4–9. Brian Darling and Peter Ferrara told the FBI that Abramoff provided the content for the articles they wrote. *Id.* at 8, ¶ 14. Darling received AML Bitcoin tokens directly from Abramoff for that work. ECF No. 61-2 at 21. Darling confirmed at trial that he sourced his articles through Abramoff, not Defendant. Crim. Dkt. 570, Trial Tr. 743:8, 751:11–19, 755:7–23. The Government's own description was that Darling's paid articles repeated "the lies and misleading statements Andrade and Abramoff were feeding them." Crim. Dkt. 682 at 11. The same is true of the social media accounts on which the Court made its "overwhelming evidence" finding. Crim. Dkt. 694 at 11. The defense showed from the Government's own production that employees maintained the account passwords from late 2017 through 2019: Dylan Pugliese until November 2018, Melanie Cowan until April 2019, and Bernadette Tran through December 2019. It also showed that the list of passwords beginning with Defendant's initials, which the Government used

at trial as Exhibit 805, was created in January 2020, after the period of the alleged misrepresentations. Crim. Dkt. 657-1 ¶ 7; Crim. Dkt. 656 at 13–16. Who controlled those accounts, and who made the statements posted on them, is a central question under *Janus*.

The declaration also states that Abramoff appointed his friend Carlos De La Guardia as AML Bitcoin's Vice President for Latin American affairs, and that De La Guardia "handled the AML Bitcoin communications with the Panama Canal and even authored the Panama press releases." ECF No. 61-1 at 13, ¶ 25. The Government itself told the Court that De La Guardia "helped draft and approve" the "Panama-related press releases." Crim. Dkt. 682 at 27. The Panama representations are among the specific statements the Court has already identified, in its own voice, as lies Defendant knowingly told. Crim. Dkt. 718, Tr. 19:25–20:6 ("specific ones to investors about Panama … he knows they're not true"). At trial, moreover, the Court excluded WhatsApp messages between Abramoff and De La Guardia reporting that the Panamanian law firm Morgan & Morgan had said AML Bitcoin was "something that Panama's ship registry needs," that it was "a project the government should implement," and that when the idea was presented to the Panama Maritime Authority, "they loved it." Crim. Dkt. 656 at 33 (citing Trial Tr. 1237–38; Ex. 2160-046); Crim. Dkt. 694 at 12. Meanwhile, the Government told the jury that Panamanian government interest in AML Bitcoin "didn't exist." Crim. Dkt. 656 at 33 (citing Trial Tr. 208). The Government later dismissed the excluded evidence as "sideshows." Crim. Dkt. 682 at 22–23. Whether the Panama statements were false, who wrote them, and what Defendant had reason to believe about them will all be litigated in this action, before the same judge who excluded that evidence and then called the statements Defendant's knowing lies.

The same evidence describes what Abramoff was doing with AML Bitcoin during the offering period. It includes his written plan to use AML Bitcoin to move funds through Angola, which he said "could enable deposits of more than US$1B per month" in Dubai accounts. ECF No. 61-1 at 6, ¶ 8. It also includes special purchase agreements, circulated under the cover of raising money for the Super Bowl advertisement, which the defense contends were used to siphon funds. *Id.* at 7–8, ¶¶ 11–12, 14.

The CIPA declaration and submission attached to the motion explain why the Angola evidence connected to classified material. They describe Abramoff's written plan, beginning in October 2017, to use AML Bitcoin to move funds from designated Angolan banks into Dubai accounts. ECF No. 61-1 at 6, ¶ 8; ECF No. 61-2 at 12–13. The submission stated that discovery suggested the Angola scheme "was designed to support notorious international money launderer Gennadiy Bogolyubov and Abramoff's pro-Russia agenda." ECF No. 61-2 at 7. It cautioned that some of Abramoff's conduct was "with and/or on behalf of pro-Russian oligarchs in Ukraine" and involved "money laundering through unfriendly countries, reports about which may also be classified." *Id.* at 6 n.3.

The CIPA papers identified that agenda by reference to a specific recording: Abramoff's "Call to Arms" recording, which he sent to Croatian lobbyist Natko Vlahovic. In it, Abramoff calls for a campaign to reverse what he called "horrific" anti-Russian trends in American politics and to pressure Congress. He estimates that the effort would cost $20 million a year for five years and would best be funded by "successful Russians who are supporters of Putin." ECF No. 61-1 at 9–10, ¶ 18; ECF No. 61-2 at 17. Vlahovic is the same person whom Abramoff introduced to AML Bitcoin. Vlahovic then worked on "a statement apparently designed for an official of the Angolan government about Angola exclusively accepting AML Bitcoin," and on draft press releases announcing adoption of AML Bitcoin by the governments of Angola, Slovenia, and Estonia. ECF No. 61-1 at 9–10, ¶ 18. The defense offered to provide the Court with the recording. ECF No. 61-2 at 17 nn.9–10. A copy of the recording is attached to this reply as Exhibit 1. Morgan Decl. ¶ 2 & Ex. 1.

Exhibit 1 is not new evidence. The motion's own exhibits describe the recording and record the defense's offer to provide it, ECF No. 61-1 at 9–10, ¶ 18; ECF No. 61-2 at 17 nn.9–10, and the defense twice filed it in the criminal case. First, on October 6, 2025, the defense filed it as Exhibit J-2, "Abramoff Recording — Russia Funds into USA," to its reply in support of bond. Crim. Dkt. 777-16. Footnote 7 of that filing confirms that the Court had already reviewed evidence submitted to it ex parte on a USB drive, Crim. Dkt. 692-2, before issuing its ex parte order, Crim. Dkt. 701,

and that the drive's contents were to be provided to the Government. Crim. Dkt. 777 at 17 n.7. They were. That evening, defense counsel emailed the exhibits to the reply that could not be uploaded to ECF, including the recording, to the Court's courtroom deputy, with a copy to the Assistant United States Attorney. Morgan Decl. ¶ 2 & Ex. B. The Court denied bond the next day. Crim. Dkt. 781. Second, on December 24, 2025, the defense filed the recording again as Exhibit C to its reply on the surrender date. The placeholder describes it as the Abramoff-Russia recording "[o]riginally filed at Dkt. 777, Exhibit J-2 (Dkt. 777-16)." Crim. Dkt. 811-3. The defense filed a Notice of Manual Filing the same day, Crim. Dkt. 812, and sent the audio files to the courtroom deputy, copying the Government. Morgan Decl. ¶ 2 & Ex. A. At the deputy's direction, the files were uploaded through the Court's digital submission portal. On January 30, 2026, the deputy confirmed: "I see three digital recording files uploaded on 1/6/26." *Id.* The recording is submitted here because the motion relies on it and the SEC's opposition disputes what the criminal court was told. It does not raise a new ground.

Meanwhile, Angola appeared in the promotion of AML Bitcoin itself. In August 2017, Defendant told an associate that "Angola which is in Africa, the president there will endorse AML Bitcoin," and that Abramoff's marketing strategy consisted of "reality shows," "Congress," and "various presidents [of foreign countries] issuing [] public letters of support." ECF No. 61-1 at 5, ¶ 7. During those same months, according to the declaration, Abramoff was privately planning to use AML Bitcoin to move Angolan money to Dubai. *Id.* at 6, ¶ 8. That is the connection between Abramoff's separate activities and the marketing of AML Bitcoin that the Court found did not exist.

The record also shows that Abramoff's interest in both Angola and Defendant's currency predated the ICO by two years. An email Abramoff sent to himself on September 7, 2015, titled "Projects," lists "Angola representation" and "Aten Gold Coin," the name of Defendant's earlier digital currency. Crim. Dkt. 780-2. On October 7, 2025, the same day the Court denied bond, the defense opposed the Government's application for a forfeiture money judgment on related grounds. It contended that Abramoff-controlled entities, namely Pangea, Landfair Capital, and

Sugar Mountain Holding, purchased AML Bitcoin tokens during the ICO and together contributed well over half of the funds raised. Crim. Dkt. 780 at 2. It identified Sugar Mountain Holding as an account seeded in 2015 with approximately $225,000 in cash. That account later sent funds to Block Bits Capital (the Dillman and Mata fund), to Defendant for AML Bitcoin tokens, and to Pangea and Landfair Capital. *Id.* at 2–3 (citing IRS-GJ-0028710); Crim. Dkt. 780-1. The defense asked again for Abramoff's informant file "to determine what conduct Abramoff was authorized to engage in." Crim. Dkt. 780 at 3.

Those questions matter here for a further reason. If the SEC seeks disgorgement, the remedy is limited to net profits from the wrongdoing and must be awarded for the benefit of victims. *Liu v. SEC*, 591 U.S. 71, 79–80 (2020). Whose money funded the offering, whether Abramoff-controlled entities were among the purchasers, and whether any of that conduct was authorized by the Government bear directly on any monetary remedy in this action. They are also the same questions the defense pressed, without an evidentiary hearing, in the criminal case.

Who prepared the promotional statements, for what purpose, and with whose knowledge or authorization will be contested facts in this action. Those facts bear on falsity, on scienter, and on whether Defendant was the maker of the challenged statements. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (the maker of a statement is the person "with ultimate authority over the statement, including its content and whether and how to communicate it").

The Court has already resolved this question against Defendant. It denied the multiple-scheme instruction for want of evidence, Crim. Dkt. 631, Trial Tr. 2673:24–2674:13, after restricting the evidence that would have supported it. In denying a new trial, it described the defense's evidence of Abramoff's separate schemes as "an attempt to muddy the water." It held that, although "Dillman and Abramoff may have had separate plans that cut against Andrade's interests," those plans "were not remotely relevant." Crim. Dkt. 694 at 8–9. It said this although Abramoff had conceded on cross-examination the plan to move Angolan funds through AML Bitcoin into Dubai accounts. Trial Tr. 1858–61; Ex. 3262; *see* Crim. Dkt. 656 at 11. The Court

also excluded the materials seized from Mariia Butina, which reflected Abramoff's campaign to promote deregulation of cryptocurrency, the opposite of Defendant's compliance-based approach. Crim. Dkt. 656 at 33; Ex. 2360; Trial Tr. 2283–84. It later found no "spillover" between Abramoff's activities and Defendant's charged conduct. Crim. Dkt. 781 at 6:7–27; Aff. ¶¶ 33–36. That finding is difficult to square with what the magistrate judge in the same case had found during discovery. She recognized as a theme of the defense that Abramoff was using Landfair Capital and other entities "for his schemes about Mr. Andrade's business that were adverse to Mr. Andrade, at the same time that Abramoff was orchestrating the conduct for which Mr. Andrade has been charged." Crim. Dkt. 165 at 7 (quoted in Crim. Dkt. 548 at 2 n.4). She held that "Mr. Andrade has established a connection to this case surrounding Mr. Abramoff's involvement." The question, she said, was "not just about Mr. Abramoff or Mr. Andrade and AML Bitcoin," but "whether Mr. Abramoff may have been working against Mr. Andrade, and how that affects Mr. Andrade's responsibility and scienter." Crim. Dkt. 165 at 12:15–22 (quoted in ECF No. 61-2 at 8–9). Scienter is an element the SEC must prove here. The FBI's own affidavit, moreover, recounts that Abramoff told FBI undercover agents on June 21, 2017, the same month he proposed the AML Bitcoin ICO, that "the secret Landfair Capital Consulting account" was designed to conceal his involvement in illegal lobbying activity. Crim. Dkt. 548 at 2 n.2 (citing FBI-302-014129 ¶ 24); *see* ECF No. 61-1 at 4, ¶ 6. A reasonable observer would expect the spillover finding to carry into this action, where the SEC's own complaint places Abramoff at the center of the promotion.

*4. Viewed together, the record would leave a reasonable member of the public doubting that the Abramoff evidence received a neutral hearing.* Section 455(a) exists "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). The "reasonable person" whose view controls is a well-informed, thoughtful member of the public. *Holland*, 519 F.3d at 913. Such a person would see the record set out above: the CIPA submission and the order that followed (Part II.C.1); the evidence the Court declined to hear and later called irrelevant (Part II.C.2); the evidence that goes to the heart

of this action (Part II.C.3); and a recording twice filed in the criminal case and confirmed received six weeks before the Court held the classified material "utterly irrelevant." Crim. Dkt. 828 at 4–5.

Defendant does not ask this Court to decide whether those rulings were correct; the Ninth Circuit will. The question under § 455(a) is how they would appear to a well-informed member of the public who knew what the Court had been offered. That observer could reasonably doubt that the Abramoff evidence was weighed on its merits. The observer could also reasonably expect the same treatment if the same evidence were offered in this action, where it bears directly on who made the challenged statements and why. That doubt is what § 455(a) is meant to prevent. Here, unlike in most cases, it can be avoided at no cost, because no proceeding in this action has yet occurred.

*5. A reasonable observer would expect those conclusions to govern discovery and dispositive motions here.* Defendant expects to seek discovery on precisely these subjects: the Government's knowledge of Abramoff's informant status, the alteration and suppression of FBI reports about him, communications among the SEC, the FBI, and other agencies, and testimony from Agent Buma and Ms. Edwards. Aff. ¶ 45. In a civil action, the scope of that discovery is governed by Rule 26(b)(1), not by the criminal discovery rules or the CIPA rulings in the criminal case, and it must be decided on its own record.

A well-informed observer would ask whether a judge who has already characterized that evidence as unexplained, "cumulative," "a sideshow," and "utterly irrelevant" could decide its relevance and proportionality afresh. The observer would ask the same question about the likely next step: an SEC motion for summary judgment, or a motion to give the criminal judgment preclusive effect. Each requires the Court to decide what is genuinely disputed, to view the evidence in the light most favorable to Defendant, and, where necessary, to permit further discovery under Rule 56(d). The observer would perceive a significant risk that those motions would be resolved by applying conclusions the Court has already announced, rather than on the civil record. *Holland*, 519 F.3d at 913. That is the risk § 455(a) exists to prevent. *Liljeberg*, 486 U.S. at 860.

### D. The Filings the SEC Recites Were Not "Rehash."

The SEC quotes the March 11, 2026 Order's list of Defendant's post-sentencing filings to argue that its "frivolousness" remark was "a natural response" to rehashed arguments. ECF No. 65 at 7, 10. The list omits what the filings said. Each raised the CIPA issues, the prejudice to counsel from Defendant's incarceration, or both:

- *Bond reply* (Crim. Dkt. 777, Oct. 6, 2025): argued that the informant file was withheld "potentially through CIPA," *id.* at 16–18 (citing *Sedaghaty*, 728 F.3d at 903), and attached the recording as Exhibit J-2. Crim. Dkt. 777-16. Bond was denied the next day without addressing CIPA, Crim. Dkt. 781; Crim. Dkt. 822 at 7, and the same day the defense again sought the informant file. Crim. Dkt. 780 at 3.
- *First extension* (Crim. Dkt. 788, Oct. 13, 2025), granted: Defendant's input was "indispensable" given "hundreds of docket entries." *Id.* at 2–3.
- *Second extension and reply* (Crim. Dkts. 808, 811, Dec. 2025): the record comprised "nearly 800 docket entries," the appeal raised CIPA and informant issues, and counsel "will be unable to effectively represent Mr. Andrade without his active participation." Crim. Dkt. 808 at 4–5; Crim. Dkt. 811 at 3 & n.4, 6 n.6. The reply re-attached the recording. Crim. Dkts. 811-3, 812.
- *Reconsideration* (Crim. Dkt. 815): counsel was "unable to access or pull the necessary evidence," and the CIPA expert could not proceed without Defendant. *Id.* at 2 & n.1; 9th Cir. No. 25-5095, Dkt. 39.1 at 14.
- *Ninth Circuit emergency motion* (Dkt. 39.1): "[n]either counsel nor the expert can . . . locate the supporting documents without the Appellant," given more than 800 docket entries and nine terabytes of data. *Id.* at 2, 15, 30.
- *Renewed bond motion* (Crim. Dkt. 822): documented the predicted harm, including an exhausted 500-minute phone allowance, refused confidential calls, and a unit

manager's statement that the facility "cannot normally accommodate confidential" attorney meetings. *Id.* at 4–5, 9.

The Court was well informed. The Order itself acknowledges Defendant's argument that "preparing his appeal would be too difficult in prison given its exceptional complexity." Crim. Dkt. 828 at 2. And the Order called CIPA the renewed motion's "only one new issue," *id.*, although the bond and surrender replies had raised it, with the recording, and no order had decided it.[1] Either the renewed motion pressed an undecided issue, and so was not a rehash, or the Court treated CIPA as new, in which case its "frivolousness" label was aimed at the substance of the CIPA argument that the Order then addressed. *Id.* at 1, 3–5. Either way, the SEC's account fails, and the SEC does not deny that the same arguments will be pressed here. ECF No. 65 at 10.

**E. The Motion Is Timely.**

A recusal motion must be made "with reasonable promptness after the ground for such a motion is ascertained." *Preston v. United States*, 923 F.2d 731, 733 (9th Cir. 1991). The rule exists to avoid wasting judicial resources and to prevent litigants from holding a motion in reserve until a ruling goes against them. *Id.*; *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992). Neither purpose is implicated. The SEC identifies no resource that has been spent, and it identifies no adverse ruling in this action that Defendant is trying to avoid.

*1. The ground is prospective, and it ripened when the case was poised to resume.* The § 455(a) concern is not that the Court ruled against Defendant in the criminal case. It is that the Court will adjudicate this action. For more than five years that concern was academic, because by stipulation all proceedings were stayed, and the SEC itself requested the August 2025 extension. ECF No. 65 at 3–4. The SEC accommodated a further extension in April 2026. *Id.* at 7. It first

[1] The renewed motion described the CIPA issues as raised "for the first time in the Ninth Circuit." Crim. Dkt. 822 at 2. That description overlooked both the bond reply in Crim. Dkt. 777, which raised the informant file and CIPA on October 6, 2025, and attached the Abramoff recording as Exhibit J-2 (*id.* at 16–18; Crim. Dkt. 777-16), and the surrender reply in Crim. Dkt. 811, which raised the *Sedaghaty* issue and re-attached the recording on December 24, 2025 (*id.* at 3 & nn.2, 6; Crim. Dkts. 811-3, 812).

asked the Court to lift the stay and set a schedule in its July 13, 2026 status report, and the Court extended the stay over its objection on July 27, 2026, through October 12. *Id.* at 4.

Defendant moved on October 2, 2026, before the stay expired, before any schedule was set, and before any discovery or motion practice began. The SEC argues Defendant should have moved in April or July. But in April the SEC agreed that nothing would happen, and the July report was the first time the SEC sought to restart the case. A litigant cannot be faulted for not seeking recusal from a tribunal that, by the SEC's own acquiescence, was not about to sit.

*2. The SEC's delay narrative is not supported.* The SEC attributes the stay to "Andrade's routine requests," ECF No. 65 at 7. But the SEC's own brief shows that the stay was entered on stipulation in January 2021, was extended at the SEC's request in August 2025, and was extended in April 2026 with the SEC's accommodation. The Court, not Defendant, ordered each extension. The SEC's citations to scheduling requests in Defendant's appeal, ECF No. 65 at 7–8, concern a different court and a different proceeding. They have no bearing on whether this motion was filed with reasonable promptness in this one.

*3. Preston sets a standard, not a deadline, and good cause exists.* The SEC distinguishes *Preston* because the movant there filed ten days after learning the relevant facts. ECF No. 65 at 7. But *Preston* did not announce a ten-day rule. It asked whether the motion was brought with reasonable promptness and whether its purposes were served. 923 F.2d at 733–35. The SEC's own quotation of *United States v. Rogers*, 119 F.3d 1377, 1382 (9th Cir. 1997), confirms that delay "may … be excused for good cause."

Good cause exists here: the stay, the SEC's own agreement to it, the absence of any proceeding for the motion to disrupt, and Defendant's incarceration. The incarceration point is not an after-the-fact excuse. As shown in Part II.D, the Court was warned beginning in October 2025 that incarceration would prevent Defendant from working effectively with counsel. The renewed bond motion documented that it had. Crim. Dkt. 822 at 4–5. Since Defendant's surrender, defense counsel has reported the same privileged-communication difficulties in each status report in this

action, and in July 2026 the Court extended the stay over the SEC's objection. ECF No. 65 at 4, 7 (citing ECF Nos. 55, 56, 58, 63); Aff. ¶ 4.

The § 144 affidavit must be the party's own sworn statement of facts, and a party may file only one. It had to address the same classified, informant-related subjects that, as Defendant's counsel told the criminal court, "should certainly not be discussed in a prison phone booth or among guards." Crim. Dkt. 822 at 9. Defendant had to prepare it from FMC Fort Worth, with a 500-minute monthly phone allowance, paid email, and uncertain access to confidential attorney communication. *Id.* at 4–5 & n.2. That is a legitimate reason it took time to complete. The SEC's response that Defendant has nevertheless filed motions in his appeal, ECF No. 65 at 8, proves little. Preparing a short motion to extend time is not the same as preparing a sworn affidavit that must set out facts and reasons with the specificity § 144 demands.

*4. The SEC's own authority favors reaching the merits.* In *National Abortion Federation*, the court reached the merits despite timeliness concerns "in the interest of completeness and clarity." 257 F. Supp. 3d at 1088. Here, the equities favor that course even more strongly. No ruling has been made in this action, there is no strategic advantage to Defendant, and a decision on the merits now would secure an adjudication that neither party can later question on this ground. Section 455(a), unlike § 144, imposes no affidavit requirement, and a judge may and should consider whether impartiality might reasonably be questioned whenever the question is brought to the court's attention. *United States v. Sibla*, 624 F.2d 864, 867–68 (9th Cir. 1980).

## F. The SEC Misapplies Section 144.

The SEC states that "[c]ourts apply the same substantive standard" under §§ 144 and 455. ECF No. 65 at 5. The substantive question may overlap, but the procedure does not. Under § 144, the facts in the affidavit are accepted as true, and the challenged judge, and any judge deciding legal sufficiency, may not pass on their truth. *Berger v. United States*, 255 U.S. 22, 36 (1921); *Sibla*, 624 F.2d at 867.

To the extent the SEC contests facts the affidavit alleges, including through its own account of the related-case history, that is a dispute for the judge who decides the merits under § 144, not a basis to find the affidavit insufficient. The SEC acknowledges that a party who files a proper motion and affidavit "can get two bites of the apple." ECF No. 65 at 5. Defendant has submitted a sworn affidavit with record citations for each fact, and he asks that it be evaluated as § 144 requires.

**G. The Administrative Events Are Context.**

Defendant has never contended that the 2020 Executive Committee order was Judge Seeborg's act. Aff. ¶ 12. As to the 2025 reassignment, the SEC is correct in part. *Mata* was related to this case and assigned to Judge Seeborg in May 2022, ECF No. 65 at 12; the August 9, 2023 ruling concerned only *Dillman*, Crim. Dkts. 199, 200; and Judge Donato referred *Dillman* sua sponte. *Dillman* Dkt. 65. Defendant corrected the citation in Aff. ¶ 42 by a Notice of Errata filed on October 14, 2026, before the SEC filed its opposition. ECF No. 64. He now also withdraws the characterizations in the motion and in Aff. ¶¶ 42–43 and 46(f) that *Mata* was pending before Judge Donato and that the Court reassigned *Dillman* on its own motion.

The corrected record still describes the same sequence by a different route. In 2023, the Government represented that Dillman's case "arose out of the investigation resulting in the charges" against Defendant, Crim. Dkt. 199 at 2, and the Court found the cases unrelated. Crim. Dkt. 200. In October 2025, the Court related *Dillman* to *Mata*, a case before it only because of Defendant's, and reassigned *Dillman* to itself. *Dillman* Dkt. 66; *Mata* Dkt. 35. Dillman's conduct was central to Defendant's defense, Crim. Dkt. 718, Tr. 16:10–13; an Abramoff-controlled account funded Dillman and Mata's Block Bits Capital, Crim. Dkt. 780 at 2–3; and the Court counted Block Bits sales in the loss calculation. Sent. Tr. 30:6–15. Defendant does not contend that the Local Rules forbade the reassignment. It is cumulative context, and the § 455(a) motion does not depend on it.

## III. CONCLUSION

Defendant respectfully requests that the Court:

1. disqualify Judge Seeborg from further proceedings in this action under 28 U.S.C. § 455(a); or, in the alternative,
2. determine that the Affidavit is timely and legally sufficient under 28 U.S.C. § 144 and refer the request for determination on the merits under Civil Local Rule 3-14; and
3. grant such other relief as the Court deems just.

Dated: October 28, 2026

Respectfully submitted,
CHARLES C. MORGAN LEGAL PRACTICE, LLC

/s/ Charles C. Morgan
Charles C. Morgan (pro hac vice)
Attorney for Defendant
ROWLAND MARCUS ANDRADE